Emilio A. Cazares, Esq., SBN 324810
Cassie N. Holloway, Esq., SBN 328284
C. Tab Turner (motion for admission pro hac vice forthcoming)
**TURNER & ASSOCIATES, P.A.**
1001 B Ave., Suite 308
Coronado, California 92118
Telephone: (619) 537-0007
emilio@tturner.com
cassie@tturner.com
tab@tturner.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

SAMANTHA HANCOCK, ELENA SHAW *on behalf of the* ESTATE OF MICAH SHAW, LUIS ROSA-ALBERTY, and ALEX ROSA-VALENTIN,

Plaintiffs,

vs.

STANDARD CHARTERED BANK and BANK SADERAT PLC,

Defendants.

Case No. '26CV5577 LL VET

**COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS


I. NATURE AND OVERVIEW OF THE ACTION .......... 1

II. JURISDICTION AND VENUE .......... 5

III. DEFENDANTS .......... 6

A. DEFENDANT STANDARD CHARTERED BANK .......... 6

B. DEFENDANT BANK SADERAT PLC .......... 6

IV. IRAN AND THE IRGC'S DESIGNATIONS .......... 7

V. HEZBOLLAH .......... 9

A. HEZBOLLAH'S HISTORY, KEY LEADERS, AND CURRENT ORGANIZATIONAL STRUCTURE .......... 9

1. Hezbollah in Iraq .......... 12

2. Development of the Iraqi Proxies .......... 18

B. HEZBOLLAH'S AND THE IRGC'S AGENTS & PROXIES IN IRAQ .......... 37

1. Asa'ib Ahl Al–Haq ("AAH" or the "League of the Righteous") .......... 37

2. Jaysh al Mahdi's Promised Day Brigades ("PDB") .......... 39

3. Kataib Hezbollah ("KH") .......... 40

4. The IRGC Funded the Design and Production of Explosively Formed Penetrators ("EFPs") Used to Kill or Maim Coalition Forces, Including Plaintiffs .......... 43

C. HEZBOLLAH FINANCING .......... 46

1. Hezbollah's Business Affairs Component ("BAC") .......... 48

2. SCB Customer Lebanese Canadian Bank .......... 51

D. U.S. SANCTIONS AND IRAN'S RELIANCE ON U.S. DOLLARS .......... 54

E. THE FINANCIAL ACTION TASK FORCE AND IRAN'S BANKING SECTOR .......... 55

F. THE IRGC'S REVENUE SOURCES, FINANCING MECHANISMS AND KEY COMMERCIAL ASSETS ........ 56

1. Public Sources Linking NIOC and the Iranian Petrochemical Industry to The IRGC ........ 57

2. NIOC/NITC Were Controlled by the IRGC and Are Closely Intertwined With Its Terrorist Activities ........ 62

3. IRGC'S Crude Oil Exports to Chinese Refineries ........ 65

4. Dubai—A Primary Hezbollah and IRGC Money Laundering Hub Within the UAE ........ 70

5. SCB's Assistance to Hezbollah's Money Laundering Operations in Dubai ........ 71

VI. SCB KNOWINGLY PROVIDED SUBSTANTIAL ASSISTANCE TO HEZBOLLAH AND THE IRGC ........ 79

A. SCB'S OPERATIONS IN THE UNITED ARAB EMIRATES ........ 79

B. SCB KNEW IT OPERATED IN HIGH-RISK JURISDICTIONS WITH HIGH-RISK CUSTOMERS ........ 81

C. SCB WILLFULLY AND INTENTIONALLY CHOSE TO DISREGARD U.S. LAWS, REGULATIONS, AND INTERNAL GUIDELINES ........ 84

D. SCB KNOWINGLY PROVIDED SUBSTANTIAL ASSISTANCE TO HEZBOLLAH SUPER FACILITATORS AND MONEY-LAUNDERING NETWORKS ........ 90

1. Muhammad Bazzi (SDGT) ........ 90

2. The Tajideen Family Network (SDGT) ........ 105

3. Al Zarooni Exchange / Hassan Mohsen Mansour ........ 115

4. Kaloti Jewellery Group / Salor DMCC / Trading Track Company ........ 117

E. SCB KNOWINGLY PROVIDED SUBSTANTIAL ASSISTANCE TO THE IRGC ........ 123

1. MTN–Irancell and TCI ........ 123

2. Reza Zarrab's Network of IRGC Entities ........ 128

3. The IRGC's Smuggling of Oil to Chinese Refineries ............................ 132

VII. BANK SADERAT PLC KNOWINGLY PROVIDED SUBSTANTIAL ASSISTANCE TO HEZBOLLAH ............................ 134

VIII. THE IRGC–QF AND HEZBOLLAH COMMITTED ACTS OF INTERNATIONAL TERRORISM AT THE IRGC'S DIRECTION IN WHICH PLAINTIFFS WERE FORESEEABLY INJURED ............................ 138

IX. THE PLAINTIFFS ............................ 138

1. THE MAY 29, 2007 ATTACK – SADR CITY ............................ 138

2. THE DECEMBER 9, 2007 ATTACK – AZ ZUBAYDIYAH ............................ 138

3. THE APRIL 21, 2008 ATTACK – SADR CITY ............................ 139

CLAIMS FOR RELIEF ............................ 140

FIRST CLAIM FOR RELIEF ............................ 140

SECOND CLAIM FOR RELIEF ............................ 143

THIRD CLAIM FOR RELIEF ............................ 145

PRAYER FOR RELIEF ............................ 147

# I. NATURE AND OVERVIEW OF THE ACTION

1. This is a civil action brought under 18 U.S.C. § 2333(a) of the Anti-Terrorism Act ("ATA"), as amended by 18 U.S.C. § 2333(d) of the Justice Against Sponsors of Terrorism Act ("JASTA"), by American nationals who were injured, and by the estates and families of American nationals who were killed or injured, by reason of acts of international terrorism in Iraq between 2004 and 2011.[1] These attacks were committed, planned, or authorized by the United States-designated Foreign Terrorist Organization ("FTO") Hezbollah[2] in coordination with and under the direction of the Islamic Republic of Iran's ("Iran") FTO-designated Islamic Revolutionary Guard Corps ("IRGC")[3] and its external directorate, FTO-designated IRGC Qods Force ("IRGC–QF"),[4] and their terrorist proxies and agents.

---

[1] Unless otherwise specified, the factual allegations in this Complaint pertain to the period from 2001 to 2011 ("Relevant Period").

[2] Hezbollah is transliterated in a variety of ways. The U.S. government prefers the spelling "Hizballah," but for the sake of consistency, all spellings in the Complaint use the more common iteration, "Hezbollah." In 1997, the U.S. Department of State designated Hezbollah an FTO (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")). *See* U.S. DEP'T OF STATE, FOREIGN TERRORIST ORGANIZATIONS (2025), https://www.state.gov/foreign-terrorist-organizations (last visited Sept. 18, 2026). Hezbollah has remained designated an FTO since that time.

[3] In 2019, the U.S. Department of State designated the IRGC an FTO (as that term is defined in 8 U.S.C. § 1189 of the AEDPA). *See* Press Release, *Designation of the Islamic Revolutionary Guard Corps*, U.S. DEP'T OF STATE (Apr. 8, 2019), https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/. The IRGC has remained designated an FTO since that time.

[4] In 2007, the IRGC–QF was designated a Specially Designated Global Terrorist ("SDGT"). *See* Fact Sheet, *Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism*, U.S. DEP'T OF TREASURY (Oct. 25, 2007), https://home.treasury.gov/news/press-releases/hp644. The IRGC–QF has remained designated an SDGT since that time. In 2019, the U.S. Department of State designated the IRGC–QF an FTO (as that term is defined in 8 U.S.C. § 1189 of the

2. Hezbollah operates as an extension and proxy of the IRGC, but for historical reasons it has been separately designated a Specially Designated Terrorist ("SDT") (1995), FTO (1997), and Specially Designated Global Terrorist ("SDGT") (2001) by the United States.

3. To implement the Iranian regime's terror campaign in Iraq after Saddam Hussein's Baathist regime's 2003 ouster, the IRGC–QF and Hezbollah, under the IRGC's direction, worked together to establish, recruit, train, fund, arm, and direct Iraqi Shi'a proxies, including FTO Kataib Hezbollah ("KH") and FTO Asa'ib Ahl Al-Haq ("AAH"), to attack U.S. and other peacekeeping forces that were supporting Operation Iraqi Freedom (2003–2008) and Operation New Dawn (2009–2011).

4. The weapons the IRGC, IRGC–QF, and Hezbollah provided to their Iraqi Shi'a proxies included a signature anti-armor weapon known as an Explosively Formed Penetrator ("EFP") which was designed by Hezbollah, precision manufactured by the IRGC, and distributed in Iraq by the IRGC–QF.

5. Each attack set forth in the Complaint was committed jointly by FTO Hezbollah, FTO IRGC, and FTO IRGC–QF and their Iraqi proxies as part of a campaign to drive U.S. and Coalition Forces out of Iraq (the "Coalition Forces," constituting U.S. and allied forces in Iraq, were referred to as Multi-National Force–Iraq ("MNF–I")).

6. Defendants are Standard Chartered Bank ("SCB"), a British financial institution, and Bank Saderat Plc ("Bank Saderat"), a London-based, wholly-owned subsidiary of Bank Saderat Iran.

7. Both Defendants knowingly provided extensive and sustained material support to Hezbollah and the IRGC through those respective terrorist organizations'

---

AEDPA). *See* Press Release, *Designation of the Islamic Revolutionary Guard Corps*, U.S. DEP'T OF STATE (Apr. 8, 2019), https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/. The IRGC–QF has remained designated an FTO since that time.

multinational networks of commercial agents, operatives, and facilitators.

8. Both Defendants provided pervasive and systemic support for Hezbollah, including providing it with vital access to the United States financial system.

9. SCB also provided pervasive and systemic support for the IRGC, including providing it with vital access to the United States financial system.

10. The IRGC and Hezbollah have long deployed complex networks of operatives and front-companies across the globe that allow them to move vast sums of illicit funds, evade U.S., European Union ("EU"), and United Nations ("UN") counterterrorism and non-proliferation sanctions, and fund their terrorist operations in Iraq and throughout much of the world.

11. Hezbollah and the IRGC also exploited the weak underbelly of the global regulatory system by strategically operating in jurisdictions with weak or non-existent anti-money laundering ("AML") and financial crime controls and enforcement (including, among others, Lebanon, Syria, Turkey, UAE, The Gambia, Angola, Colombia, Paraguay, and Venezuela), and lax oversight of high–risk commodity-based enterprises (including, among others, conflict diamonds, gold, crude oil, bulk-cash currency exchange, and narcotics trafficking).

12. During the Relevant Period, Iran's revenues from export sales of crude oil and natural gas via the National Iranian Oil Company ("NIOC") and its subsidiaries were the largest source of the IRGC's revenues (which it shared in part with Hezbollah). But, as detailed below, with the help of the IRGC, Hezbollah's Islamic Jihad Organization ("IJO")[5] developed its own "Business Affairs Component" ("BAC") which provided the IRGC with alternative ways to launder oil-

[5] The IJO is the component within Hezbollah responsible for procurement, intelligence, counterintelligence, surveillance, planning, coordination, and execution of terrorist attacks against Hezbollah's and Iran's targets, including in Iraq during the Relevant Period.

related revenues and additional funding streams and trafficking routes via Hezbollah's illegal trade in conflict diamonds, gold, weapons, and narcotics.

13. The BAC also provided Hezbollah and the IRGC with alternative methods to access military equipment, industrial merchandise, advanced technologies, and commercially available dual-use goods that Iran could not legally obtain in international markets due to counterterrorism and counter-proliferation sanctions.

14. SCB knowingly, actively, and substantially assisted Hezbollah's BAC and its money laundering networks on behalf of Hezbollah's crude oil, refined gasoline and diesel fuel, conflict diamonds, gold, weapons, and narcotics traffickers.

15. SCB's assistance for Hezbollah and IRGC money launderers like Reza Zarrab was consistent with its overall policy of facilitating illicit finance.

16. Bank Saderat was designated an SDGT by the United States in 2007 for, *inter alia*, transferring vast sums of U.S. dollars—some of it laundered by SCB—to Hezbollah.

17. Indeed, the U.S. Treasury Department reported on September 8, 2006, that "Bank Saderat facilitates Iran's transfer of *hundreds of millions of dollars to Hezbollah* and other terrorist organizations each year."

18. As set forth in detail below, both Defendants were aware of their respective roles in these illegal activities and both Defendants' conduct was pervasive and systemic involving multiple customers and multiple illicit schemes—all perpetrated over multiple years and encompassing the Relevant Period—and involving hundreds if not thousands of illicit transactions totaling billions of U.S. dollars for the benefit of Hezbollah and the IRGC.

19. Given Defendants' full knowledge of their own respective key roles in the criminal activities of their Hezbollah and (in SCB's case, also) IRGC-affiliated customers and counterparties and their knowledge that they were specifically breaking laws intended to prevent the financing of terrorism, the acts of international

terrorism that injured Plaintiffs were a foreseeable (if not inevitable) risk of Defendants' illicit and proscribed conduct.

20. Each act of international terrorism at issue here was a foreseeable consequence of Defendants' pervasive and systemic assistance to Hezbollah and (in SCB's case, also) the IRGC, particularly by assisting their terror financing efforts.

21. Based on the factual allegations set forth below, both Defendants are liable to all Plaintiffs for the injuries they have sustained as a result of these acts of international terrorism.

## II. JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2333(a) and (d), and 18 U.S.C. § 2338 as a civil action brought by nationals of the United States who have been injured by reason of acts of international terrorism, and/or their estates, survivors, or heirs.

23. Venue is proper in this District pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391(b) and (d).

24. SCB is subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a) and Fed. R. Civ. P. 4(k)(1)(C).

25. Defendant SCB is additionally subject to personal jurisdiction in this district pursuant to Rule 4(k)(1)(A) and Cal. Code Civ. Proc. § 410.10 because it maintains a branch office in San Francisco, California.

26. To the extent SCB is not subject to the personal jurisdiction of California's courts of general jurisdiction, it is subject to this Court's personal jurisdiction under Rule 4(k)(2).

27. Bank Saderat is subject to this Court's personal jurisdiction under Rule 4(k)(2).

28. Defendants' unlawful conduct was purposefully directed at the United States, and specifically designed to effectuate the flow of billions of U.S. dollars through the United States in violation of U.S. laws.

## III. DEFENDANTS

### A. DEFENDANT STANDARD CHARTERED BANK

29. Defendant Standard Chartered Bank PLC is one of the world's largest multinational banks, with over 1,700 branches, offices, and outlets in more than 70 countries.

30. Headquartered in London, the bank operates principally through its branches and subsidiaries in Asia, Africa, and the Middle East, and it has operations in consumer, corporate and institutional banking, and treasury services.

31. Since 1976, SCB has had a license issued by the State of New York to operate as a foreign bank branch in New York, New York ("SCB–New York"). The New York branch provides wholesale banking services, primarily U.S. dollar clearing and settlement services for international wire payments through CHIPS and the Federal Reserve Board of New York ("FRBNY").

32. Although SCB operates branches and subsidiaries across the globe, during the Relevant Period, its compliance functions were centralized and under the direct and ultimate supervision of SCB's management in London, responsible for both monitoring and prevention of terror financing by all branches and subsidiaries within the SCB group, including its branches and offices in the United States, Africa, and the Middle East.

### B. DEFENDANT BANK SADERAT PLC

33. Bank Saderat Iran is one of the largest banks in Iran. It has approximately 3,400 offices worldwide, including, as discussed below, a United Kingdom subsidiary (Defendant Bank Saderat Plc), and branches in Frankfurt, Paris, Athens, Dubai, and Beirut.

34. Bank Saderat Iran was nationalized after the Iranian Revolution in 1979 but allegedly privatized in 2009. According to Bank Saderat Iran, 49% of its shares are owned by the Iranian government, but it is technically a non-governmental entity.

35. In 2002, Bank Saderat Iran's London bank branch became a wholly-

owned bank subsidiary, incorporated under United Kingdom law (i.e. Defendant Bank Saderat Plc).

36. Bank Saderat Plc is the legal successor in interest to the Iran Overseas Investment Bank ("IOIB"), London.

37. IOIB changed its name to Bank Saderat Plc in March 2002.

38. Defendant Bank Saderat Plc maintains its principal office in London, United Kingdom.

39. Both Bank Saderat Plc and Bank Saderat Iran were designated SDGTs by the United States in October 2007 for their roles in financing Hezbollah and the IRGC.

## IV. IRAN AND THE IRGC'S DESIGNATIONS

40. Since the Iranian Revolution in 1979, Iran has been a principal source of extremism and terrorism throughout the Middle East and the rest of the world, responsible for bombings, kidnappings, and assassinations across the globe.

41. The United States designated Iran a State Sponsor of Terrorism on January 19, 1984.

42. That designation has remained in force since that time, including throughout the Relevant Period.

43. The IRGC has itself been separately designated by the United States as an SDGT in 2017 and an FTO in 2019.

44. As the U.S. Department of State noted in 2019, the designation of the IRGC was based on its history of supporting terrorism since the 1980's: "Iran is an outlaw regime that uses terrorism as a key tool of statecraft and … the IRGC, part of Iran's official military, has engaged in terrorist activity or terrorism since its inception 40 years ago."

45. In announcing the designation of the IRGC as an FTO, the President affirmed, "[t]he IRGC is the Iranian government's primary means of directing and

implementing its global terrorist campaign." He also said: "If you are doing business with the IRGC, you will be bankrolling terrorism."

46. The success of the IRGC's terror campaigns relied on its terror financing facilitated by Defendants and others. Its FTO designation observed that "the IRGC continues to provide financial and other material support, training, technology transfer, advanced conventional weapons, guidance, or direction to a broad range of terrorist organizations, including Hizballah, … Kata'ib Hizballah in Iraq … and other terrorist groups."[6]

47. The IRGC is a paramilitary force answerable only to the Supreme Leader of Iran himself, to whom the IRGC's devotion is "a religious imperative."

48. As the U.S. Department of Treasury explained in designating the IRGC an SDGT, "[t]he IRGC has played a central role to Iran becoming the world's foremost state sponsor of terror." Treasury also designated the IRGC "for the activities it undertakes to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of" its foreign operations directorate, the IRGC–QF.[7]

49. In 2017, Congress found that the IRGC–QF "is the primary arm of the Government of Iran for executing its policy of supporting terrorist and insurgent groups. The IRGC–QF provides material, logistical assistance, training, and financial support to militants and terrorist operatives throughout the Middle East…."

50. According to the U.S. Department of State's *Country Reports on Terrorism 2008*:

---

[6] Press Release, *Designation of the Islamic Revolutionary Guard Corps*, U.S. DEP'T OF STATE (Apr. 8, 2019), https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/.

[7] *See* Press Release, *Treasury Designates the IRGC under Terrorism Authority and Targets IRGC and Military Supporters under Counter-Proliferation Authority*, U.S. DEP'T OF TREASURY (Oct. 13, 2017), https://home.treasury.gov/news/press-releases/sm0177.

> The Qods Force, an elite branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating and supporting terrorists abroad. The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hezbollah, Iraq-based militants, and Taliban fighters in Afghanistan.…

## V. HEZBOLLAH

### A. HEZBOLLAH'S HISTORY, KEY LEADERS, AND CURRENT ORGANIZATIONAL STRUCTURE

51. Inspired by the success of Iran's Islamic revolution and influenced by the ideological worldview of Iran's first (late) Supreme Leader, Ayatollah Ruhollah Khomeini, young Shi'a fanatics built a network in Lebanon that was directly answerable to him—Hezbollah.

52. Since the early 1980s, Iran's IRGC has helped Hezbollah equip itself not only with vast supplies of weapons and explosive devices but also with broadcasting, healthcare, and educational centers to expand Hezbollah's political and social reach within Lebanon.

53. After its founding, Hezbollah evolved into a multifaceted, sophisticated, highly organized, politically powerful, and well-financed terrorist organization.

54. Hezbollah now resembles a multinational corporate or governmental entity, with departments, agencies, branches, in-house banking, insurance, and other financial services, and media outreach. Its estimated enterprise value is worth billions of U.S. dollars.

55. Notwithstanding Hezbollah's multifaceted nature, it is a single, unified entity dedicated to religiously inspired terrorism.

56. As current leader of Hezbollah Naim Qassem has stated, "If the military wing were separated from the political wing, this would have repercussions, and it would reflect on the political scene. But Hezbollah has one single leadership, and its

name is the Decision-Making Shura Council. It manages the political activity, the Jihad activity, the cultural and the social activities...Hezbollah's Secretary General is the head of the Shura Council and also the head of the Jihad Council, and this means that we have one leadership, with one administration."[8]

57. U.S. assessments echo Qassem's description: "Hezbollah has a unified leadership structure that oversees the organization's complementary, partially compartmentalized elements," according to a Congressional Research Service report.[9]

58. Hezbollah has a sophisticated organizational structure. A key component is the Jihad Council, which is responsible for its paramilitary and terrorist activities.

59. The Jihad Council overseas the terrorist organization's "resistance" operations, including oversight of operations, recruitment, training, equipment procurement, and internal security.

60. Hezbollah's terror apparatus, the above-mentioned Islamic Jihad Organization ("IJO") (a/k/a External Security Organization), is a substantial component of its Jihad Council.

61. The Jihad Council established the IJO in 1983 after Hezbollah's terrorist attack in Beirut on U.S. military personnel conducting UN peacekeeping operations in Lebanon.

62. As a sub-directorate of the Jihad Council, the IJO works alongside, but is distinct from, Hezbollah's domestic militia activity in Lebanon.

---

[8] Naim Qassem, interview with al-Mustaqbal, December 31, 2000, as cited in Center for Special Studies, Intelligence and Terrorism Information Center special information bulletin, "Hezbollah," June 2003. http://www.terrorism-info.org.il/malam_multimedia/English/eng_n/html/hezhollah.htm.

[9] Casey L. Addis and Christopher M. Blanchard, "Hezbollah: Background and Issues for Congress," Congressional Research Service, January 3, 2011.

63. The IJO is functionally responsible for procurement, intelligence, counterintelligence, surveillance, planning, coordination, and execution of terrorist attacks against Hezbollah's and Iran's enemies outside of Lebanon.

64. When former Hezbollah leader Hassan Nasrallah met with Iran's (late) second supreme leader, Ayatollah Ali Khamenei, in 2001, Nasrallah publicly kissed Khamenei's hand, a gesture heavy with meaning among the Shi'a: it implied that Nasrallah accepted Khamenei as his leader.

65. Hezbollah had developed advanced tactical capabilities through the battlefield experience of attacking the Israel Defense Forces ("IDF") in southern Lebanon, including the use of roadside bombs featuring remote detonators and passive infrared ("PIR") switch systems.

66. Beginning in 1985, Israel established and maintained a security buffer zone in southern Lebanon along its border with Lebanon to prevent Hezbollah attacks into northern Israel.

67. By the late 1990s, Hezbollah effectively deployed EFPs against IDF armor and had developed sophisticated tools to defeat IDF countermeasures.

68. For 15 years, the IDF maintained this buffer zone until increasing IDF casualties precipitated an Israeli withdrawal in 2000 to its internationally recognized border with Lebanon.

69. During that 15-year period, southern Lebanon served as a laboratory for Hezbollah to hone its tactical war fighting skills and weapons development.

70. The accumulated experience Hezbollah gained through its decades-long campaign against the IDF also included developing precision use of indirect fire weapons and employing Iranian-provided 107mm and 122mm rockets to launch indirect fire attacks on Israeli fortified outposts and on Israel itself.

71. Hezbollah's tactics evolved and improved over time. These including developing the EFP in confrontations against Israeli armor. As noted above, EFPs are

explosive devices with liners (usually made of copper) shaped like an inverted metal dish or platter. Hezbollah continuously improved on the design.

### 1. Hezbollah in Iraq

72. At the IRGC's direction, Hezbollah and the IRGC–QF worked symbiotically to plan, authorize, and commit attacks on Coalition Forces in Iraq. They accomplished this by establishing Iraqi Shi'a proxy groups, providing them with funding, weapons, and training, and then guiding and directing them to attack Coalition Forces.

73. Specifically, the IRGC–QF and Hezbollah provided these proxies with sophisticated weapons specially designed to inflict casualties on the well-protected Coalition Forces—principally, EFPs and Improvised Rocket-Assisted Munition ("IRAMs"), along with the tactics, techniques, and procedures ("TTPs") developed by Hezbollah necessary to use them most effectively.

74. These Shi'a proxies included:

- Badr Corps (Badr Organization);
- Jaysh al-Mahdi ("JAM"), including the Promised Day Brigades;
- Asa'ib Ahl Al-Haq ("AAH" or the "League of the Righteous"); and
- Kataib Hezbollah ("KH") (designated an FTO in 2009).

75. In 2003, Hezbollah began to successfully export its TTP to Iraq – particularly its experience deploying EFPs against High Mobility Multipurpose Wheeled Vehicles ("HMMWVs"), including hiding EFPs inside fiberglass "rocks" painted to match the limestone geology of South Lebanon.

76. Hezbollah's transfer of TTP was critical to the effectiveness and lethality of its proxies in Iraq that murdered and maimed more than a thousand Americans between 2004 and 2011.

77. The IRGC provided EFPs to these proxies for the *exclusive* purpose of targeting Coalition Forces, and Hezbollah's advanced EFP training was provided

exclusively to these cells to improve their emplacement of EFPs against Coalition armored vehicles. The IRGC and Hezbollah were the sole sources of the weapons.[10]

78. These proxy terror cells served as EFP emplacers (or in some cases, trigger pullers) for the IRGC and Hezbollah. They were generally not permitted to use their independent judgment in choosing their targets (they were often directed to select a particular date or location for an attack, and were even required to provide visual evidence that they had carried out the IRGC's directives).

79. If a proxy group or cell failed to comply with the IRGC's directives it could be deprived of EFPs and other support. EFPs were carefully controlled. For example, "[e]ach major arms cache [had] a 'hide custodian' who signs out weapons such as EFPs and is responsible for their proper use against U.S. forces and the minimization of Iraqi casualties."[11] When EFPs were misused, the IRGC cut the group off.[12]

80. The IRGC delivered other weapons to these groups as well, as described below.

81. One of the first indications that Hezbollah operatives might be present in Iraq after the U.S.-led invasion came in an article in *The New York Times* published in November 2003:

---

[10] In 2007, when AAH founder Qais Khazali was captured by Coalition Forces, he acknowledged that "EFPs still come solely from Iran and there is currently nobody in Iraq manufacturing the components of an EFP."

[11] *See* Michael Knights, *The Evolution of Iran's Special Groups in Iraq*, CTC SENTINEL (U.S. Military Academy at West Point) (Nov. 2010), https://ctc.westpoint.edu/wp-content/uploads/2011/05/CTCSentinel-Vol3Iss11-127.pdf.

[12] On rare occasions, certain elements defied this directive. For example, EFPs were used in the assassinations of two provincial governors and two provincial police chiefs in the latter half of 2006. The U.S. military assessed that these events were contrary to IRGC policy.

> Both American and Israeli intelligence have found evidence that Hezbollah operatives have established themselves in Iraq, according to current and former United States officials. Separately, Arabs in Lebanon and elsewhere who are familiar with the organization say Hezbollah has sent what they describe as a security team of up to 90 members to Iraq.

82. By the summer of 2004, British intelligence had detected the EFP's appearance in southern Iraq, which it "associated with Lebanese Hezbollah." It also noted "indications of Iranian involvement in the construction of the devices."

83. On December 2, 2004, a British Defence Intelligence Report noted "an influx of Lebanese Hezbollah IED technology under Iranian sponsorship."

84. Similarly, the U.S. Department of State's *Country Reports on Terrorism 2006* reported the following about Hezbollah's activities in Iraq:

> Since at least 2004, Hezbollah has provided training and logistics to select Iraqi Shia militants, including for the construction and use of shaped charge IEDs, which Hezbollah developed against Israeli forces in southern Lebanon during the late 1990s and which can penetrate heavily armored vehicles.

85. In 2006, the Australian government reported the following regarding Hezbollah's "Unit 3800" and the IRGC–QF:

> Hezbollah has established an insurgent capability in Iraq, engaging in assassinations, kidnappings and bombings. The Hezbollah units have been set up with the encouragement and resources of Iran's Revolutionary Guards al Qods Brigades. Hezbollah has also established a special training cell known as Unit 3800 (previously known as Unit 2800) specifically to train Shia fighters prior to action in Iraq.

86. Unit 3800 was established by then-Hezbollah leader Hassan Nasrallah at Iran's behest.

87. Unit 3800 trained, advised, and directed Iran's Shi'a proxy groups in Iran.

88. The IRGC–QF Department of Special External Operations (Department 9000) was responsible for providing weapons to its favored Shi'a proxy groups.

89. A 2010 Department of Defense report stated that weapons the IRGC delivered to its proxies in Iraq included EFPs (with radio-controlled, remote arming, and passive infrared detonators), IEDs, anti-aircraft weapons, mortars, 107 and 122mm rockets, rocket-propelled grenades and launchers, explosives, and small arms.[13]

90. It also noted that "Lebanese Hezbollah provides insurgents with the training, tactics, and technology to conduct kidnappings, small unit tactical operations and employ sophisticated IEDs." U.S. and Coalition Forces' discovery and exploitation of weapons caches in Iraq frequently evidenced the Iranian source of the arms through their markings or inventory documents.

91. These developments were reported in the international media. By 2006 and 2007, EFPs were a defining feature of the U.S. presence in Iraq in public reporting—but reports of Iran's and Hezbollah's use of their proxies in Iraq to attack U.S. and Coalition Forces, including the EFPs, dates back even earlier.

92. As early as mid-2004, the *New Republic* reported that "Shia militias enjoy the backing of Iran…."

93. In mid-2005, British forces reported on weapons smuggling from Iran, including "timers, detonators and other bomb-making equipment." The smuggling group "had the 'fingerprints' of either Iran's Revolutionary Guard, … or the Lebanese based Hezbollah which Tehran backs."[14]

---

[13] U.S. DEP'T OF DEFENSE, REPORT ON THE MILITARY POWER OF IRAN 2–3 (2010), https://fas.org/man/eprint/dod_iran_2010.pdf.

[14] The *Guardian*, "Iranian arms intercepted at Iraqi border: Britain warns Tehran about weapons smuggling" (Aug. 11, 2005).

94. In October 2005, a British news source reported that Iran provided the militia with highly sophisticated tools and intelligence, including that: "They are believed to have supplied armour-piercing explosives to Shia militia."

95. The report continued:

> Iraqi insurgents are being fed Iranian satellite images of our Army bases. Terrorists will soon be able to record British troop movements and view real time video footage of military vehicles and personnel.
>
> Iraq's neighbour Iran puts its first spy satellite into orbit later this month-and UK Foreign Office sources last night warned that the Iranian Revolutionary Guard is passing pictures to Iraqi rebels.

96. Also in 2005, *The Times* (UK) reported on accusations from the British government that the IRGC was supplying EFPs to Shi'a militia, using Hezbollah agents:

> The British Government provoked a war of words with Iran last month when it accused the country's Revolutionary Guard of supplying the technology for the bombs, which use infra-red "trip wires" to set off explosives as a military vehicle passes. The bombs use a shaped charge, capable of piercing armour, believed to have been developed in Iran.
>
> The complex technique was first mastered by the Iranian-backed Hezbollah organisation in Lebanon. British officials believe that the technology has now come to southern Iraq via Hezbollah's backers in Iran. The Iranian Government has denied the accusations.

97. Iran's and the IRGC-QF's own designations as sponsors of terrorism, discussed above, expressly identify their role in Iraq specifically.

98. The U.S. government has found that the IRGC "has been directly involved in terrorist plotting; its support for terrorism is foundational and institutional, and it has killed U.S. citizens," and specifically that Iran is responsible "for the deaths

of at least 603 American service members in Iraq since 2003" — a number that includes some of the deceased family members of Plaintiffs herein.

99. The IRGC was designated an FTO on April 15, 2019, in part for its role in killing Americans in Iraq. The designation press release explained:[15]

> The Iranian regime is responsible for the deaths of at least 603 American service members in Iraq since 2003. This accounts for 17% of all deaths of U.S. personnel in Iraq from 2003 to 2011, and is in addition to the many thousands of Iraqis killed by the IRGC's proxies.

100. In October 2007, the U.S. Department of Treasury designated the IRGC–QF as an SDGT, finding:

> The Qods Force has had a long history of supporting Hezbollah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hezbollah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hezbollah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hezbollah and has assisted Hezbollah in rearming in violation of UN Security Council Resolution 1701. …

101. On January 9, 2008, the U.S. Department of Treasury designated Ahmad Foruzandeh, a Brigadier General in the IRGC–QF, finding:

> As of mid-February 2007, Foruzandeh ordered his Iranian intelligence officers to continue targeting Shia and Sunnis to further sectarian violence within Iraq. Foruzandeh is also responsible for planning training courses in Iran for Iraqi militias, including Sayyid al-Shuhada and Iraqi Hezbollah [KH], to increase their ability to combat Coalition Forces. The training includes courses in guerilla warfare, light arms, marksmanship, planting improvised explosive devices (IEDs), and firing anti-aircraft missiles.

---

[15] Press Release, *Designation of the Islamic Revolutionary Guard Corps*, U.S. Dep't of State (Apr. 8, 2019), https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/.

### 2. Development of the Iraqi Proxies

102. Muqtada al-Sadr is an Iraqi Shi'a cleric and the son of Grand Ayatollah Muhammad Sadiq al-Sadr, a revered religious leader assassinated by the Hussein regime in 1999. Muqtada al-Sadr inherited leadership of his father's movement, known as the Sadrist Movement, a mass religious, social, and political movement with deep grassroots support among Iraq's poorer Shi'a communities.

103. Muqtada al-Sadr's Sadrist Movement commanded the loyalty of perhaps millions of Iraqi Shi'a, but under the Hussein regime's rule it had no military capacity; it was almost exclusively a social and political movement.

104. The 2003 U.S.-led invasion freed Muqtada al-Sadr and his followers from the constraints placed on them by the Hussein regime, and the young Sadr set his sights on becoming the preeminent leader of Iraq's Shi'a community.

105. At the invitation of Ayatollah Khamenei, Sadr and his key deputies were formally received in Iran in June 2003, shortly after the U.S. invasion. General Abdul Reza Shahlai—a deputy commander of the IRGC–QF—served as the "chief of protocol" for the visit, and Qasem Soleimani, then IRGC–QF Commander, served as host to the Sadr delegation.

106. Sadr met with Ayatollah Khamenei during the visit and received assurances from General Shahlai that the IRGC–QF wanted to financially support the Sadrist movement.

107. Shortly thereafter, the IRGC dispatched two of Hezbollah's most senior terror operatives, Imad Mughniyah and Mustafa Badr al-Din, to help organize and birth the creation of the Sadrist Movement's armed faction.

108. Hezbollah operatives were present on the ground in Iraq following the U.S. invasion in 2003 and were directly involved in providing training and support to JAM from its inception.

109. Imad Mughniyah and Mustafa Badr al-Din worked closely both with Sadr and his associates and the Iranian-sponsored Badr Corps (made up of Iraqi Shi'a who opposed the Hussein regime during the 1980–1988 Iran-Iraq War), but Hezbollah remained cautious and did not encourage either Badr or JAM to immediately confront Coalition Forces.

110. As former Badr Corps leader and "Special Group" (lethal forces split off from JAM, described further below) Kataib Hezbollah (KH) founder Abu Mahdi al-Muhandis (discussed below) would later explain to the Hezbollah-affiliated channel *Al-Mayadeen*:

> *Al-Muhandis*: Of course, my relationship with martyr Imad, the great martyr Imad [Mughniyah], and martyr Mustafa Badr a-Din, started in the early 1980s. This was a strong and operational relationship. The first ones to train the first Iraqi jihadi resistance groups in the beginning of the 1980s were Imad and Mustafa. They also had a major role in organizing the resistance cells against the Americans in Iraq.
>
> *Host*: Training Iraqis here, to fight the Americans?
>
> *Al-Muhandis*: Sure, they trained Iraqis. The first Iraqi cells, I was among them, after 2003…. They had a major role; their brothers and men still have an essential role in training and planning… they have a very important role.

111. The same al-Muhandis was the mastermind of the 1983 bombings of the U.S. Embassy in Kuwait City, and he later became the founder of KH in Iraq and an advisor to Qassem Soleimani, then commander of the IRGC–QF. (The two men were both killed in the same airstrike in January 2020.)

112. Mustafa Badr al-Din, one of Hezbollah's leading bombmakers at the time, was arrested by Kuwait after the 1983 attacks and convicted for his role in the bombings. He later became a leading figure in Hezbollah after his escape from a Kuwaiti prison.

113. In 2008, Imad Mughniyah was killed in Syria.

114. Ten years after his death, several of Mughniyah's former protégés gathered at an elaborate ceremony to pay tribute to him and extol his contributions to the terror campaign he helped launch in Iraq.

115. At an event commemorating the anniversary of Mughniyah's death, on February 23, 2018, several Iraqi Shi'a notables spoke, including al-Muhandis, who declared: "The martyr Mughniyah is still present in all fields of confrontation as [part of] a jihadist school that terrorized the enemies...."

116. Qais Khazali (discussed below), also in attendance, asserted that "[t]he pillars of the Islamic Resistance that took place in Iraq were the fruit of the martyr Mughniyah."

117. Khazali went on to say:

> I got to know him in 2003 or 2004. At that time when I met him, I didn't know that he is Imad Mughniyeh. I only knew him as "Haj Radwan." Imad Mughniyah was the person behind the Iraqi Resistance against the American occupation of Iraq. The first generation of the commanders of the Resistance were the product of Mughniyah's training.

118. Although Mughniyah was a key figure in Hezbollah's operational (terrorist) activities in Iraq, the terrorist organization's political and diplomatic role in guiding Iraqi Shi'a factions was of equal, if not greater, importance.

119. For this purpose, Hezbollah tapped a senior member of its Political Council, Muhammad Kawtharani, to be responsible for the organization's Iraq portfolio.

120. As the U.S. Department of Treasury noted when it designated him an SDGT on August 22, 2013, Kawtharani was:

> [T]he individual in charge of Hezbollah's Iraq activities, Kawtharani has worked on behalf of Hezbollah's leadership to promote the group's interests in Iraq, including Hezbollah efforts

> to provide training, funding, political, and logistical support to Iraqi Shi'a insurgent groups.

121. Kawtharani was an inspired choice because he not only previously lived in Iraq but had also been a pupil of Ayatollah Muhammad Sadiq al-Ṣadr.

122. Kawtharani wasted no time in contacting one of Muqtada al-Sadr's most trusted deputies, Mustafa al-Yaqubi, soon after (and possibly before) the overthrow of the Hussein regime by Coalition Forces in March 2003.

123. Mustafa al-Yaqubi had frequent contact with Kawtharani through the years and appears to have served as a primary channel for communications between Hezbollah, Sadr, and his JAM proxy group.

124. According to one of MNF–I's Tactical Interrogation Reports documenting an interview of al-Yaqubi, the Hezbollah and IRGC backed As'aib Ahl al-Haq leader:

> Mustafa al-Yaqubi has frequent contact with Lebanese Hezbollah. He speaks often by phone with al-Kawtharani, who is Lebanese Hezbollah's political spokesperson on Iraq issues. Al-Kawtharani has served in that position since shortly after Saddam Hussein's regime fell. Al-Kawtharani is a former student of the Najaf al-Hawza. But he is Lebanese-one of two Lebanese students who attended. He and Mustafa discuss major events that take place in Iraq.[16]

125. From June 2003 through August 2004, at the IRGC's direction, Hezbollah organized and trained JAM gunmen, instilled organizational discipline and professionalism into the nascent militia and slowly built up its capabilities so that it could effectively threaten U.S. and Coalition Forces across Iraq.

---

[16] MULTI-NATIONAL FORCES–IRAQ, TACTICAL INTERROGATION REPORT OF QAIS AL-KHAZALI, TIR N122A–28 (28th Interrogation) (April 5, 2007).

126. According to a 2007 Multi-National Forces – Iraq ("MNF–I") report, "members of the Sadr movement have deep respect for Lebanese Hezbollah…. Hezbollah sends trainers to Iran to train Iraqi fighters on EFPs."

127. For instance, Muqtada al-Sadr's father-in-law was Grand Ayatollah Muhammad Baqir al-Sadr, who was a contemporary of Hezbollah's spiritual leader, Muhammad Fadlallah.

128. Hezbollah's former leader, Hassan Nasrallah, received his religious education in Lebanon from a seminary that taught Baqir al-Sadr's teachings on Shi'ism.

129. Due to its conflict with Israel in Lebanon, Hezbollah also possessed hard-earned specialized knowledge on how to deploy new tactical and technological countermeasures against a modern army.

130. Yet, despite the affinity between Hezbollah and the leaders of the Sadrist Movement, when Hezbollah slowly began to introduce EFPs into Iraq in small numbers at the IRGC's direction (during the late autumn of 2003 and into the first half of 2004), it did so through Iran's other, more established proxy, the Badr Corps, instead of JAM.

131. Unlike JAM, the Badr Corps had prior (and extensive) military training from, and its operatives had long-standing operational ties to, both the IRGC–QF and Hezbollah.[17]

132. Most notable among the Badr Corps cells was the so-called "Sheibani Network" named after Hamid A'atabi al-Sheibani, also known as Abu Mustafa al-Sheibani.

---

[17] The Badr Corps had long established four geographic commands inside Iraq, all with experience conducting attacks against the Hussein regime. The Baghdad-based command was supervised from an IRGC base in nearby Bakhtaran, Iran, by Abu Mustafa al-Sheibani, whose extensive smuggling routes were used both before and after the 2003 U.S.-led invasion for transporting weapons, men, and money from Iran into Iraq.

133. Accordingly, when Hezbollah introduced its most effective anti-armor weapon into Iraq, it began by training Badr Corps operatives on the emplacement of single EFPs with relatively primitive initiation systems—a process that allowed Hezbollah to test the weapons, assess the capabilities of its Iraqi proxies, and probe Coalition Forces' responses to the threat.

134. According to the Chilcot Report released by the British Government describing Britain's role in the Iraq conflict, "[t]he first IED attack in Iraq using an Explosively Formed Projectile (EFP) took place against a UK Warrior vehicle in al-Amara in May 2004."

135. By this method of slowly introducing the weapon system and directing its use against British forces, Hezbollah was able to assess the capabilities of the Badr Corps personnel, assess the effectiveness of its tactics, techniques, and procedures, and adjust those TTPs based on how first British (and later American) forces responded.

136. At the same time it was supplying the Badr Corps with the initial training and direction to launch EFP attacks against Coalition Forces, Hezbollah also provided training and logistical support to JAM, though it did not initially furnish JAM operatives with EFPs.

137. A Sadrist uprising led by armed JAM forces in August 2004 in the Shi'a holy city of Najaf would soon change the direction of the conflict.

138. JAM forces launched an uprising and confronted U.S. Marines, other U.S. Army units, and their tactical air support.

139. As a result, JAM suffered significant casualties.

140. Over the course of approximately three weeks, the U.S. military lost nine soldiers and Marines.

141. By contrast, an estimated 1,500 JAM fighters were killed and an undetermined number, most likely in the thousands, were wounded.

142. IRGC personnel were present during the bloodshed and carefully observed the fighting.

143. The lesson from the uprising was clear—JAM members were, at that time, insufficiently organized and disciplined to cause any serious harm to Coalition Forces. Thus, shortly after the uprising in Najaf was brought under control, Muqtada al-Sadr authorized his deputies to create what became known as the "Special Groups" to be supported and trained by Hezbollah and funded and controlled by the IRGC.

144. Sadr's key deputies wanted to be able to deploy more professional (and lethal) forces that could successfully attack Coalition Forces in Iraq while his "regular" JAM militia concentrated on ethnic cleansing and kidnapping Sunnis as well as its traditional criminal enterprises.

145. Initially, the Special Groups functioned essentially as regional commands under the overall leadership of Muqtada al-Sadr's senior deputies, including Qais al-Khazali and Akram al-Kaabi (a/k/a Akram Abbas al-Kabi).

146. As the U.S. military later noted:

> When Special Groups were formed, [Qais Khazali] and Akram al-Kabi were named the general supervisors, or members of the Ishraf Committee (Ishraf means oversight and supervision). Qais and Layth [Qais' brother] were directly involved with Special Groups, and in this position, they would negotiate and procure weapons and IEDs from Iran and distribute them to JAM.

147. Predictably, the IRGC and Hezbollah saw these newly-formed Special Groups (which they helped create and organize) as an opportunity to intensify Iran's control over JAM's terror apparatus.

148. From the initial formation of JAM's Special Groups in 2004 through much of 2006, the IRGC used Hezbollah to train and direct Special Groups cells to target Coalition Forces.

149. This was confirmed by Akram Kaabi himself during a January 1, 2019, interview on Al-Nujaba TV, a channel operated by Al-Nujaba, an Iranian-backed Shi'a group formed in 2013 as an outgrowth of Special Group Asa'ib Ahl Al-Haq ("AAH") (discussed below) and designated (together with Kaabi) as an SDGT on March 5, 2019.

150. During the interview, Kaabi stated that:

> After [the 2004 Battle of Najaf], we realized that we needed a new method, especially since the brothers from Hezbollah and from the IRGC helped us in that battle in Najaf. Even in Sadr City, there were Iranian consultants. There was an IRGC officer called Abu Ali, who was originally from Ahwaz and spoke fluent Arabic. He was with us in Najaf, and he helped us with the battle management and provided much-needed basic and important advice.

151. Kaabi went on to say:

> Our chief engineer in Najaf, Dr. Jassem Al-Abadi, who was martyred, was among the first to be trained by that brother from Hezbollah and by the brothers from the IRGC. So, we realized that if we acquired more capabilities, things would improve. Our morale was high. Our mujahideen were ready to make sacrifices. So, we decided to take this path and acquire a lot of expertise. So, we developed our relationship with the brothers in Hezbollah and the IRGC. Both Hezbollah and the IRGC were open with us about everything....

152. Kaabi was also explicit about the degree to which his exploits in Iraq were directed and coordinated with Hezbollah's senior leadership:

> After the battle of Najaf, I traveled by land to Syria and then to Lebanon, and I met Hassan Nasrallah for the first time. The brothers [in Hezbollah] did not keep any secrets from us. They were forthcoming with their years of experience. They summarized this experience and presented it to us in full detail and this, indeed, led to a significant change in our resistance on the ground.

153. Kaabi also stated the following about Mughniyah:

> The late Imad Mughniyah participated in my meeting [with Nasrallah]. Nasrallah and Mughniyah asked me to debrief them about the battle of Najaf – the events, and the deployment of the forces and the vehicles. Mughniyah even asked me to present everything on a blackboard so that they would get a feel for what had happened on the ground. So, I reviewed all the details.... Obviously, all this happened in the second meeting. The first meeting was an official introductory meeting. Then, since I was still in Lebanon, the second meeting was held. Both Nasrallah and Mughniyah sympathized with us. Both said that they had tried to contact us many times prior to the events in Najaf and that had they succeeded we would have been able to accomplish greater victories, and to change the balance of power significantly. But they said that this was the will of the Lord and that Hezbollah will not deny us anything. They said: 'All of our capabilities and expertise are at your disposal.'

154. Perhaps most notable, in the interview Kaabi specifically discussed the role of EFPs in targeting American forces in Iraq:

> At first, we used old anti-aircraft missiles to manufacture IEDs. They would cause a large explosion, with a loud noise and lots of smoke, but they had little effect on the heavily armored [American] vehicles. Penetrating this armor was no easy task.
>
> But later, our IEDs improved. We started using explosively formed penetrators. These charges would not cause a lot of smoke or a loud explosion, but they would penetrate the armor of the tanks through a certain hole. They would explode inside the tank, destroying it and killing everyone inside.

155. Kaabi's narrative broadly confirms the intelligence assessment publicly disclosed over the past decade.

156. Hezbollah also trained Special Groups and Badr Corps operatives at training camps in southern Lebanon and Iran, and Hezbollah's expertise in the use of

EFPs, kidnapping, communications, and small-unit operations was critical to the IRGC's operations in Iraq between 2003 and 2011.

157. By early 2005, the presence of Hezbollah operatives in Iraq became an open secret when Iraqi Interior Minister Falah al-Naquib announced the arrest of eighteen Lebanese Hezbollah operatives on terrorism charges.

158. On October 10, 2005, the British Broadcasting Company ("BBC") reported that:

> An armour-piercing version of the bomb—blamed for the deaths of eight British soldiers this year—marks the latest advance in the insurgents' arsenal. *The UK has accused Iran of supplying the new weapon to militants in southern Iraq, via the Lebanese Hezbollah militia group,* although Tehran has denied this. (Emphasis added.)

159. The UK's *Belfast Telegraph* reported in 2007 that Muqtada al-Sadr publicly acknowledged his organization's coordination with Hezbollah:

> Speaking in Tufa in Iraq, Muqtada al-Sadr, the head of the Mehdi Army, admitted to "formal links" with Hezbollah. "We have formal links with Hezbollah, we do exchange ideas and discuss the situation facing Shiites in both countries," he said. "It is natural that we would want to improve ourselves by learning from each other. We copy Hezbollah in the way they fight and their tactics, we teach each other, and we are getting better through this."

160. From September 2004 to late 2005, these newly-formed Special Groups conducted low-intensity operations against the British and U.S. militaries, launching increasing numbers of EFP attacks but mostly training in Iran and Lebanon with Hezbollah and the IRGC–QF, developing their TTPs and preparing for the next round of conflict.[18]

[18] EFPs were provided by the IRGC for the exclusive purpose of targeting Coalition Forces, and Hezbollah's advanced training was provided exclusively to assist Special Groups to improve their emplacement of EFPs against United States and British armored vehicles.

161. As Special Groups operatives detained by Coalition Forces later explained, only Hezbollah instructors taught Special Groups operatives the "Engineers Course" that focused on constructing and employing EFPs.

162. Not every Iraqi Special Group operative received this training. One detainee reported that "Engineers are special and have to be smart. If you are not smart no one will waste the time and expenses to send you to Iran to train to be an engineer because you will fail."

163. Hezbollah also trained these "Engineers" on how to incorporate EFPs into the tactical design of ambushing MNF–I convoys, principally to kidnap U.S. and Coalition soldiers.

164. Iraqi Special Group tactics for a kidnapping-ambush using EFPs closely resembled the tactics Hezbollah developed in attempting to kidnap IDF soldiers in southern Lebanon.

165. One MNF–I interrogation of a Special Groups detainee revealed the extensive training he and other Iraqi operatives received from the IRGC–QF and Hezbollah for attacking MNF–I convoys with EFPs and other weapons:

> During one of [Detainee]'s training sessions, his group was instructed on techniques involving the attack of military convoys and abduction of POWs. Upon the arrival of a four-vehicle convoy, EFP's would be emplaced to disable the first three vehicles in a convoy. The attackers, who are hiding on one side of the road from an unidentified distance away, would successively fire upon the fourth vehicle with shoulder-fired missiles. Amidst the attack, two small groups of individuals would alternatively bound from the hidden area away from the road to the fourth vehicle while firing upon the fourth vehicle using small arms. The alternatively bounding small groups would advance to the vehicle, pull out any individual who is still living, and bring the individual back to an area where the attackers' own convoy of vehicles is waiting. In order to prevent a quick reaction force from arriving to aid the disabled convoys, a simultaneous mortar attack would be planned on a nearby military base. The simultaneous mortar attack would be followed through to keep the quick reaction force at the

> nearby base busy. Another way to prevent assistance from a quick reaction force would be to emplace more EFPs at a further distance down the same planned route as the military convoy.

166. An attack combining an EFP and other methods of attacking a convoy is called a "complex attack."

167. By 2007, MNF–I officials were reporting carefully planned, complex ambushes and retaliatory attacks on United States forces that included direct assaults on U.S. military outposts, ambushes in which American troops were captured, and complex attacks that used multiple weapons to strike more than one U.S. military target.

168. As Qais Khazali would later explain to his interrogators: "EFPs still come solely from Iran and there is currently nobody in Iraq manufacturing the components of an EFP."

169. Hezbollah and the IRGC also introduced their proxies to the use of 107mm and 122mm artillery rockets (which Hezbollah had previously deployed in large numbers against the IDF in southern Lebanon and against Israeli border towns in northern Israel).

170. Both JAM and the Special Groups used these same types of rockets in their indirect fire attacks on U.S. and Coalition Forward Operating Bases and MNF–I Headquarters in the Green Zone.

171. The IRGC also supplied JAM and JAM Special Groups with 240mm rockets (also known as the Fadjr-3) developed by the Shahid Bagheri Industries division of the Aerospace Industries Organization of Iran ("AIO").

172. Not only did the IRGC supply these weapons to both Hezbollah and (later) its Iraqi Shi'a proxies (including the Special Groups), but Hezbollah's TTP in the use of these weapons was also transferred to JAM and JAM Special Groups.

173. During a July 2, 2007, press briefing, U.S. Brigadier General Kevin J. Bergner noted that Special Groups were trained in Iran by Hezbollah instructors in a four-week long course that was titled "Artillery."

174. According to Brig. Gen. Bergner, U.S. intelligence concluded that: "This course teaches the use of indirect fire weapons including 60mm and 120mm mortars, and 107mm, 122mm and 240mm rockets."

175. In May 2006, senior Hezbollah commander Ali Mussa Daqduq traveled to Tehran with Youssef Hashim, a fellow Hezbollah operative and senior supervisor of Hezbollah operations in Iraq.

176. There, Daqduq and Hashim met with the Commander and Deputy Commander of the IRGC–QF's Special External Operations.

177. Daqduq was directed to return to Iraq and report to the IRGC–QF on the training and operations of the Special Groups and provide assessments on their training in mortars and rockets, use of IEDs, and kidnapping operations.

178. General Shahlai—the aforementioned deputy commander in the IRGC–QF who met with Daqduq and Hashim—served as the case officer or supervisor of the Special Groups.

179. The United States later designated General Shahlai in September 2008 "for threatening the peace and stability of Iraq and the Government of Iraq."

180. The U.S. Department of Treasury further found that General Shahlai supplied weapons and training to the Iraqi Special Groups:

> In late-August 2006, Shahlai provided material support to JAM Special Groups by supplying JAM Special Groups members with 122mm grad rockets, 240mm rockets, 107mm Katyushas, RPG-7s, 81mms, 60mm mortars, and a large quantity of C-4.
>
> Shahlai also approved and coordinated the training of JAM Special Groups. As of May 2007, Shahlai served as the final approving and coordinating authority for all Iran-based Lebanese Hezbollah training for JAM Special Groups to fight Coalition Forces in Iraq. In late-August 2006, Shahlai instructed a senior

> Lebanese Hezbollah official to coordinate anti-aircraft rocket training for JAM Special Groups.

181. The U.S. Department of State's *Country Reports on Terrorism 2006* noted that Iran provided guidance and training to Iraqi Special Groups for carrying out attacks against MNF–I and Coalition Forces:

> Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks. Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hezbollah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. *These individuals then passed on this training to additional militants in Iraq.* (Emphasis added.)

182. As detailed above, the Australian government reported in 2006 that Hezbollah, along with the IRGC–QF, was committing attacks in Iraq through insurgent groups it developed.

183. In July 2007, Brig. Gen. Bergner briefed the media on how the IRGC–QF used Hezbollah operatives in Iraq:

> Iran's Quds Force, a special branch of Iran's Revolutionary Guards, is training, funding and arming the Iraqi groups…. Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities. And it paints a picture of the level of effort in funding and arming extremist groups in Iraq.

184. Brig. Gen. Bergner further noted that:

> The groups operate throughout Iraq. They planned and executed a string of bombings, kidnappings, sectarian murders and more against Iraqi citizens, Iraqi forces and coalition personnel. They receive arms—including explosively formed penetrators, the

> deadliest form of improvised explosive device—and funding from Iran. They also have received planning help and orders from Iran.

185. In designating the IRGC–QF an SDGT, the U.S. Department of Treasury found that it "provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians."

186. The U.S. Department of State's *Country Reports on Terrorism 2007* stated that the IRGC–QF and Hezbollah provided Iraqi Special Groups with the tools necessary to carry out attacks against armored Coalition vehicles:

> The [IRGC–QF] continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devises (IEDs) and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

187. The U.S. Department of State's *Country Reports on Terrorism 2008* noted that the IRGC and Hezbollah continued attacks on MNF–I and Coalition Forces through their Iraqi proxies by "[p]rovid[ing] lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces," including EFPs.

188. Ali Mussa Daqduq conducted multiple visits to Iraq to undertake training needs assessments, survey the operational environment, and obtain feedback from Special Groups members in Iraq on their needs.

189. This was intended to ensure that the training being designed and staffed by Hezbollah instructors would provide the greatest benefit to their students.

190. In addition, Daqduq's assessments provided informed feedback to the IRGC–QF logisticians on the armaments the Special Groups fighters needed to meet their needs and improve their operational performance.

191. U.S. intelligence also learned about Hezbollah's series of 30-day training courses held for Iraqi Special Groups. These included:

- Engineering: A demolitions course, focusing on the construction and emplacement of EFPs, including the use of passive infrared devices or "Magic Eye."
- Artillery: A course teaching the use of indirect fire weapons, including 60mm and 120mm mortars, and 107mm, 122mm, and 240mm rockets.
- Intelligence: A course covering basic source operations and collection, observations, etc. to derive intelligence that is used at the tactical level.

192. According to U.S. intelligence, Hezbollah also conducted "mini-courses" and "refresher training" at a camp near Tehran and also taught a course for JAM Special Groups on how to improve their "kidnapping capability."

193. Ultimately, the U.S. military concluded that Daqduq's mandate was "to reorganize the Special Groups into an organization that mirrored Lebanese Hizbollah."

194. On January 20, 2007, pursuant to Daqduq's direction, a team of at least twelve AAH gunmen, disguised as U.S. soldiers, infiltrated the Provincial Joint Coordination Center ("PJCC") in Karbala, Iraq. In the well-planned attack, they killed one U.S. soldier and abducted four others, whom they later executed.

195. Two months later, in March 2007, British Special Air Service commandos assigned to Multi-National Division-South ("MND–S") captured Qais al-Khazali, his brother Layth al-Khazali, and Daqduq in Basra.

196. The documents, computers, and media recovered from the target site as well as the subsequent interrogations of these men significantly supplemented the

U.S. military's understanding of Hezbollah's operational role in Iraq and the IRGC's central role in supporting and enabling the Special Groups.

197. Qais al-Khazali later described Daqduq as the "designer of the Special Groups."[19]

198. MNF–I's exploitation of a computer that was captured during the 2007 raid revealed contents that confirmed the training and evaluation role that Daqduq performed.

199. MNF–I described the contents of the files recovered from the captured computer as follows:

> Documents seized include: spreadsheets detailing weapons and targets, step-by-step instructions for operations/attacks; and numerous letters equivalent to after-action reports detailing attacks, including, for example; an ambush and IED attack on a MNF convoy in Karbala resulting in 4 X MNF KIA; an IED attack on a British patrol which destroyed two Land Rovers and killed the occupants; and a sniper attack on a British patrol which killed a British soldier.

200. According to U.S. intelligence estimates following Daqduq's 2007 arrest, the IRGC provided Hezbollah and Daqduq up to $3 million in U.S. currency every month to run Special Groups in Iraq.

201. On January 9, 2008, the U.S. Department of Treasury designated several individuals and entities "for threatening the peace and stability of Iraq and the Government of Iraq."

---

[19] Daqduq was held in U.S. detention until November 2011 with the goal to continue to hold him in U.S. custody. The Iraqi government denied the request, and he was transferred to Iraqi custody on December 18, 2011. The charges that the U.S. had brought against him were summarily rejected by an Iraqi Court in May 2012 as lacking evidence, and he was released from confinement, later returning to Lebanon. In Lebanon, Daqduq trained Hezbollah's special forces. He was killed by Israeli forces on June 12, 2026, his death confirmed by Qais al-Khazali.

202. These individuals included the aforementioned Ahmad Foruzandeh, a Brigadier General in the IRGC–QF. As described above, Foruzandeh was directly involved in terrorist operations targeting MNF–I and Coalition Forces in Iraq.

203. At the same time, the U.S. Department of Treasury designated Abu Mustafa al-Sheibani for his role as the leader of the Sheibani Network, noting:

> The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers. Its second objective is to eliminate Iraqi politicians opposed to Iran's influence. Elements of the IRGC were also sending funds and weapons to Al-Sheibani's network.
>
> Al-Sheibani's network—consisting of several hundred members—conducted IED attacks against Americans in the Baghdad region. As of March 2007, Al-Sheibani, known to transport Katyusha rockets to be used for attacks against Coalition Forces, launched rockets against Americans and made videos of the attacks to get money from Iran. As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for eventual arrival in Baghdad. In early-May 2007, Al-Sheibani's network assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq.

204. As stated above, a 2010 Department of Defense report confirmed that weapons the IRGC delivered to its proxy militias in Iraq included EFPs and other weapons and Hezbollah provided training and technology to carry out attacks.

205. On November 19, 2012, the U.S. Department of Treasury designated Daqduq an SDGT, finding:

> Daqduq is a senior Hezbollah commander responsible for numerous attacks against Coalition Forces in Iraq, including planning an attack on the Karbala Joint Provincial Coordination Center (JPCC) on January 20, 2007, which resulted in the deaths of five U.S. soldiers.

206. As numerous federal courts have found,[20] Hezbollah and the IRGC orchestrated the terror campaign that killed and injured Plaintiffs herein.

207. Specifically, Hezbollah and the IRGC created, trained, funded, and armed several proxy groups that targeted American citizens in Iraq, and through these proxy groups, they jointly planned, authorized, and committed hundreds if not thousands of attacks on American and Coalition Forces during the Relevant Period, including the attacks that injured Plaintiffs.

---

[20] *See Est. of Fishbeck v. Islamic Republic of Iran*, No. 18-cv-2248 (CRC), 2023 U.S. Dist. LEXIS 201125, at *24 (D.D.C. Aug. 18, 2023) ("The use of the EFP was reserved for use by Iranian-backed Shia Militant Groups with direct support from Islamic Revolutionary Guard Corps (IRGC)-Qods Force and Hezbollah.") (internal citation and quotation marks omitted); *Lee v. Islamic Republic of Iran*, No. 19-cv-00830 (APM), 2023 U.S. Dist. LEXIS 15314 (D.D.C. Jan. 30, 2023) (finding 25 EFP attacks were "part of the EFP campaign orchestrated by the IRGC and Hezbollah that was conducted by one of the IRGC's Hezbollah-trained Special Group proxies") (internal citation and quotation marks omitted); *Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65, 76 (D.D.C. 2023) ("The unique components of EFPs, the tactics through which they are deployed, and the expertise necessary to create them have led many experts to trace the EFPs detonated in Iraq to Iran and Hezbollah."); *Stearns v. Islamic Republic of Iran*, 633 F. Supp. 3d 284 (D.D.C. 2022) (finding 61 EFP attacks were "part of the EFP campaign orchestrated by the IRGC and Hezbollah, that was conducted by one of the IRGC's Special Group proxies") (internal citation and quotation marks omitted); *Roberts v. Islamic Republic of Iran*, 581 F. Supp. 3d 152 (D.D.C. 2022) (finding nine attacks "could only" have been perpetrated by EFPs that were "designed, manufactured, and distributed by Hezbollah [or] the IRGC") (internal citation and quotation marks omitted); *Burks v. Islamic Republic of Iran*, No. 16-cv-1102 (CRC), 2022 U.S. Dist. LEXIS 244554, at *28-29 (D.D.C. Sept. 30, 2022) (finding that "Iran and its proxy Hezbollah played a central role ... in devising and supporting EFP attacks that killed and injured many hundreds of U.S. service members in Iraq") (internal citation and quotation marks omitted); *Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2021 U.S. Dist. LEXIS 7170 (D.D.C. Jan. 14, 2021) (finding 73 EFP attacks were "part of the EFP campaign orchestrated by the IRGC and Hezbollah that was conducted by one of the IRGC's Hezbollah-trained Special Group proxies.") (internal citation and quotation marks omitted).

## B. HEZBOLLAH'S AND THE IRGC'S AGENTS & PROXIES IN IRAQ

### 1. Asa'ib Ahl Al–Haq ("AAH" or the "League of the Righteous")

208. The Asa'ib Ahl Al–Haq ("AAH" or the "League of the Righteous") terrorist organization was a Special Group that was directed and trained by Hezbollah and the IRGC, and funded and armed by the IRGC.

209. AAH conducted numerous attacks on Iraqi Security Forces and Coalition Forces, particularly on American targets.

210. According to a report by the U.S. military:

> In August 2006 MAS (Muqtada al-Sadr) asked [Qais al-Khazali] to lead a delegation to Tehran to discuss the situation in Iraq and Iranian support for JAM (Jaysh al-Mahdi (JAM) Militia subordinate to Muqtada al-Sadr). According to reporting, [Supreme Leader] Khamenei … met with [Qais al-Khazali] and recruited him to lead a special group known as Asayb Al–Haq, or the K2 network. The K2 network would operate with the knowledge or authorization of MAS. [Qais al-Khazali] agreed. Iran was interested in working with [Qais al-Khazali] because of his influence on MAS. Layth (al-Khazali's brother, captured with him on 20 March 2007 in Basra, served as the Operations Chief for Asayb Al–Haq) and as a liaison between the secret network formed by Qayis and the Iranians. In his position, Layth travelled frequently between Iraq, Iran and Syria.

211. Qais al-Khazali and his brother Layth al-Khazali returned to Iraq, requisitioned the most experienced and capable fighters from Sadr's JAM terror cells, and formed AAH.

212. At its inception, AAH was a Hezbollah-directed and IRGC-supplied cluster of terror cells that owed fealty to Sadr. Over time, it became a more cohesive entity that grew more independent of Sadr (even ceremonially).

213. AAH's evolution was the product of assessments made by senior Hezbollah commanders, including Daqduq, who had traveled to Iraq at the IRGC's

behest to evaluate the training, organization, and effectiveness of their Iraqi proxy groups.

214. Hezbollah identified Qais al-Khazali and Akram Kaabi as among the more capable JAM commanders, cultivated them, and ultimately recruited them to serve as direct agents and proxies of the IRGC–QF.

215. According to an April 2007 MNF–I report, Qais al-Khazali admitted that AAH received direct financing from the IRGC–QF.

216. Within months of Qais al-Khazali's formation of AAH, he blessed the Hezbollah-planned and -orchestrated raid on the PJCC in Karbala on January 20, 2007.

217. The kidnapping and murder of five American soldiers during the operation led to a concerted effort to locate the perpetrators, and it eventually resulted in the capture of both Khazali brothers in March 2007.

218. Thereafter, despite the capture and detention of the Khazali brothers, AAH continued to function as a full-fledged terrorist organization because of the significant funding, training, and supply of weapons it received from the IRGC, and from the training it received from, and close cooperation and coordination it maintained with, Hezbollah.

219. In sum, from 2006 to 2011, AAH operated as the IRGC's direct terror proxy targeting U.S. personnel at the direction of Hezbollah, working in concert with the IRGC.

220. Iran harbored elements of AAH's leadership (and their families), and the IRGC trained, supplied, and funded the AAH cells and operatives.

221. The IRGC used Hezbollah to train and direct AAH to commit terrorist attacks on Americans in Iraq.

222. At his July 2, 2007, press briefing, Brig. Gen. Bergner noted the extensive financial support the IRGC–QF provided in developing the Special Groups, including payments of up to "3 million U.S. dollars a month." Bergner elaborated that

"[t]he Qods Force also supplies the special groups with weapons and funding of 750,000 to 3 million U.S. dollars a month. Without this support, these special groups would be hard pressed to conduct their operations in Iraq ... The Qods Force goal was to develop the Iraqi special groups into a network similar to the Lebanese Hezbollah. Special groups would be unable to conduct their terrorist attacks in Iraq without Iranian-supplied weapons and other support." He noted that "Like Ali Mussa Daqduq, Qais [Khazali's] main contact was [General Shahlai], the deputy commander for Qods Force Department of External Special Operations. Funding and training of the special groups started in 2004."

223. As MNF–I investigators later learned, senior Hezbollah commander Daqduq not only provided training to AAH cells and advised them on terrorist operations, he also helped plan operations and had final approval over them.

224. Daqduq reported to Youssef Hashim, the head of Hezbollah Special Operations, and the latter reported to Hezbollah's Muhammad Kawtharani and General Shahlai, the director of the IRGC–QF External Operations.

### 2. Jaysh al Mahdi's Promised Day Brigades ("PDB")

225. In June 2008, Sadr announced his intention to disband JAM to focus his organization on social, cultural, and religious activities, but he soon further proclaimed that he would maintain an elite force, the Promised Day Brigades ("PDB"), to carry out attacks against Coalition Forces.

226. The PDB received funding and weapons from the IRGC and training and direction from both Hezbollah and the IRGC–QF and deployed many EFPs against American and Coalition Forces in Iraq after July 2008.

227. MNF–I took significant and forceful measures against the PDB, but because of the financial, logistical, and operational support it received from both Hezbollah and the IRGC, the PDB was able to survive and continued to attack American forces in Iraq through 2011.

### 3. Kataib Hezbollah ("KH")

228. Kataib Hezbollah ("KH") (Hezbollah Brigades) was active in Iraq from 2007 to 2011.

229. KH was founded by Abu Mahdi al-Muhandis, a member of the Badr Corps and one of the IRGC–QF's senior operatives in Iraq.

230. KH's overall operations were run by Karim Ja'far Muhsin al-Ghanimi, described by the U.S. Department of Treasury as "the overall leader of KH, which has used facilities in Iran to send weapons to Iraq." According to the U.S. government, "Ghanimi has organized KH military-related training in Iran from the IRGC–QF and Lebanese Hezbollah. Ghanimi has sent money provided by the IRGC–QF to KH leaders in Iraq."

231. KH functioned as Iran's premier terror proxy in Iraq, and like other Special Groups, its operatives received extensive training from the IRGC–QF and Hezbollah, including Hezbollah's TTP for the use of explosives, as well as weapons like the RPG–29, EFP, and the deployment of Katyusha rockets for indirect fire attacks on U.S. Forward Operating Bases.

232. According to MNF–I, IRGC–QF provided RPG–29 anti-armor weapons exclusively to KH.

233. The IRGC also provided IRAMs almost exclusively to KH.

234. IRAMs are "flying IEDs"—explosive devices made from large metal canisters, such as propane gas tanks, filled with explosives, scrap metal and ball bearings, propelled into the air by rockets.

235. IRAMs were "purpose-built" for one thing: being lobbed over walls and Hesco[21] barriers at short ranges, preventing interception by C–RAM defense systems[22] that were protecting Coalition Forces manning bases in Iraq.

236. On June 24, 2009, the United States designated KH an FTO.

237. The U.S. Department of State's notice of KH's FTO designation stated that:

> [KH] has been responsible for numerous violent terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks, and sniper operations. Kata'ib Hezbollah also targeted the International Zone in Baghdad in a November 29, 2008 rocket attack that killed two UN workers. In addition, KH has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq.[23]

238. In that same notice, the Department of State stated that KH was also simultaneously designated an SDGT, because it was "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since 2007."

239. Separately, the U.S. Department of Treasury also designated KH pursuant to Executive Order 13438 — "Blocking Property of Certain Persons Who Threaten Stabilization Efforts in Iraq," an Iraq-specific sanctions authority issued by President Bush on July 17, 2007, apart from the SDGT framework under E.O. 13224

---

[21] Hesco barriers are a multi-cellular barrier system manufactured from welded zinc-aluminum coated steel wire mesh, joined with vertical, helical-coil joints, and lined with a heavy-duty non-woven polypropylene geotextile. Once filled with earth, sand, and dirt, the Hesco barriers provide protection against conventional fire attacks.

[22] Counter Rocket, Artillery, and Mortar (abbreviated "C-RAM" or "Counter-RAM") refers to a set of systems used to detect and destroy incoming artillery, rockets and mortar rounds in the air before they hit their ground targets, or simply provide early warning.

[23] Press Release, *Designation of Kata'ib Hizballah as a Foreign Terrorist Organization*, U.S. DEP'T OF STATE (Jul. 2, 2009), https://2009-2017.state.gov/r/pa/prs/ps/2009/july/125582.htm.

— for having "committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces."[24]

240. The same July 2, 2009, press release also stated that "the IRGC–Qods Force provides lethal support to Kata'ib Hezbollah and other Iraqi Shi'a militia groups who target and kill Coalition and Iraqi Security Forces."

241. That press release further reported that:

> As of 2008, Kata'ib Hezbollah was funded by the IRGC–Qods Force and received weapons training and support from Lebanon-based Hezbollah. In one instance, Hezbollah provided training—to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks—to Kata'ib Hezbollah members in Iran.

242. In 2008, the U.S. Department of Defense described the linkages it found between KH, Iran, and multiple terrorist attacks against Coalition Forces in Iraq—including KH's use of EFPs:

> [A]lso known as Hezbollah Brigades, [it] is a terrorist group believed to receive funding, training, logistics and material support from Iran to attack Iraqi and coalition forces using what the military calls 'explosively formed penetrators'— roadside bombs designed to pierce armor-hulled vehicles—and other weapons such as rocket-assisted mortars.

243. The U.S. Department of Treasury designated KH's founder, Abu Mahdi al-Muhandis, an SDGT in July 2009 and announced the designation in the same press release announcing KH's designation.

244. The U.S. Department of Treasury's press release noted the following about al-Muhandis's terrorist activities in Iraq:

> As of early 2007, al-Muhandis formed a Shia militia *group employing instructors from Hezbollah* to prepare this group and

---

[24] Press Release, *Treasury Designates Individual, Entity Posing Threat to Stability in Iraq*, U.S. DEP'T OF TREASURY (Jul. 2, 2009), https://home.treasury.gov/news/press-releases/tg195.

> certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces. The groups received training in guerilla warfare, handling bombs and explosives, and employing weapons--to include missiles, mortars, and sniper rifles. In another instance as of September 2007, al-Muhandis led networks that moved ammunition and weapons—to include explosively formed penetrators (EFPs)—from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces. As of mid-February 2007, al-Muhandis also ran a weapon smuggling network that moved sniper rifles through the Iran-Iraq border to Shia militias that targeted Coalition Forces.

245. In a July 2010 press briefing, the then-MNF–I commander, U.S. Army General Ray Odierno, identified KH as the group behind increased threats to U.S. bases in Iraq.

246. General Odierno confirmed that KH operatives had gone to Iran for special training and then returned to Iraq and he stated, "they are clearly connected to [the] Iranian IRGC."

### 4. The IRGC Funded the Design and Production of Explosively Formed Penetrators ("EFPs") Used to Kill or Maim Coalition Forces, Including Plaintiffs

247. The EFPs deployed by the IRGC and Hezbollah in Iraq were not truly "improvised" explosive devices but professionally manufactured and specifically designed to target U.S. and Coalition Forces' armor.

248. EFPs constitute "weapons of mass destruction" as that term is defined in 18 U.S.C. § 2332a(c)(2)(A).

249. First used by Hezbollah against Israeli armor in Lebanon, EFPs are categorized by the U.S. military as a type of shaped-charge weapon. They are usually made by placing a precision-manufactured concave copper disk in front of high-explosives that have been packed into a steel tube with a cap welded to one end.

250. In Iraq, EFPs were often triggered by a passive infrared devices that ultimately set off an explosion within the steel casing of the EFP, forcing the copper

disk forward, and turning it into a high-velocity molten slug that could pierce the military-grade armor of most U.S. vehicles deployed in Iraq.

251. To produce these weapons, copper sheets are often loaded onto a punch press to yield copper discs. These discs are annealed in a furnace to soften the copper. The discs are then loaded into a large hydraulic press and formed into the disk-like final shape.

252. This munitions manufacturing process is critical to the design and concomitant lethality of the EFP weapon.

253. Unlike homemade explosive devices such as traditional IEDs, EFPs are far more sophisticated and are specifically designed to target vehicles such as armored patrols and supply convoys, though the IRGC and Hezbollah and its Iraqi proxies also deployed them against U.S. and Iraqi civilians.

254. Senior U.S. military and government officials repeatedly and publicly attributed Iran's provision of lethal weapons technology to Iraqi militant groups, including EFPs specifically.

255. For example, in 2006, Brig. Gen. Michael Barbero, Deputy Chief of Staff for Strategic Operations of MNF–I stated: "Iran is definitely a destabilizing force in Iraq. I think it's irrefutable that Iran is responsible for training, funding and equipping some of these Shi'a extremist groups and also providing advanced IED technology to them, and there's clear evidence of that."

256. That same year, the Deputy Chief of Staff for Intelligence with the MNF–I, U.S. Army Major General ("Maj. Gen.") Richard Zahner, declared that:

> Labels on weapons stocks seized inside and outside Iraq point to Iranian government complicity in arming Shiite militias in Iraq […] Iran is funneling millions of dollars for military goods into Iraq […] You'll find a red label on the C-4 [explosive] printed in English and will tell you the lot number and name of the manufacturer.

257. Maj. Gen. Zahner further added:

> [T]he control of military-grade explosives in Iran is controlled through the state apparatus and is not committed through rogue elements right there. It is a deliberate decision on the part of elements associated with the Iranian government to affect this type of activities.

258. In May 2007, the Commander of the Multi-National Division–Center, U.S. Army Maj. Gen. Richard Lynch, stated that:

> Most of our casualties have come from improvised explosive devices. That's still the primary threat to our soldiers—IEDs. And we have an aggressive campaign to counter those IEDs, but they still are taking a toll on our soldiers: 13 killed, 39 soldiers wounded. *What we're finding is that the technology and the financing and the training of the explosively formed penetrators are coming from Iran.* The EFPs are killing our soldiers, and we can trace that back to Iran. (Emphasis added.)

259. Other U.S. government reports, such as the Department of Defense's 2007 *Measuring Stability and Security in Iraq* quarterly report to Congress, similarly concluded that:

> The Iranian regime's primary tool for exercising clandestine influence in Iraq is the Islamic Revolutionary Guard Corps' (IRGC) Qods Force (QF), which provides arms, intelligence, funds, training, and propaganda support to Iraqi Shi'a militants targeting and killing Coalition and Iraqi forces, as well as Iraqi civilians. The QF seeks to increase long-term Iranian strategic influence in Iraq and the withdrawal of U.S. forces. Among the weapons it provides to Iraqi militants are improvised explosive devices (IEDs), advanced IED technologies (including explosively formed projectiles (EFPs)), and rockets and mortars used for indirect fire attacks.

260. The U.S. Department of State's *Country Reports on Terrorism 2011* reported the following about the IRGC's operations in Iraq:

> Despite its pledge to support the stabilization of Iraq, Iran continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi Shia militant groups targeting U.S.

> and Iraqi forces, as well as civilians. Iran was responsible for the increase of lethal attacks on U.S. forces and provided militants with the capability to assemble explosives designed to defeat armored vehicles. The IRGC–QF [Islamic Revolutionary Guard Corps–Quds Force], in concert with Lebanese Hezbollah, provided training outside of Iraq as well as advisors inside Iraq for Shia militants in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry.

261. Similarly, in 2011, the U.S. Ambassador to Iraq, James F. Jeffrey, was quoted as saying:

> [F]resh forensic testing on weapons used in the latest deadly attacks in the country bolsters assertions by U.S. officials that Iran is supporting Iraqi insurgents with new weapons and training. […] We're not talking about a smoking pistol. There is no doubt this is Iranian.

## C. HEZBOLLAH FINANCING

262. Hezbollah is subject to strict economic sanctions programs imposed by the United States (the "U.S. Sanctions Regime") as the result of its designation as an SDT (1995), FTO (1997) and SDGT (2001).

263. The U.S. Sanctions Regime is intended, among other things, to prevent Hezbollah from engaging in banking activities through the U.S. financial system, including via electronic funds transfers, and thereby limits Hezbollah's ability to carry out terrorist attacks.

264. Hezbollah requires formal banking services, including the ability to execute electronic funds transfers through the global financial system, in order to:

a. Build and maintain its operational infrastructure to plan and execute terrorist attacks;

b. Purchase and store weapons, explosives, and other material to carry out terrorist attacks;

c. Pay, train, transport, and shelter its terrorist operatives and proxies; and,

d. Carry out specific terrorist attacks.

265. Hezbollah is not permitted to execute electronic funds transfers through the U.S. financial system and conduct other banking activities via banks and other financial institutions which observe and enforce the U.S. Sanctions Regime.

266. The U.S. Sanctions Regime is only effective to the extent that global financial institutions adhere to its restrictions.

267. If all banks and financial institutions worldwide observed and genuinely enforced the U.S. Sanctions Regime, Hezbollah's ability to access the global financial system and conduct banking activities would be severely restricted, and Hezbollah's capabilities (including acts of terrorism) would be significantly reduced.

268. As then-Treasury Under Secretary for Terrorism and Financial Intelligence Stuart Levey explained to the House Financial Services Subcommittee on Oversight and Investigations in July 2006:

> [W]hen we block the assets of a terrorist front company, arrest a donor, or shut down a corrupt charity, we deter other donors, restrict the flow of funds to terrorist groups and shift their focus from planning attacks to worrying about their own needs. While any single terrorist attack may be relatively inexpensive to carry out, terrorist groups continue to need real money. They depend on a regular cash flow to pay operatives and their families, arrange for travel, train new members, forge documents, pay bribes, acquire weapons, and stage attacks. Disrupting money flows stresses terrorist networks and undermines their operations.

269. Hezbollah and its Business Affairs Component (discussed below) therefore select financial institutions that are willing to work with them and in practice flout the U.S. Sanctions Regime.

### 1. Hezbollah's Business Affairs Component ("BAC")

270. For decades, American intelligence and law enforcement agencies were aware of Hezbollah's growing capabilities and its increasing reliance on illicit activities to fund its operations.

271. Most of what is publicly known about Hezbollah, its exploitation of the U.S. financial system, and its collaboration with Lebanese banks comes from three principal sources: (a) publicly announced U.S. Department of Treasury designations of Hezbollah leaders, operatives, and commercial enterprises, and related official testimony to Congress; (b) publicly available information concerning what became known as Project Cassandra, which originated in the Drug Enforcement Administration's ("DEA") investigation of Hezbollah's development into an international crime syndicate that collected funds worth as much as $1 billion U.S. dollars a year from narcotics and weapons trafficking, money laundering, and other criminal activities across Europe, Africa, and the Americas; and (c) publicly disclosed materials relating to UN and European investigations of diamond smugglers and money launderers.

272. According to published reports, the DEA's Project Cassandra Taskforce members in particular came to learn that Hezbollah, working closely with Iran's intelligence services and its IRGC, had carefully cultivated illicit networks among Lebanese expatriate communities around the world to create a web of businesses that acted as front companies for Hezbollah's and the IRGC's black-market trading and money laundering activities.

273. According to these published reports, Project Cassandra Taskforce members tracked Hezbollah's flow of weapons, drugs, conflict diamonds,[25]

---

[25] "Conflict Diamonds" (a/k/a "Blood Diamonds") as used herein refers to the illegal trade in diamonds with African countries where violent conflicts have taken place between armed militias and African government forces. Beginning in 1998, the United Nations Security Council ("UNSC") initiated international embargos regarding trading in diamonds with countries like Angola, Sierra Leone, and Liberia.

ammunition, explosives, military-grade spare parts (including parts for Iran's illicit nuclear and ballistic missile programs), and U.S. dollar funds along the same Hezbollah transit routes that carried shipments of seemingly legal goods, such as frozen chicken, raw materials, precious metals, used cars, cigarettes, and consumer electronics.

274. As the Project Cassandra Taskforce learned, Hezbollah ran these networks through its BAC, i.e., its "commercial apparatus," a special financial and business unit established by the late Imad Mughniyah, then Hezbollah's most senior terrorist commander, and overseen by two deputies, Adham Hussein Tabaja, a prominent Hezbollah financier and real estate developer in Lebanon, and Abdallah Ali Safieddine (a/k/a "Safi al-Din"), the brother of Hashem Safieddine, one of Hezbollah's most senior leaders who was reported to be the designated successor to Hezbollah's former supreme leader and U.S.-designated terrorist Hassan Nasrallah before Hashem Safieddine was killed on October 3, 2024. Nasrallah was killed shortly beforehand, on September 27, 2024.

275. Both Adham Tabaja and Abdallah Safieddine have been designated SDGTs by the U.S. Department of Treasury.

276. The BAC oversees Hezbollah's vast network of world-wide criminal and commercial enterprises which it uses to finance its terrorist operations.

277. During the Relevant Period, Abdallah Safieddine served as Hezbollah's de facto ambassador and deputy to the IRGC–QF in Iran and as Imad Mughniyah's representative (until the latter's death in 2008), among other things, coordinating the BAC's joint financial efforts with the IRGC–QF and reporting to the late Qassem Soleimani.

---

Beginning that same year, the EU adopted regulations banning the direct or indirect import into the EU of rough diamonds from those countries.

278. According to the DEA, Hezbollah's BAC developed extensive operational and financial linkages with various drug cartels and money laundering networks across South America:

> Members of the Hezbollah BAC have established business relationships with South American drug cartels, such as La Oficina de Envigado, responsible for supplying large quantities of cocaine to the European and United States drug markets. Further, the Hezbollah BAC continues to launder significant drug proceeds as part of a trade-based money laundering scheme known as the Black-Market Peso Exchange.

279. The Project Cassandra Taskforce investigations of Safieddine and the Hezbollah-affiliated narcotic trafficker Ayman Joumaa[26] eventually intersected with a separate effort by U.S. Special Operations Command ("SOCOM") that was tracking the source of funds used by IRGC proxies that were deploying sophisticated weapons against U.S. armored vehicles in Iraq, including, among other weapons, IRGC-supplied (and Hezbollah-designed) EFPs (discussed in detail below).

280. When phone numbers connected to the IRGC network supplying EFPs to IRGC and Hezbollah proxies in Iraq matched phone numbers intercepted during the Project Cassandra Taskforce's Colombia investigation of Joumaa's narcotic trafficking network, Project Cassandra and SOCOM investigative teams were able to tie Safieddine's EFP network in Iran to Hezbollah's narcotics trafficking and money laundering network operating in Colombia and South America's "Tri-Border Area" between Brazil, Paraguay, and Argentina.

---

[26] The DEA had launched "Operation Titan" targeting an international cocaine smuggling and money laundering ring in South America, but surveillance led them to a significant operative with strong connections to the Colombian cartels who was referred to as "Taliban." This individual turned out to be a Hezbollah operative named Chekry Harb, and the discovery of his (and Hezbollah's) role in drug trafficking and money laundering led to further revelations and eventually to the DEA's efforts to map Hezbollah's drug trafficking networks, including those of drug kingpin Ayman Joumaa.

281. Ultimately, the U.S. Intelligence Community and Department of Justice's analysis of thousands of hours of intercepted Arabic phone conversations from Colombia, among other locations, painted a picture of Abdallah Safieddine as a central figure in Hezbollah's (and the IRGC's) global financial network and in the flow of U.S. dollars into Iraq to fuel attacks against U.S. service members, among others.

282. According to then-DEA Acting Deputy Administrator Jack Riley, "[t]hese drug trafficking and money laundering schemes utilized by the Business Affairs Component provide a revenue and weapons stream for an international terrorist organization responsible for devastating terror attacks around the world."

**2. SCB Customer Lebanese Canadian Bank**

283. During the Relevant Period, Lebanese Canadian Bank ("LCB"), a Beirut-based bank that the U.S. Treasury Department designated a financial institution of "primary money laundering concern" in February 2011 for facilitating the money-laundering activities of Hezbollah-linked narcotics trafficker Ayman Joumaa's network, was a central part of Hezbollah's financing operations and proved to be a wellspring of further DEA investigations into Hezbollah money laundering in the UAE and elsewhere.

284. Those investigations revealed that LCB held U.S. dollar accounts for and provided financial services to hundreds of BAC components, including Al Qard al-Hassan ("AQAH")—Hezbollah's unlicensed bank, designated by the U.S. Department of Treasury as an SDGT on July 24, 2007, the major narcotics, weapons, and conflict diamond smuggling networks, and the exchange houses responsible for laundering those networks' revenues.

285. During the Relevant Period, LCB moved hundreds of millions of dollars for the benefit of persons and entities it knew were part of Hezbollah and/or the BAC of Hezbollah's IJO through New York.

286. FinCEN found that "Hezbollah derived financial support from the criminal activities of [Hezbollah's narcotics trafficking] network; and that LCB managers are complicit in the network's money laundering activities."[27]

287. The Project Cassandra team targeted LCB by gathering evidence showing how Ayman Joumaa's narcotics network was laundering an estimated $200 million a month in U.S. dollar-denominated funds through LCB directly and through various Lebanese money exchange houses, including New Line Exchange, Elissa Exchange, Hassan Ayash Exchange, Halawi Exchange, and Mecattaf SAL that held accounts with LCB, as well as several other Lebanese banks.[28] As described in more detail below, Prime Bank in The Gambia, a subsidiary of LCB, served as a critical financial gateway for Hezbollah's BAC to launder millions of dollars.

288. These exchange houses were also a vital conduit for BAC narcotics proceeds transited to Iraq to help Hezbollah underwrite its terrorist proxies, including so-called Special Groups that targeted Plaintiffs herein and hundreds of other Americans.

289. FinCEN's February 10, 2011, report described LCB-laundered money through its U.S. correspondent banks—chiefly SCB:

> [S]ome of the funds move to LCB's U.S. correspondent accounts via suspiciously structured electronic wire transfers to multiple

---

[27] The U.S. Department of Justice's Verified Amended Complaint against Lebanese Canadian Bank et. al (S.D.N.Y. 11 Civ. 9186) is incorporated by reference into this Complaint. A copy of the complaint is available at: https://www.investigativeproject.org/case_docs/us-v-lebanese-canadian-bank-sal-et-al/2192/amended-complaint.pdf.

[28] *See* Press Release, *Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network*, U.S. DEP'T OF TREASURY (Jan. 26, 2011), https://home.treasury.gov/news/press-releases/tg1035. The U.S. Department of Treasury later designated Kassem Rmeiti and Company for Exchange SAL ("Rmeiti Exchange"), Halawi Exchange and, more recently, Chams Exchange Company SAL ("Chams Exchange") for laundering money on behalf of Joumaa, among others.

> U.S.-based used car dealerships—some of which are operated by individuals who have been separately identified in drug-related investigations. The recipients use the funds to purchase vehicles in the United States, which are then shipped to West Africa and/or other overseas destinations, with the proceeds ultimately repatriated back to Lebanon. Other funds are sent through LCB's U.S. correspondent accounts to pay Asian suppliers of consumer goods, which are shipped to Latin America and sold, and the proceeds are laundered through a scheme known as the Black-Market Peso Exchange, in each case through other individuals referred to in this finding or via companies owned or controlled by them.

290. The U.S. Department of Treasury also found that LCB was the "favored bank" for the Joumaa–Hezbollah illegal banking activity:

> With respect to the exchanges and companies related to Ayman Joumaa, numerous instances indicate that substantial amounts of illicit funds may have passed through LCB. Since January 2006, hundreds of records with a cumulative equivalent value of $66.4 million identified a Lebanese bank that originated the transfer; approximately half of those were originated by LCB, for a cumulative equivalent value of $66.2 million, or 94%, thus, indicating that LCB probably is the favored bank for these exchange houses, particularly in the context of illicit banking activity. Similarly, a review of all dollar-denominated wire transfers with the two primary exchange houses either as sender or receiver between January 2004 and December 2008 showed 72% originated by one of the exchange houses through LCB.

291. SCB was a major correspondent banker for LCB, Hezbollah's "favored bank."

292. Between 2008 and 2011, SCB–Dubai maintained at least four U.S. dollar accounts for LCB, including account numbers ending in 4308, 4556, 4929, and 4005.

293. These were highly active accounts—for a single month in 2008 (September 22–October 22), SCB–Dubai processed U.S. dollar deposit transactions

for these LCB accounts worth a total of $68,879,495.50 U.S. dollars. SCB would have processed these transactions through New York.

294. In fact, as shown in the Banker's Almanac, SCB–New York also maintained a correspondent account for LCB during the Relevant Period, ending in 7001.

### D. U.S. SANCTIONS AND IRAN'S RELIANCE ON U.S. DOLLARS

295. Due to a series of interlocking sanctions programs, virtually all trade and investment activities with Iran by U.S. persons, wherever located, were prohibited during the Relevant Period.

296. The U.S. government requires U.S. financial institutions to use sophisticated computer systems and software algorithms to monitor and screen all wire transfer activities.

297. Banks in New York clear and settle the vast majority of the world's U.S. dollar payments and foreign exchange transactions and are supposed to be the first line of defense to prevent the IRGC, Hezbollah, and other terrorist organizations from accessing the U.S. financial system to fund or otherwise engage in terrorism and other prohibited conduct.

298. At the same time, however, during the Relevant Period approximately 60 percent of Iranian government revenues and 90 percent of Iran's export revenues originated from the sale of its oil and gas resources controlled by the IRGC, a market largely denominated in U.S. dollars (known as "petrodollars"[29]). Insofar as Iran's currency, the rial, was (in part due to U.S. sanctions) one of the world's least valued currencies, the Iranian regime was desperately dependent on access to U.S. dollars it held overseas and the interest income these petrodollar deposits generated.

---

[29] The petrodollar market developed because, among other reasons, the United States was the largest producer and consumer of oil in the world; the world oil market has been priced in U.S. dollars since the end of World War II.

299. Given the IRGC's control of Iran's oil revenues through NIOC and other oil and gas companies they controlled, the U.S. Sanctions Regime posed a significant obstacle not only for the Iranian regime as a whole, but particularly for the IRGC, which was reliant on access to U.S. dollars and the ability to move them through the international financial system via a combination of Iranian and Western financial institutions.

300. IRGC access to international payment system platforms was also critical to its capacity to fund its terror proxies, such as Hezbollah in Lebanon and Kataib Hezbollah in Iraq, and to fuel its global terrorism and weapons proliferation activities.

### E. THE FINANCIAL ACTION TASK FORCE AND IRAN'S BANKING SECTOR

301. The Financial Action Task Force ("FATF") is the inter-governmental body that sets international standards for Anti-Money Laundering and Combating the Financing of Terrorism laws and regulations ("AML/CFT"), conducts so-called "mutual" evaluations of countries against these standards, and publicly identifies jurisdictions that fail to address deficiencies in those areas.

302. FATF in October 2001 expanded its mandate to incorporate efforts to combat terrorist financing, in addition to money laundering. Specifically, FATF's Special Recommendation VII stated that countries should take measures to require financial institutions to include accurate and meaningful originator information on funds transfers and related payment messages.

303. Iran has been on FATF's "black" list since it was introduced in 2008, including due to its refusal to "criminaliz[e] terrorist financing."[30]

---

[30] *FATF Public Statement–February 2010*, FINANCIAL ACTION TASK FORCE (2010), https://www.fatf-gafi.org/en/publications/High-risk-and-other-monitored-jurisdictions/Fatfpublicstatement-february2010.html.

304. For example, Iran exempted "liberation organizations" from counter-terrorist financing provisions—which in practical terms means state-sponsorship of terrorism exemptions for among others, terrorist groups such as Hezbollah, its Iraqi Shi'a proxies, and Hamas.

305. Significantly, on October 11, 2018, FinCEN issued an Advisory on the Iranian Regime's Illicit and Malign Activities and Attempts to Exploit the Financial System which warned financial institutions the Iranian regime uses "covert means" to access the financial system:

> to further its malign activities includ[ing] misusing banks and exchange houses, operating procurement networks that utilize front or shell companies, exploiting commercial shipping, and masking illicit transactions using senior officials, including those at the Central Bank of Iran (CBI)…. Often, these efforts serve to fund the regime's nefarious activities, including providing funds to the Islamic Revolutionary Guard Corps (IRGC) and its Islamic Revolutionary Guard Corps–Qods Force (IRGC–QF), as well to Lebanese Hezbollah, Hamas, and other terrorist groups.[31]

## F. THE IRGC'S REVENUE SOURCES, FINANCING MECHANISMS AND KEY COMMERCIAL ASSETS

306. During the Relevant Period and even today, the IRGC has financed much of its operations through a web of commercial fronts and foundations in Iran and transnationally.

307. IRGC leaders and operatives, operating through affiliates and front-companies, engage in enormous quantities of trade-based money laundering, smuggling of state-owned resources (especially oil), trafficking in proscribed items, and organized fraud schemes worth billions of U.S. dollars annually.

---

[31] FINANCIAL CRIMES ENFORCEMENT NETWORK, ADVISORY ON THE IRANIAN REGIME'S ILLICIT AND MALIGN ACTIVITIES AND ATTEMPTS TO EXPLOIT THE FINANCIAL SYSTEM (2018) https://www.fincen.gov/sites/default/files/advisory/2018-10-12/Iran%20Advisory%20FINAL%20508.pdf.

308. During the Relevant Period and even today, the IRGC controlled the National Iranian Oil Company ("NIOC") and its subsidiaries, including the National Iranian Tanker Company, National Iranian Oil Refining and Distribution Company ("NIORDC"), and the National Petrochemical Company ("NPC").

309. NIOC and NITC provide both the Iranian oil and the tankers to transport it, respectively, for the extensive oil sales conducted by the IRGC.

310. Specifically, during the Relevant Period, NIOC coordinated with the Central Bank of Iran ("CBI") to collect proceeds from IRGC oil sales, amounting to hundreds of millions of dollars that directly benefited the IRGC and fueled its terrorist operations.

311. The IRGC's involvement in Iran's oil and natural gas sector became widely known after the ascension of Mahmoud Ahmadinejad as President of the Iranian government in 2005.[32]

### 1. Public Sources Linking NIOC and the Iranian Petrochemical Industry to The IRGC

312. Both the IRGC's relationship with NIOC and NIOC's long-standing involvement in Iran's violent and malevolent activities, have been widely reported for years.

313. According to an August 4, 1985, *Los Angeles Times* article titled "Billion-Dollar Iran Arms Search Spans U.S., Globe," NIOC's London headquarters, called "NIOC House," was a key site for the IRGC's weapons smuggling operations dating back to the 1980s.

[32] Because the entire Iranian regime is answerable to the Office of the Supreme Leader, and the IRGC serves as an executive arm of the Supreme Leader, Ahmadinejad's formal moves added a more formal (de jure) gloss to a power structure that already existed (de facto).

314. The *Los Angeles Times* article noted that Iranian weapons smuggling operations—that is, "Iran's global effort to keep its military machine operating"—were run from a "well-guarded, seven-story, modern building at 4 Victoria St., London" called "NIOC House because the National Iranian Oil Company is headquartered here."

315. Furthermore, the article described how the NIOC House was also home to the Islamic Republic of Iran Air Force and its Logistics Support Center and the Iranian Navy and its Technical Supply Office.

316. According to the article, the building "has an empty look to it," and "[u]niformed guards stand behind locked, smoked glass doors, moving quickly to the doors when strangers approach. A sign in Persian and English warns those who approach to have their passes ready."

317. From those offices, "neatly typed but sometimes badly misspelled orders for munitions, parts and giant war machines are issued."

318. A September 3, 1985, *Los Angeles Times* article called NIOC House "the command center of Iran's multibillion-dollar campaign to acquire American-made weapons and military supplies."

319. An interviewed British government official commented: "It is one of the most secure buildings in London. It is quite a stronghold, solidly built with discreet security."

320. A December 27, 1986, article in *The Daily Telegraph* titled "London base for Iranian arms search" described Iran's use of London's NIOC House to purchase arms since 1981, detailing how "the top three floors of this soulless glass and concrete building opposite the Department of Trade and Industry is given over to Iran's logistics centre or revolutionary guards." Security for the building "verges on the obsessive"; "visitors are vetted by uniformed security guards and their briefcases passed through an X-ray machine."

321. A September 24, 1987, article in *The New York Times* titled "British Shut Down Iran Arms Office," reported that the UK shut down the Iranian Military Procurement Office, an operation with over fifty employees located in NIOC House.

322. Five months later, the British paper *The Observer* published an article on February 28, 1988, titled "London Arms Ban Ignored," describing how "Iranian Revolutionary Guards and army officers, posing as employees of Iran's state oil company, are continuing to use London as an arms purchasing centre, five months after the Government ordered a ban on such activities."

323. *The Observer*'s article detailed how as many as thirty employees working in NIOC's offices in Westminster "are involved in clearing world-wide purchases of military equipment."

324. Iran's pre-ban arms purchases through London had amounted to over $2.5 billion U.S. dollars a year, and subsequent trading had returned to about half the pre-closure level.

325. The article specified how the transactions were completed: "Expelled military procurement staff, now scattered throughout Europe, keep in daily contact with colleagues at NIOC House."

326. When the Iranian Defense Ministry publicizes that it wants to purchase a certain piece of equipment, "[t]he role of the army officers and Revolutionary Guards at NIOC House is to check on the sustainability and condition of the equipment being offered, authorize the financial transaction and arrange shipment if necessary."

327. On June 26, 2005, the Iranian daily newspaper *Farhang-e Ashti* reported the following regarding the IRGC's expanding role in Iran's domestic economy:

> With the coming to power of the ninth government came expanded military involvement in economic projects. The military, particularly the Islamic Revolution Guards Corps [IRGC], are mostly involved in oil projects—the most important economic projects in the country. Awarding two no-bid oil contracts without

> any formalities to the Khatam-al-Anbiya Base within a one-month period marks the beginning of military involvement in national oil projects.

328. On December 12, 2005, the *Arab Press Service* published an article titled "Iran's Petroleum Sector Is Being Taken Over by Revolutionary Guards" that stated the following about the IRGC's expanding role in NIOC:

> Staging a military coup d'état gradually, the Islamic Revolutionary Guards Corps (IRGC) is about to take over Iran's petroleum sector. On the sidelines of a conference in Tehran backed by the state-owned National Iranian Oil Co. (NIOC) and the Petroleum Ministry, Iranian executives said over 400 managers in this sector would be replaced by IRGC appointees.

329. *The Wall Street Journal* reported on July 26, 2006, that "Iran's Revolutionary Guard is set to win multibillion-dollar energy contracts, as foreign companies weigh the country's nuclear-power standoff with the West and its president tightens his grip on hydrocarbon resources."

330. *The Wall Street Journal* reported on October 14, 2006, on the IRGC's "commercial" growth:

> The secretive paramilitary group, according to the U.S., arms both violent Shiite militias in Iraq and Hezbollah.... Now the Revolutionary Guard is making an aggressive push into the backbone of Iran's economy, its oil and gas fields, one of the world's richest troves of fossil fuel.

331. On September 5, 2007, *Time* magazine published an article titled "Iran's Rich Revolutionary Guard," noting that: "Since around 2000, the IRGC[] has been awarded billions of dollars in contracts in the oil, gas and petrochemical industries, as well as major infrastructure projects."

332. An August 16, 2007, article in *The Wall Street Journal Europe* titled "Leading the News: Can the U.S. step up pressure on Iran?" reported that "Treasury

officials have barnstormed Europe to explain to bank regulators and executives there how Iran is using its financial system to allegedly further illicit activities."

333. On October 22, 2007, the American Enterprise Institute ("AEI") (Washington, DC) published a report entitled, "How Intertwined Are the Revolutionary Guards in Iran's Economy?"

334. On October 25, 2007, the U.S. Department of Treasury designated many IRGC-related entities, including the IRGC–QF, as SDGTs, noting that the IRGC "runs prisons, and has numerous economic interests involving defense production, construction, and the oil industry."

335. On February 10, 2010, the U.S. Department of Treasury designated multiple IRGC-controlled companies, noting the following regarding the IRGC's presence in Iran's markets:

> IRGC has a growing presence in Iran's financial and commercial sectors and extensive economic interests in the defense production, construction, and oil industries, controlling billions of dollars of business. The profits from these activities are available to support the full range of the IRGC's illicit activities, including WMD proliferation and support for terrorism.

336. The U.S. Department of Treasury concluded the following regarding the IRGC's role in Iran's economy: "the IRGC's domination of the oil and gas sectors … means that bolstering trade strengthens … the most hard-line segment of society in the Islamic Republic."

337. On February 16, 2010, the German magazine *Spiegel* published an article titled "Revolutionary Guards Keep Stranglehold on Iran," which stated that the IRGC tolerates no competition in the oil industry:

> Iranian business owners in Tehran still remember how, in August 2006, Revolutionary Guards, their weapons at the ready, took a military boat out to the Orizont drilling platform and boarded the platform. A short time later, the largest privately owned Iranian oil producer abandoned the well, and from then on the proceeds from

> Orizont's oil went directly into the coffers of the Pasdaran [i.e., the IRGC].

### 2. NIOC/NITC Were Controlled by the IRGC and Are Closely Intertwined With Its Terrorist Activities

338. In 2019, the U.S. Department of Treasury designated a worldwide Iranian petroleum shipping network originating with NIOC for "financially support[ing] [the IRGC–QF] and its terror proxy Hezbollah" in a "vast oil-for-terror shipping network."

339. It found that the shipping network "is directed by [the IRGC–QF] and its terrorist proxy Hezbollah," and that "[t]he IRGC–QF also relies heavily on Hezbollah officials and front companies to broker associated contracts," and it declared "that those purchasing Iranian oil are directly supporting Iran's militant and terrorist arm, [the IRGC–QF]."

340. Notably, according to the U.S Department of Treasury, the network was overseen by senior IRGC–QF official and former Iranian Minister of Petroleum (2011–2013) Rostam Qasemi.[33]

341. In January 2020, the U.S. Department of Treasury reaffirmed that NIOC finances the IRGC–QF and "its terrorist proxies," and designated four international petrochemical and petroleum companies.

342. The U.S. Department of Treasury stated the following regarding the four IRGC–QF supporting entities:

---

[33] Prior to serving as Minister of Petroleum and Chairman of NIOC, Qasemi was Commander of the IRGC's Khatam al-Anbiya (or GHORB) construction conglomerate. In 2010, Qasemi was first designated under E.O. 13382 for his role in Khatam al-Anbiya and, in 2019, further designated as a terrorist under E.O. 13224, along with the broader petroleum-shipping network that he oversaw. *See* Press Release, *Treasury Targets Iran's Islamic Revolutionary Guard Corps*, U.S. DEP'T OF TREASURY (Feb. 10, 2010), https://home.treasury.gov/news/press-releases/tg539.

> [They] have collectively transferred the equivalent of hundreds of millions of dollars' worth of exports from the National Iranian Oil Company (NIOC), an entity instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's Islamic Revolutionary Guard Corps–Qods Force (IRGC–QF) and its terrorist proxies.[34]

343. A month later, OFAC designated five additional UAE-based companies for having "purchased hundreds of thousands of metric tons of petroleum products from [] NIOC []."

344. The U.S. Department of Treasury again stressed that "Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime, which has used these funds to support the Islamic Revolutionary Guard Corps–Qods Force's (IRGC–QF) malign activities throughout the Middle East, including the support of terrorist groups."[35]

345. NIOC and its NITC subsidiary were ultimately formally designated as SDGTs by the U.S. Department of Treasury in 2020.

346. The U.S. Department of Treasury stated the following reasons for jointly designating NIOC and NITC as terrorist organizations:

> [They] provide both the oil and tankers for the sale of Iranian oil by the IRGC–QF. The cooperation and coordination between the IRGC–QF and these entities extends well beyond the simple sale of oil, including coordination between NIOC and the Central Bank of Iran to facilitate the collection of tens of millions of dollars in proceeds from the sale of oil that benefitted the IRGC–QF.

---

[34] Press Release, *Treasury Targets International Network Supporting Iran's Petrochemical and Petroleum Industries*, U.S. DEP'T OF TREASURY (Jan. 23, 2020), https://home.treasury.gov/news/press-releases/sm885.

[35] Press Release, *Treasury Targets Companies Facilitating Iran's Petroleum Sales*, U.S. DEP'T OF TREASURY (Mar. 19, 2020), https://home.treasury.gov/news/press-releases/sm949.

347. The U.S. Department of Treasury further noted the following regarding the historical role of NITC and NIOC in supporting both the IRGC–QF and Hezbollah:

> NITC has also played a significant role in oil deals used to generate revenue for the IRGC–QF and Hezbollah. NITC personnel coordinated with the IRGC–QF on the loading of oil provided by NIOC, and NITC Managing Director Nasrollah Sardashti (Sardashti) worked with Hezbollah on logistics and pricing for oil shipments to Syria.[36]

348. The reference to Hezbollah in the designations of NIOC and NITC reflects the symbiotic relationship between Hezbollah and the IRGC and their deep coordination in both financial and operational matters.

349. Previously, the Iran Threat Reduction and Syria Human Rights Act 2012 stated that:

> It is the sense of Congress that the National Iranian Oil Company and the National Iranian Tanker Company are not only owned and controlled by the Government of Iran but that those companies provide significant support to Iran's Revolutionary Guard Corps and its affiliates.[37]

350. The U.S. Department of Treasury also announced in 2012 that it found NIOC to be "an agent or affiliate of the" IRGC.

351. In reporting its finding, the U.S. Department of Treasury emphasized the IRGC's "support for terrorism" and "history of attempting to circumvent sanctions by maintaining a complex network of front companies."

---

[36] Press Release, *Treasury Sanctions Key Actors in Iran's Oil Sector for Supporting Islamic Revolutionary Guard Corps-Qods Force*, U.S. DEP'T OF TREASURY (Oct. 26, 2020), https://home.treasury.gov/news/press-releases/sm1165.

[37] Iran Threat Reduction and Syria Human Rights Act of 2012, Pub. L. 112–158, 126 Stat. 1214, codified as amended at 112 U.S.C. § 202.

352. In 2019, the U.S. Department of Treasury again noted that "[t]he international community must vehemently reject Iranian oil and related products in the same way that it rejects the violent acts of terrorism these [oil-for-terror] networks fund."[38]

353. The IRGC's leadership worked with Hezbollah to cultivate a variety of means for smuggling oil to finance their joint terrorist activities during the Relevant Period.

354. For example, in 2019 the U.S. Department of Treasury designated multiple IRGC officials and co-conspirators, noting that:

> The IRGC–QF also uses several front companies to mask its role in selling the crude oil, condensate, and gas oil. The companies are overseen by Hezbollah officials Muhammad Qasir and Muhammad Qasim al-Bazzal (al-Bazzal), both of whom were designated pursuant to E.O. 13224 in 2018 in connection with another oil-for-terror scheme.[39]

355. The same pattern of close coordination between the IRGC and Hezbollah in, among other arenas, the illicit sale of Iranian crude oil, can be seen in the efforts of Hezbollah operative Muhammad Bazzi's efforts to broker sales of Iranian oil in Africa.

### 3. IRGC'S Crude Oil Exports to Chinese Refineries

356. During the Relevant Period, the IRGC facilitated the substantial growth of Iranian oil exports to China, rising from seven percent of Iran's total oil exports in 2004 to 25 percent by 2011.

---

[38] Press Release, *Treasury Designates Vast Iranian Petroleum Shipping Network That Supports IRGC–QF and Terror Proxies*, U.S. DEP'T OF TREASURY (Sept. 4, 2019), https://home.treasury.gov/news/press-releases/sm767.

[39] *Id.*

357. This trade, which was priced in U.S. dollars, required illegal methods to circumvent sanctions on Iran's sale of oil in dollars, a fact understood by Defendants, crude oil customers in Asia, and middlemen and oil brokers around the world.

358. Much of this flowed from four IRGC-controlled entities: NIOC, National Iranian Gas Company ("NIGC"), National Iranian Oil Refining and Distribution Company ("NIORDC"), and the NPC.[40]

359. For the IRGC, generating "off-the-books" revenue by selling crude oil accounted for a substantial part of its operating budget and financed its acts of international terrorism.

360. For its part, the Chinese government secured a steadily increasing supply of Iranian crude oil for its national oil companies—China National Petroleum Corporation ("CNPC"), China National Offshore Oil Corporation ("CNOOC"), and China Petroleum and Chemical Corporation ("Sinopec")—through its state-owned oil broker Zhuhai Zhenrong Company LTD, later designated by the U.S. Department of State in 2012 and 2019.

361. According to a June 2, 2000, *Reuters* article titled "Iran Doubles Crude Sales to China at 160,000–[Barrels per Day]," Zhuhai Zhenrong began purchasing crude oil from IRGC-controlled NIOC in the mid-1990s.

362. The *Reuters* article also stated that "NIOC vice president Ahmad Rahgozar told a news conference in Kuala Lumpur [Malaysia] that the increased volume was due to a refinery upgrading programme in China which allows them to process more sour crudes" and quoted Rahgozar as saying that "China is buying a

---

[40] In October 2020, OFAC designated the Iranian Ministry of Petroleum under E.O. 13224 for providing financial support to the IRGC–QF. OFAC found that "[t]he Iranian Ministry of Petroleum has been used by individuals at the highest levels of the Iranian regime to facilitate the IRGC revenue generation scheme." *See*, Press Release, *Treasury Sanctions Key Actors in Iran's Oil Sector for Supporting Islamic Revolutionary Guard Corps-Qods Force*, U.S. DEP'T OF TREASURY (Oct. 26, 2020), https://home.treasury.gov/news/press-releases/sm1165.

good portion of our crude...they are importing 160,000 bpd from Iran and it is increasing…."

363. In April 2004, *Reuters* reported that NIOC was selling six million barrels of oil a month to Zhuhai Zhenrong, China's sole importer at the time of "term-supplies" of crude oil from Iran.[41]

364. During the Relevant Period, the IRGC used a variety of methods to sell Iranian oil to China, including, among others:

- Establishing front-companies and using intermediaries to conceal the origin of the oil and circumvent sanctions;
- Using false flags on oil tankers, making ship-to-ship oil transfers, and falsifying documents to disguise the origin of the oil;
- Shipping oil to third countries, such as Oman, United Arab Emirates, Malaysia, and Indonesia, and then re-exporting it to China;
- Using barter trade to exchange oil for goods and services, such as construction and engineering services;
- Offering discounts on oil prices to Chinese buyers, making it more attractive to purchase Iranian oil despite the risks; and
- Using informal networks, bribes of officials, and personal connections to negotiate oil deals and avoid detection.

---

[41] According to the U.S. Energy Information Administration ("EIA"), "term supplies" of crude oil refer to the long-term contracts between crude oil producers and buyers, typically for a period of one to five years. These contracts provide a stable supply of crude oil to the buyer and a guaranteed demand for the producer. The terms of these contracts can vary, including the price, volume, and delivery schedule. This type of arrangement helps both parties to manage risks associated with price fluctuations and supply disruptions. *See Glossary*, U.S. ENERGY INFORMATION ADMINISTRATION (2023), https://www.eia.gov/tools/glossary/index.php.

365. The above illicit methods allowed the IRGC to sell significant amounts of oil to China, despite international sanctions and restrictions.

366. In response to U.S. counterterrorism financing sanctions, the IRGC assembled an intricate network of front companies in Turkey, Hong Kong, Singapore, Oman, UAE, and even China itself to facilitate the illicit sale of Iranian oil.

367. *Reuters* later quoted a U.S. Deputy Treasury official as stating that "Iran cultivates complex sanctions evasion networks where foreign buyers, exchange houses, and dozens of front companies cooperatively help sanctioned Iranian companies to continue to trade."[42]

368. During the Relevant Period, Bank of Kunlun, a Chinese state-owned financial institution, was at the center of the IRGC's economic relationship between China and Iran, facilitating oil payments and blunting the impact of U.S. counter-financing of terrorism sanctions.

369. Established in 2006, the Bank of Kunlun is a commercial bank based in Karamay, an oil-producing hub in China's far-western Xinjiang region.

370. In 2010, due to increasing OFAC sanctions against Iranian entities, the Bank of Kunlun was chosen by the Chinese government as the primary bank for processing Zhuhai Zhenrong's payments to NIOC—denominated in Chinese yuan and EU euros.

371. To ensure the continued success of Iran's oil trade with China during the Relevant Period, NIOC-brokered oil shipments to China were (and are) carried by a "dark fleet" of older tankers owned by IRGC-controlled NITC or foreign IRGC front companies.

---

[42] Timothy Gardner and Daphne Psaledakis, *U.S. Targets 'Shadow Banking' Network Helping Iran Evade Sanctions*, REUTERS (Mar. 9, 2023), https://www.reuters.com/world/us-targets-shadow-banking-network-helping-iran-evade-sanctions-2023-03-09.

372. The IRGC's "dark fleet" of ships typically switch off their automatic identification system ("AIS") transponders when loading at Iranian ports to avoid detection and often modify their AIS transponder data to mask a respective tanker's movements at sea.

373. In January 2004, *TradeWinds*, a shipping industry publication, reported that NITC had purchased a Very Large Crude Carrier ("VLCC") oil tanker named *Iran Hengam,* identified by International Maritime Organization ("IMO") number 9212905, from Hyundai in South Korea.

374. In August 2006, SCB–Dubai credited a payment from NITC worth $378,833.73 U.S. dollars into FAL Oil's U.S. dollar account. NITC's U.S. dollar payment covered the costs of replenishing the refined fuel oil products used by VLCC *Iran Hengam* in its shipping voyages.

375. In 2019, the U.S. Department of Treasury designated, among others, NITC's VLCC *Iran Hengam* (subsequently renamed "*Happiness I*") as an SDGT for participating in a "large shipping network" that was "directed by and financially supports the Islamic Revolutionary Guard Corps–Qods Force (IRGC–QF) and its terrorist proxy Hizballah."[43]

376. In addition to the IRGC–China nexus for the illicit sale of oil, the IRGC provided incentives to and cultivated relationships with figures in the Chinese military-industrial complex to procure restricted items and technical expertise that substantially aid IRGC military capabilities.

377. State-affiliated Chinese companies and banks regularly overlooked evidence of IRGC illicit activities due to the prioritization of Iran's oil imports and China's broader economic strategy for the Middle East.

---

[43] Press Release, *Treasury Designates Vast Iranian Petroleum Shipping Network That Supports IRGC–QF and Terror Proxies*, U.S. DEP'T OF TREASURY (Sept. 4, 2019), https://home.treasury.gov/news/press-releases/sm767.

### 4. Dubai—A Primary Hezbollah and IRGC Money Laundering Hub Within the UAE

378. Dubai came under particular criticism during the Relevant Period for its lack of regulation. FATF specifically noted the aforementioned significant difference in the value of its rough diamond imports and exports, observing that "[i]n essence, diamond multinationals will channel their rough diamond purchases … through Dubai. Often, the parcels are not even opened and, after re-invoicing, are shipped to the final destination, often Belgium, India or far-east cutting centres. The invoice will inevitably provide a higher figure … As a result, the local company produces a profit – which is a purely paper profit, because it generally remains a transaction between affiliated companies."

379. The UAE also served a role as a diamond trade center, providing a link between mining countries and polishing centers and providing the supply needed by cutters and polishers who produce polished diamonds.

380. During the Relevant Period, the volumes (carat) imported to and exported from the UAE were almost the same—approximately 60 million carats.

381. Diamond traders in Dubai additionally benefited from its various free trade zones, including the DMCC and the Dubai Airport Free Zone Area ("DAFZA"). The Chairman of the Dubai Diamond Exchange was reported to have commented that "[Dubai has] no issues with tax evasion because there is no tax."

382. Dubai also emerged as "one of the world's least regulated gold markets," as described by the Institute for National Strategic Studies, National Defense University.[44] It served as the destination point for 95 percent of gold from East and Central Africa, which included its receipt of conflict gold from countries affected by armed conflict and corruption—the Democratic Republic of Congo ("DRC"), South Sudan, Sudan, and Central African Republic ("CAR").

---

[44] Kimberly L. Thachuk, *Terrorism's Financial Lifeline: Can It Be Severed?* STRATEGIC FORUM 191 (2002), at 4.

383. *The New York Times* reported in an October 5, 2003, article titled "U.S. Focusing on Dubai as a Terrorist Financial Center" that Dubai "has become an important crossroads for financing terrorism," citing a former counterterrorism official with the Central Intelligence Agency and the State Department: "'Contraband of all kinds moves through there—liquor, cigarettes, precious gems, you name it. Dubai is going to emerge as one of the battlegrounds in terrorist financing. It's a real, real problem and I don't know anyone who has a handle on what's going on there.'"

384. As set forth herein, SCB maintained accounts in Dubai and performed obviously high-risk services for notorious money launderers and other glaringly high-risk customers despite the fact that they were obviously engaged in illegal activities (bulk cash, conflict diamonds, gold bullion, shady oil brokers) and were, in many cases, associated with individuals or entities publicly tied to terrorism.

**5. SCB's Assistance to Hezbollah's Money Laundering Operations in Dubai**

385. SCB assisted known Hezbollah operatives. Hezbollah money launderers, smugglers, and traffickers laundered their ill-gotten cash through "exchanges," which exchanged that cash for wire transfers to bank accounts. SCB helped launder these funds.

386. For example, SCB helped launder the funds of a Hezbollah operative named Hassan Mohsen Mansour.

387. Mansour was later arrested in France (in February 2016) and indicted in a Florida court for drug trafficking and money laundering. The affidavit supporting his arrest warrant described him as "a Hezbollah associate, known to be involved in multi-faceted criminal activity, not simply money laundering and drug trafficking," adding that Mansour was "working directly with established members of Hezbollah."

388. One of Mansour's responsibilities for Hezbollah's BAC was to arrange transport for narcotics to Australia and then to move the cash collected back out of Australia for the drug cartels (with Hezbollah getting its commission).[45]

389. To help move the cash out of Australia, Mansour contracted a Pakistani national, Altaf Khanani, whose Al Zarooni Exchange could process currency in Dubai and generate U.S. dollar deposits that would translate into electronic funds transfers through SCB's Dubai branch (among others).

390. SCB was perfectly aware that Al Zarooni exchange was a terrorism laundering operation.

391. As *The New York Times* noted as far back as 2003, in an article titled, "U.S. Focusing on Dubai as a Terrorist Financial Center," Dubai served as a major conduit "for terrorist money," particularly "the emirates' many free trade zones, which allow the commingling of legal and illegal commerce. But the most significant, elusive conduit is the informal international money-transfer network known as hawala."[46]

392. Numerous public sources described Altaf Khanani's relatives and business associates and the investigation in Pakistan of their money laundering activities, including reports dating back to the early 2000s describing law enforcement concerns about Khanani transferring money to "militant groups" in Pakistan.

393. Not only was Dubai itself a high-risk jurisdiction for money laundering (and terror financing) but Khanani's "customers" and counterparties, such as

---

[45] Mansour was connected to Hezbollah narcotics traffickers Chekry Harb and Ayman Joumaa (discussed herein).

[46] Hawala operates outside the traditional banking system, relying on personal networks to move funds without money actually being exchanged. It is highly susceptible to exploitation for money laundering or terrorism financing purposes.

Hezbollah operatives like Mansour, were in other high-risk jurisdictions like Pakistan, Lebanon, and South America.

394. Al Zarooni Exchange was ultimately designated by OFAC on November 12, 2015, pursuant to E.O. 13581 for "being owned or controlled by, or acting for or on behalf of" the Altaf Khanani Money Laundering Organization ("Khanani MLO").[47]

395. On the same day, OFAC also designated the Khanani MLO itself as a "transnational criminal organization" which "exploits its relationships with financial institutions to funnel billions of dollars across the globe on behalf of terrorists, drug traffickers, and criminal organizations."

396. The OFAC designation described how the Khanani MLO "facilitates illicit money movement between Pakistan, the United Arab Emirates (UAE), United States, United Kingdom, Canada, Australia, and other countries, and is responsible for laundering billions of dollars in organized crime proceeds annually."

397. Indeed, OFAC confirmed that the Khanani MLO's "diverse" money laundering clientele included "**individuals associated with Hezbollah**." (Emphasis added.)

398. The Khanani MLO has laundered billions of dollars annually for criminals, terrorists, and narco-traffickers in significant part by using SCB–Dubai to wash cash it obtained through its currency exchange businesses including, Al Zarooni Exchange and Mazaka General Trading, LLC.[48]

---

[47] Press Release, *Treasury Sanctions the Khanani Money Laundering Organization*, U.S. DEP'T OF TREASURY (Nov. 12, 2015), https://home.treasury.gov/news/press-releases/jl0265.

[48] The company was nominally owned by Mohammed Hamad Ali Muri, but the U.S. Department of Treasury designated it as a Transnational Criminal Organization ("TCO") in 2016 for its role as part of the Khanani money laundering enterprise.

399. The Khanani MLO (called Khanani and Kalia International," or "KKI") began in 1984; by the late 1990s, the company had transformed into one of the largest currency traders in Pakistan, with a web of remittance agents across the world. KKI relied heavily on hawala, which the Pakistan government attempted in vain to regulate in an effort to curb the money laundering problem that had plagued the country for decades.[49]

400. The UK targeted Khanani's network as early as 1997, tracing funds worth hundreds of millions of British pounds across Spain, Italy, Germany, and the Netherlands.

401. The Khananis evaded arrest, however, having become indispensable to politicians and military officials within Pakistan's corrupt government.

402. As far back as 2001, KKI was cited as an example of one of Pakistan's currency exchanges which potentially "run illicit money-transfer operations that are linked informally to a vast network of similar operations around the globe" in an October 1, 2001, *USA Today* article titled "'Hundi' system may foil investigators."

403. On October 5, 2003, in an article titled "U.S. Focusing on Dubai as a Terrorist Financial Center," *The New York Times* reported that:

> One of the largest exchange houses and hawala dealers in the Muslim world, the Khanani and Kalia International based in Karachi, Pakistan, has shipped funds through Dubai and is now being investigated by the Pakistani authorities on suspicion of having transferred money to militant groups, American and Pakistani officials said. The authorities in the emirates also investigated the company about 18 months ago in connection with a suspicious transfer of funds between Pakistan and Britain through Dubai, Central Bank officials here said.

[49] Since the 1950s, Pakistan has been part of the "Golden Crescent," along with Iran and Afghanistan, which comprises the most important opium-producing center of the world. As a result of the extensive drug trade in the region, Pakistan became, and remains, a hub for drug trafficking and money laundering.

404. By 2007–2008, KKI's official banking records showed that the company processed funds worth $2.3 billion U.S. dollars, but authorities estimated the true unreported figure to be many times higher—between $14–$16 billion U.S. dollars annually.

405. KKI was shifting huge volumes of hard currency in physical bulk-cash banknote shipments across the border into war-ravaged Afghanistan, much of it going to heroin producers.

406. As KKI grew in prominence, different law enforcement agencies conducted investigations into the company.

407. Pakistan's financial crisis in 2008 precipitated an investigation into KKI, which at the time was handling 40 percent of all of Pakistan's foreign currency transactions.

408. The country's Federal Investigation Agency ("FIA") raided its head office and franchises and arrested eight senior figures, including Javed Khanani.

409. Altaf Khanani was living in Dubai, and eluded capture.

410. The agency alleged that KKI had illegally siphoned funds worth $10 billion U.S. dollars out of Pakistan.

411. The raid and arrests received media attention, including the following:

- A National (AsiaNet) article on November 8, 2008, titled "Crackdown on Money-Changers."
- An article on November 9, 2008, in the same publication titled "FIA Intensifies Crackdown," which reported that Pakistan's money changing market largely shuttered as a result of the raid.
- An Agence France Presse article on November 10, 2008, titled "Pakistan Courts Extend Detention of Money Changers."
- A Pakistan Press International article on November 18, 2008, titled "FIA to Keep Strict Watch on Illegal Foreign Exchange Flight."
- A United News of India article on November 11, 2008, titled "Pakistan's Central Bank Suspends License of Foreign

Exchange Firm" reported that KKI's license had been suspended temporarily.

- A Dawn article on December 3, 2008, titled "Charge-Sheet Filed Against Forex Scam Suspects" which described the charge sheet submitted by the investigation officer to the Pakistan court.

412. The charge sheet listed additional websites and databases KKI used for money laundering which were not registered with the State Bank of Pakistan.

413. It further stated that KKI had used the services of Al-Zarooni Exchange in the UAE, listing Atif Aziz Polani (later designated in 2016) and Jawed Qasim as the point people to assist with their illicit dealings.

414. Altaf Khanani's son, Obaid Khanani, who worked as a senior manager at Al-Zarooni Exchange, was designated along with Polani in 2016.

415. As described in a *Business Recorder* article published on May 17, 2009, titled "Atif Polani remanded to FIA custody," Polani, "accused in [the] country's biggest foreign exchange scam," was arrested in Dubai and brought to Karachi to face charges.

416. Polani was reported to be "facing charges of illegal banking, money laundering, fraud and cheating by sending and bringing foreign currency worth billions of rupees endangering economy of the country" in a November 5, 2009, *Daily Times (Pakistan)* article titled "KKI director's medical report sought in 2 days."

417. His charge of "illegal banking; money laundering and electronic money transfer illegally in and out of country" was additionally reported in a January 20, 2010, *Right Vision News* article titled "Pakistan: Bail plea for Kalia adjourned," and a February 19, 2010, *Right Vision News* article titled "Pakistan: K&K directors granted bail in illegal forex transfer case," which reported that the KKI directors "fraudulently created replica website clik.pk.net without the knowledge of SBP for affecting illegal transfer of money from and outside Pakistan in a clandestine manner

and setting up offices outside the country by appointing Atif Polani and Javed Qasim as focal persons to execute the illegal transactions."

418. On March 9, 2010, *Right Vision News* reported in an article titled "Pakistan: Charge-sheet filed in forex scam case" that Polani was accused of participating in *another* scam which "illegally transferred an amount of over Rs3 billion abroad through 11 bogus accounts opened by them in different banks."

419. The arrested KKI officials, including Javed Khanani, were formally charged in a Pakistan court in 2011. The prosecution reiterated that KKI had used the services of Al-Zarooni Exchange in the UAE, again naming Atif Polani and Jawed Qasim as the point people who assisted on all such dealings.

420. This allegation was reported on by the media, including in a January 30, 2011, *Plus Patent News* article titled "Charges Framed Against Forex Dealers," and, the next day, a *Right Vision News* article titled "Pakistan: Charges Framed Against Forex Dealers."

421. A March 27, 2011, *Islamabad Dateline* article titled "FIA to re-probe case against Khanani, Kalia" reported that names of the KKI officials had been deleted from the investigation report submitted to the court overseeing the money laundering case, and a *Pakistan Today* article from the same date titled "FIA drags Khanani, Kalia and their friends back to court" reiterated that KKI was accused of having used Al-Zarroni Exchange's services, with Atif Polani and Jawed Qasim as the point people.

422. Nevertheless, the company officials were acquitted in 2011, and then-FIA director general Waseem Ahmed gave an angry public statement saying that the accused had "used their resources" to obtain their acquittals. Altaf Khanani himself was exonerated in 2013.[50]

---

[50] According to a February 4, 2018, *ABC News* article titled "Catching the Money Man: How Australian Taxpayer Dollars and a Fake Drug Cartel Helped Bring Down the World's Most Wanted Money Launderer" Altaf Khanani is "the world's most wanted money launderer," and his and Kalia's "exoneration" in Pakistan generated rumors "that the bribe paid was in nine figures."

423. The article described how Pakistan's hawala system "is the subject of international scrutiny," and "has been singled out by the 30-nation Organization for Economic Cooperation and Development and other international institutions as a prime tool for money launderers."

424. It further cited *Money Laundering Alert*, a Miami-based newsletter, as stating that "[t]he possibility that al-Qa'eda and other terrorist groups have moved money through the *hundi* [i.e. hawala] network is 'more than remote.'"

425. In 2014, the DEA worked with law enforcement officials from Britain, Canada, New Zealand, and Australia to hatch a plan to capture Altaf Khanani. They posed as a cartel on the rise, inserting undercover agents into Khanani's network.

426. Khanani agreed to launder funds worth up to $200,000 U.S. dollars every few days and wire it into an American bank account secretly under DEA control. The agency eventually lured him from his usual locations in Dubai and Pakistan to Panama.

427. Khanani was arrested by the DEA in Panama on September 11, 2015, pursuant to a grand jury sealed indictment. On October 27, 2016, he pled guilty to federal money laundering charges, and in 2017, he was sentenced to 68 months in prison for conspiracy to commit money laundering.

428. In 2016, OFAC designated Altaf Khanani's twin brother, Javed Khanani; his son and senior manager at Al-Zarooni Exchange, Obaid Khanani; and his nephew, Hozaifa Khanani, along with Atif Polani, who "played a pivotal role in managing Al Zarooni Exchange and moved funds on behalf of the Khanani MLO." The designation additionally designated nine entities associated with the Khanani MLO.[51]

---

[51] Press Release, *Treasury Sanctions Individuals and Entities as Members of the Altaf Khanani Money Laundering Organization*, U.S. DEP'T OF TREASURY (Oct. 11, 2016), https://home.treasury.gov/news/press-releases/jl0574.

429. The February 4, 2018, *ABC News* (Australia) article titled "Catching the Money Man: How Australian Taxpayer Dollars and a Fake Drug Cartel Helped Bring Down the World's Most Wanted Money Launderer" described how Altaf Khanani, "the world's most wanted money launderer," was "running the underworld's equivalent of Goldman Sachs."

430. A May 2023 report titled "Next Generation Organised Crime" by The Hague Centre for Strategic Studies characterized the Al Zarooni Exchange as "essentially a mass-volume hawala bank."

## VI. SCB KNOWINGLY PROVIDED SUBSTANTIAL ASSISTANCE TO HEZBOLLAH AND THE IRGC

### A. SCB'S OPERATIONS IN THE UNITED ARAB EMIRATES

431. UAE's Dubai Multi Commodities Centre ("DMCC") and Dubai International Financial Centre ("DIFC") both boast glittering images as thriving free-trade zones, attracting companies and investors with generous incentives like zero tax, full ownership, streamlined licensing, and financial subsidies.

432. In 2002, UAE established DMCC as a strategic initiative of the Dubai government to create a commodity marketplace in Dubai, supported by the Central Bank of UAE's domestic payment system and the global Eurodollar payment system.

433. Functionally, DMCC is a free-zone authority that provides a platform for global trade and business, including gold, precious metals, diamonds, plastics, pearls, base metals, steel, energy, oil, textiles, food, and chemicals.

434. In November 2005, the Dubai Gold and Commodities Exchange ("DGCX") started trading derivatives within the DMCC, offering futures contracts and options on precious metals, energy, and currencies.

435. In September 2004, UAE established the DIFC as a "global financial hub" offering zero percent taxes on financial services profits and assets.

436. During the Relevant Period, SCB established and operated a licensed branch or representative office in DIFC: Standard Chartered Bank PLC (reference number F000003, licensed in September 2004).

437. DIFC operates under its own regulatory regime, separate from UAE's central bank and overseen by the Dubai Financial Services Authority ("DFSA") which at least professes to prohibit money laundering and terror financing in accordance with international AML/CFT standards.

438. In March 2007, then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey gave a speech to members of Dubai's business and financial community, including entities from DMCC and DIFC, regarding the IRGC's and Hezbollah's illicit business activities:

> Iran's Revolutionary Guard Corps, or IRGC, is used by the regime to provide a 'train and equip program' for terrorist organizations like Hezbollah, as well as to pursue other military objectives of the regime. The IRGC's control and influence in the Iranian economy is growing exponentially under the regime of Ahmadinejad. More and more IRGC-associated companies are being awarded important government contracts. An IRGC company, for example, took over management of the airport and runways in Tehran, while another company won the contract to build the Tehran metro. When corporations do business with IRGC companies, they are doing business with organizations that are providing direct support to terrorism.[52]

---

[52] U.S. DEP'T OF TREASURY, REMARKS BY UNDER SECRETARY STUART LEVEY BEFORE THE 5TH ANNUAL CONFERENCE ON TRADE, TREASURY, AND CASH MANAGEMENT IN THE MIDDLE EAST (2007), https://www.iranwatch.org/library/government/united-states/executive-branch/department-treasury/remarks-under-secretary-stuart-levey-5th-annual-conference-trade-treasury-and; *see also*, *Treasury Says UAE Needs "Close Look" at Iran Banks*, REUTERS (Feb. 28, 2008), https://www.reuters.com/article/us-iran-sanctions-treasury/treasury-says-uae-needs-close-look-at-iran-banks-idUSDXB00016620080228.

439. Nonetheless, in 2008, the International Monetary Fund ("IMF") found that severe money-laundering and terrorist financing vulnerabilities exist throughout the DMCC, DIFC, and UAE's other free-trade zones "as [a] result of the heavy use of cash in the economy for business transactions, the expansion into offshore business, the use of international business companies, and the increasing amount of direct foreign investment from many countries."[53]

440. UAE's DMCC prioritizes speedy registration over thorough verification, allowing companies to provide minimal, often unvalidated information about their ownership structures and operations and provides a haven for Hezbollah and the IRGC to engage in terrorist financing and sanctions evasion through trafficking in, among other things, gold, diamonds, and narcotics.

441. As noted above, SCB has licensed branches in the UAE serving over 340,000 customers throughout the UAE, the Middle East, North Africa and beyond. Its UAE presence consists of 14 branches, with its main banking office in Dubai and its regional headquarters in the DIFC. The UAE represented one of SCB's highest earning regions across its Group during the Relevant Period.

## B. SCB KNEW IT OPERATED IN HIGH-RISK JURISDICTIONS WITH HIGH-RISK CUSTOMERS

442. At all relevant times, SCB considered its UAE branches to be a high financial crime risk environment, in part because of the UAE branches' geographic proximity to sanctioned countries, including Iran. SCB also knew that the UAE lacked adequate regulatory oversight and was a haven for money laundering, sanctions evasion, and terror financing.

443. At all relevant times, SCB knew that Hezbollah and the IRGC were

---

[53] INTERNATIONAL MONETARY FUND, UNITED ARAB EMIRATES: DETAILED ASSESSMENT REPORT ON ANIT-MONEY LAUNDERING AND COMBATING THE FINANCING OF TERRORISM 15–17 (2008), https://www.imf.org/external/pubs/ft/scr/2008/cr08305.pdf.

violent terrorist organizations.

444. At all relevant times, SCB knew that Hezbollah and the IRGC utilized the global financial system to raise and transfer funds that financed their terrorist operations and that Hezbollah and the IRGC, like other terrorist organizations, were particularly reliant on access to U.S. dollars and hence to financial institutions capable of clearing and settling payments denominated in U.S. dollars.

445. At all relevant times, SCB was aware of the U.S. Sanctions Regime and that the U.S. Sanctions Regime is and was intended to prevent Hezbollah and the IRGC (among other terrorist organizations) from conducting banking activities, including electronic funds transfers, and thereby limit their ability to operate and to carry out terrorist attacks.

446. At all relevant times, SCB had actual knowledge that terrorist organizations such as Hezbollah and the IRGC utilize electronic funds transfers and other banking services in order to operate and that providing banking services to them enables them to and enhances their capabilities to plan, prepare for, and perpetrate terrorist attacks.

447. SCB was aware of the recommendations promulgated by FATF, the requirements of the USA Patriot Act, UNSC Resolution 1373, and other domestic laws and regulations enacted after the September 11, 2001, attacks that required financial institutions to know their customers and perform enhanced due diligence on those customers to prevent money laundering and terror financing.

448. SCB–London set global standards across the entire SCB group as a whole.

449. At all relevant times, SCB knew it was required to perform customer due diligence ("CDD") that included:

- Identifying the customer and verifying the customer's identity on the basis of documents or other data obtained from a reliable and independent source;

- Identifying the beneficial owner(s) of the customer, and taking adequate measures on a risk-sensitive basis to verify that beneficial owner's identity; and
- Obtaining information on the purpose and intended nature of the customer's relationship with the firm.

450. SCB also knew that where the business relationship with a customer presented, by its nature, a higher risk of money laundering or terrorist financing, it was obligated to conduct Enhanced Due Diligence ("EDD") and if unable to apply such measures, it was required to not accept the customer or perform any transactions with or for that person or entity.

451. If SCB was not able to apply CDD measures to an existing customer, it was required to terminate its existing relationship with that customer.

452. In 2001, SCB opened what it then described as its "state-of-the-art" global service center in Chennai, India, where SCB–London would eventually route its SWIFT messages from around the globe (including for its various subsidiaries) for initial compliance review.

453. In 2005, SCB purportedly introduced financial crime and compliance software developed by Norkom Technologies that was supposed to be "installed across the bank's operations in more than 50 countries, on four continents to provide transaction monitoring and real time sanctions filtering."

454. Norkom's technology solutions were purported to help SCB "to detect, analyze, intercept and report suspicious and criminal activity" and to "immediately identify transactions to or from individuals, organizations or countries that are viewed as 'high risk,' prioritizing investigations so that the bank can focus its attention first on those that represent the greatest risk."

455. In 2005, SCB stated that "[a]n important part of our approach to tackling money laundering is our Know Your Customer (KYC) scheme. We encourage and train all our employees to develop a real knowledge of their customers to help us serve them better and to sharpen our processes in tackling fraud and money laundering."

456. In April 2009, SCB's Group Policy for the Prevention of Money Laundering stated:

> It is essential, in order to protect its reputation and to meet its legal and regulatory obligations, that the Group minimizes the risks of being used by money launderers. For the purposes of this policy 'money laundering' also includes terrorist financing.

457. Additionally, SCB's 2009 AML policy noted that:

> The Group's policy on the prevention of money laundering applies to all countries in which the Group operates and to all business activities within those countries. It is a clear statement to our staff, customers, and regulators of the Group's position on this critical risk issue.

458. In 2011, SCB reiterated its commitment to fighting money laundering, terrorist financing, fraud, and bribery:

> We are committed to combating money laundering, terrorist financing, fraud, bribery, and market abuse. To guard against the risk of financial crime within our business, we focus on training our employees, strengthening our screening systems, and ensuring that our policies and procedures are comprehensive and up-to-date.

## C. SCB WILLFULLY AND INTENTIONALLY CHOSE TO DISREGARD U.S. LAWS, REGULATIONS, AND INTERNAL GUIDELINES

459. Despite its knowledge of U.S. sanctions laws and regulations and its own stated internal compliance policies, on June 1, 1995, SCB's General Counsel wrote an e-mail advising SCB's regulatory compliance staff that SCB London could "ignore" OFAC's "regulations" and instructing that a memorandum containing this plan was "highly confidential & MUST NOT be sent to the US."

460. Six years later Iran's central bank, the CBI, asked SCB to act as its main bank for U.S. dollar proceeds derived from daily oil sales NIOC made in the oil export market.[54]

461. An e-mail dated February 19, 2001, from SCB's Head of Inbound Sales, Institutional Banking, characterized the CBI's solicitation of SCB as "*very prestigious*" because "*in essence, SCB would be acting as Treasurer to the CBI ....*"[55]

462. In emails in 2003, SCB senior officers noted the "reputational risk" and "potential reputational damage" involved in its illegal conduct.

463. When SCB anticipated that its business with its Iranian bank clients, including Defendant Bank Saderat Plc, would grow too large for SCB employees to manually "repair" the payment order messages for New York bound wire transfers, SCB automated the process by building an electronic repair system with "specific repair queues" for each Iranian client.

464. In October 2004, SCB consented to a formal enforcement action (the "SCB Consent Order") and executed a written agreement with the New York State Banking Department ("NYSBD") and the Federal Reserve Board of New York ("FRBNY"), which required SCB to adopt sound Bank Secrecy Act and Anti-Money Laundering ("BSA/AML") practices with respect to foreign bank correspondent accounts (the "Written Agreement").

465. The Written Agreement also required SCB to hire an independent consultant to conduct a retrospective transaction review for the period of July 2002 through October 2004.

466. The review was intended to identify suspicious activity involving accounts or transactions at, by, or through SCB–New York.

---

[54] At some point, SCB–Dubai also opened a U.S. dollar credit facility for the CBI.

[55] During the Relevant Period, SCB knowingly processed approximately 60,000 Iran-related payments, totaling **$250 billion**, as part of its key role in assisting Iran's terror apparatus.

467. SCB failed to inform the NYSBD and the FRBNY that its London and Dubai operations were secretly clearing hundreds of billions of dollars through SCB–New York for Iranian entities at the same time that it was promising to reform its AML practices.

468. SCB also failed to inform the NYSBD and the FRBNY that its London, Dubai, Bahrain, Singapore, and Hong Kong operations were secretly helping Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL")[56] and the IRGC evade U.S. sanctions at a time when they were illegally acquiring a wide range of U.S. equipment and technologies, including components for IEDs and EFPs used to kill and maim Coalition Forces in Iraq.

469. SCB retained Deloitte & Touche LLP ("Deloitte") to conduct the required "independent" review and to report its findings to the regulators.

470. SCB then asked Deloitte to delete from its draft "independent" report any reference to certain types of payments that could ultimately reveal SCB's illegal Iranian-related practices.

471. In an e-mail dated October 1, 2005, SCB's Group Head of Legal & Compliance, Wholesale Bank, forwarding the Quality Operating Procedure to SCB's Group Head of Compliance and Regulatory Risk, its Group Legal Advisor, and its Head of Financial Crime Risk Systems and Monitoring, observed that "read in isolation, it is clearly ... designed to hide, deliberately, the Iranian connection of payments."

472. A few days later, in an e-mail dated October 8, 2005, Deloitte's Global Leader of Anti-Money Laundering/Trade Sanctions Division wrote to SCB's Head of Compliance, that Deloitte had "agreed" to accede to SCB's request that Deloitte delete from its draft "independent" report any reference to certain types of payments that could ultimately reveal SCB's illegal Iranian practices because "this is too much and

[56] MODAFL was designated by the United States on June 28, 2005.

too politically sensitive for both SCB and Deloitte. That is why I drafted the watered-down version."

473. In a December 1, 2005, internal memorandum SCB acknowledged that, due to its conduct, its New York branch "is exposed to the risk of a breach of sanctions."

474. SCB continued to deceive regulators. In September 2006, New York State regulators requested that SCB provide them with statistics on certain Iranian transactions SCB handled, including the number and dollar volume of such transactions for a 12-month period.

475. When SCB identified 2,626 Eurodollar transactions totaling over $16 billion (for Iranian banks) from 2005-2006, it decided instead to provide only ***four days*** of data to regulators and simply claim they covered two years of transaction data.

476. In an October 2006 email, the CEO for SCB's U.S. Operations warned the SCB Group Executive Director in London that SCB's Iranian business had "the potential to cause very serious or even catastrophic reputational damage to the Group," including "subjecting management in US and London (e.g. you and I) and elsewhere to personal reputational damages and/or serious criminal liability." The Director responded: "You f---ing Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians."

477. In 2007, SCB successfully convinced the NYSBD and the FRBNY to lift the SCB Consent Order based on the materially misleading, watered-down Deloitte report and its other fraudulent disclosures.

478. In early 2009, after being contacted by U.S. law enforcement authorities, SCB conducted yet another "internal investigation" into its OFAC sanctions screening procedures, business practices, and technology.

479. As of 2011, even after its internal investigation and open law enforcement investigations commenced in the U.S., the NYSBD still found that SCB–New York had:

> No documented evidence of investigation before the release of funds for transactions with parties whose names matched the OFAC-sanctioned list; and
>
> Outsourced SCB–New York's entire OFAC compliance process to Chennai, India, with no evidence of any oversight or communication between the Chennai and SCB–New York.

480. On September 21, 2012, SCB and the New York State's Department of Financial Services ("DFS") executed a Consent Order with DFS concluding that "SCB operated as a rogue institution."

481. Manhattan District Attorney Cyrus Vance Jr. stated in the press release: "Investigations of financial institutions, businesses, and individuals who violate U.S. sanctions by misusing banks in New York are vitally important to national security and the integrity of our banking system. Banks occupy positions of trust. It is a bedrock principle that they must deal honestly with their regulators. I will accept nothing less; too much is at stake for the people of New York and this country. These cases give teeth to sanctions enforcement, send a strong message about the need for transparency in international banking, and ultimately contribute to the fight against money laundering and terror financing."

482. On August 19, 2014, DFS announced an order regarding SCB's failures to remediate AML/CFT compliance problems as required in SCB's 2012 settlement with DFS.

483. In August 2015, *The New York Times* reported that SCB was once again under investigation: "The Justice Department is examining whether it committed sanctions violations beyond those covered in the 2012 deal, which centered on what the bank called 'Project Gazelle,' an effort to forge 'new relationships with Iranian companies.'"

484. The *Financial Times* also reported in September 2015:

> Documents seen by the FT suggest that StanChart [ie., SCB] continued to seek new business from Iranian and Iran-connected companies after it had committed in 2007 to stop working with

> such clients. These activities include foreign exchange transactions that, people familiar with StanChart operations say, would have involved the US dollar….
>
> The material reviewed by the FT depicts a bank—one of the few foreign lenders with a license [sic] to operate in the country—determined to keep working with Iranian companies. The status of numerous Iranian and Iran-connected entities was still being reviewed by StanChart as late as 2013, according to documents seen by the FT. These included entities that had internal "markers" and "blocks" placed against them, a way for the bank to flag up concern about links to Tehran. Many accounts belonging to Iranian or Iran-connected entities were indeed closed by 2007, as StanChart promised. But some, like Bank Saderat—which had sanctions imposed in 2006, or Bank Sepah—still had open accounts with no markers against them.

485. On April 9, 2019, SCB entered into yet another Consent Order with DFS agreeing to pay an additional $180 million U.S. dollars to address its newly discovered misconduct.

486. DFS ultimately concluded that "during the period November 2008 through July 2014, the Bank processed nearly 15,000 illegal payments for the benefit of sanctioned Iranian parties, totaling more than $600 million."[57]

487. But there was more SCB was hiding from regulators. SCB's so-called "Iran Group" processed at least 906 Iran-related foreign exchange, trade finance, and term deposit transactions worth a total of $9,590,088,848 U.S. dollars between 2008 and 2012.

---

[57] The factual findings contained in the April 9, 2019, DFS Consent Order are incorporated herein by reference.

### D. SCB KNOWINGLY PROVIDED SUBSTANTIAL ASSISTANCE TO HEZBOLLAH SUPER FACILITATORS AND MONEY-LAUNDERING NETWORKS

488. Much of Hezbollah's revenue derived from narcotics trafficking, conflict diamonds, gold smuggling and a myriad of trade-based money laundering schemes is directed by a cadre of what the U.S. government has termed Hezbollah's "Super Facilitators."

489. These are individuals (almost exclusively Lebanese nationals) who either headed Lebanese Shi'a organized crime clans like the Ahmads, Nassours, Khanafers and Tajideens, ran narcotics trafficking networks like Ayman Joumaa or operated vast Hezbollah BAC–IRGC networks that were involved in multiple lines of criminal conduct, like Muhammad Bazzi.

490. Importantly, during the Relevant Period, the activities of these Super Facilitators was coordinated by Abdallah Safieddine at the direction of the IRGC–QF and, among other things, was used to finance the IRGC and Hezbollah's joint terror campaign against U.S. and Coalition Forces in Iraq.

#### 1. Muhammad Bazzi (SDGT)

491. Born on August 10, 1964, in Bint Jbeil in southern Lebanon, Muhammad Ibrahim Bazzi is a Hezbollah Super Facilitator who has fundraised at least hundreds of millions of dollars for Hezbollah through his business activities in Belgium, Lebanon, Iraq, and West Africa.

492. Bazzi was expelled from Sierra Leone in 1998.

493. At various times, Bazzi has held passports from Lebanon, Belgium, the United Kingdom, Sierra Leone, and The Gambia. He is married to Sawsan Hodroj, the sister of Michigan businessman Ahmad Hodroj. She is the niece of Hezbollah operative and supporter Talal Chahine.

494. Ahmad Hodroj's wife Fatima is a sister of the wife of the deposed president of The Gambia, Yahya Jammeh.

495. Thus, Muhammad Bazzi had familial ties to the president of The Gambia. Bazzi, was issued a diplomatic passport by then-President Jammeh and also served during the Relevant Period as an Honorary Consul for The Gambia in Lebanon where he reportedly met periodically with Abdallah Safieddine and other members of the BAC leadership.

496. Liberia's *The Daily Observer,* reproduced in *Africa News* on July 14, 2008, in an article titled "Gambia; Dubai Investors Meet Jammeh," referred to Bazzi as the Honorary Consul for The Gambia in Lebanon.

497. Bazzi had extensive personal and business connections with Abdallah Safieddine, the co-head of Hezbollah's BAC and Hezbollah's representative to Iran and served as an important cut-out for the BAC and the IRGC–QF when they required specific assistance.

498. Due to his leading role in financing Hezbollah's IJO, Bazzi was known throughout the Relevant Period as a senior Hezbollah operative, particularly in Lebanon where his association with Kassim Tajideen and Abdallah Safieddine was also widely known.[58]

499. In West Africa, Bazzi was also closely associated with more than one corrupt government and was widely known as a close personal associate of President Jammeh and local oligarchs.

500. Thus, even outside of Lebanon, public sources repeatedly described allegations of Bazzi's illicit conduct and his association with Hezbollah.

501. Bazzi received particularly significant media coverage starting in 2006, when then-Gambian President Yahya Jammeh started selling The Gambia's failing

---

58 In The Gambia, Bazzi worked closely with the Tajideens and Tajco and worked with LCB's Prime Bank to launder money for them.

energy and telecommunications companies to companies owned and controlled by Bazzi.

502. *All Africa*, an online news source aggregating news published across Africa, published an article on October 9, 2006, titled “Problèmes d’électricité, les solutions du voisin Global Management System” (“Electricity problems, neighbor’s solutions”) describing how President Jammeh sold The Gambia’s national water and electric company (“NAWEC”) to Global Management System, a company owned by Bazzi.

503. *The Gambia Journal* also reported on this “move that took everyone by surprise” on October 2, 2006, in an article titled “Gambia: Surprise NAWEC Take Over Announced.” The article reported how “Mr. Bazzi is the same person who less than two months ago announced that another previously unknown company, Global Trading Group, also owned by him, was in turn, the owner of three 6.8 MW generators at the new Brikama Power Plant. That time too, it took many by surprise that the generators were not owned by the Gambian state….”

504. *Freedom Newspaper*, an online newspaper published by a Gambian American journalist focused on injustices in The Gambia during President Jammeh’s time in office, launched an investigation into Muhammad Bazzi, publishing two articles on October 15 and 25, 2007, linking Bazzi with Hezbollah.

505. On November 5, 2007, *Freedom Newspaper* reprinted a letter to the editor by the “Management of Gam Petroleum” which had read the articles and were threatening to sue the paper. The letter insisted that despite the reports reflected in the October 2007 articles, Bazzi was the major shareholder and managing director of a group of companies in The Gambia, including Gam Petroleum; GEG (a new power plant in the country); Gam Veg (an edible oil refinery); and Royal Residence (a prime real estate developer) but was not associated with Hezbollah and “has never been involved in the diamond business, directly or indirectly.”

506. Bazzi's subsequent failure to deliver services to The Gambia quickly made headlines. In an article reproducing a *Freedom Newspaper* report dated December 12, 2007, titled "Gambia; Contractor Alleges Fraud Over Generators Sale," *Africa News* reported that Bazzi and his company, the Spectrum Group, canceled a contract for generators with a Turkish-based contact without any explanation and instead purchased used defective generators from China.

507. *Africa News* predicted "a full blown political crisis" in The Gambia on December 19, 2007, in an article titled "Gambia; Spectrum Group Will Not Resolve Economic Woes," which reproduced a *Freedom Newspaper* report describing "Lebanese runaway Hezbollah fighters" entrusted by the corrupt Gambian government to "milk Gambia's ailing economy." The report listed how the "so called" Lebanese investors "helped to wreck war ravaged Sierra Leone," "engaged in shady business activities, ranging from drug trafficking, foreign exchange hoarding, the sale of 'blood diamonds,'" and "gun running just to name a few." The article specifically identified Muhammad Bazzi, head of the Spectrum Group, as having "hijacked" Gambia's telecommunications, airline, and water and electricity companies without any transparency into whether the funds allegedly used to buy these institutions were "clean money" or not. The article further reported on the Spectrum Groups' colossal failures to provide services, and that any funds generated "are wired through Standard Chartered Bank Banjul Branch to Arab countries."

508. *Freedom Newspaper* reported on the association between President Jammeh and Iran on December 31, 2007, in an article titled "Iran's landmines, howitzer canons in The Gambia – the effects are serious!" The report cited the presence of Iranian security personnel "dining and wining in Banjul," the capital of The Gambia, and warned that the "GAMTEL [The Telecommunications Company LTD]–HEZBOLLAH links are being traced."

509. In 2008, Muhammed Bazzi brokered a large consignment of petroleum between the National Iranian Oil Refining and Distribution Company ("NIORDC")

and the NAWEC, a Gambian State-owned oil company, run by a close friend of President Jammeh.

510. Bazzi's Gam Petroleum received proceeds from this and other insider transactions and parked these proceeds in several banks.

511. *Freedom Newspaper* continued to report on the connection between President Jammah, Iran, and Hezbollah, publishing a report on February 26, 2011, titled "Breaking News: Gambia: Did Jammeh Sell Iranian Arms to Hezbollah?" The report described thirteen containers of Iranian arms intercepted during their transit to The Gambia and stated that a "Hezbollah cartel in Banjul" was "acting in concert with the country's President Yahya Jammeh to sell arms to the terrorist group's main base in Lebanon," in a "well-coordinated scheme, which has been going on for a while" – at least as far back as 2005.

512. The report stated that Muhammad Bazzi was President Jammeh's "conduit" for selling Iranian arms as well as drugs to Hezbollah, and included a section titled "Who is Muhammed Bazzi," which described how Bazzi devised the plan to be awarded a monopoly for the sale of all petroleum productions in Gambia through "GamPetroleum," of which he owned 99%. Bazzi was also listed as co-owner of Spectrum Group, which controlled The Gambia's energy and telecommunications sectors. The report described how Bazzi initially exported the funds generated by his companies to Lebanon via bags of dollars, but when his money laundering activity was detected, he registered "his own money laundering 1-branch bank called Prime Bank." The report cited the U.S. government's identification of Prime Bank as the subsidiary of LCB which is "partially owned by a Lebanese individual known to be a supporter of Hezbollah," a/k/a, Muhammad Bazzi.

513. Bazzi was also described in that article as The Gambia's Consul General to Lebanon.

514. The *Freedom Newspaper* report on Bazzi acting as the intermediary between President Jammeh, Iran, and Hezbollah was cited in a report published by

the Gatestone Institute on March 25, 2011, titled "Iran's Charm Offensive In Africa." The report repeated the claims that President Jammeh was colluding with Bazzi to buy weapons from Iran to sell to Hezbollah, and that Bazzi created Prime Bank, a subsidiary of the blacklisted LCB, to "assist in money laundering and weapons trading activities."

515. The IRGC weapons were also reported on in more detail by the Critical Threats Project in an article dated March 7, 2011, titled "Qods Force Operation in Africa." The article described how Nigerian security forces intercepted the shipment of thirteen twenty-foot containers of Iranian weapons in October 2010, which contained "107 mm artillery rockets, 60/81/120 mm mortars, grenades, explosives, and rocket launchers." The report characterized the seizure as a "public revelation of Iranian hard power activity in Africa."

516. Bazzi organized a major weapons shipment from Nigeria in coordination with the IRGC–QF through Abdallah Safieddine, using Prime Bank Gambia subsidiary to help finance the deal.

517. According to a report by the Combating Terrorism Center at West Point:

> Iran's Quds Force and [Hezbollah]'s global operations have involved Nigeria for more than a decade, but their activities were exposed in October 2010. Nigerian customs officials in Lagos seized 13 containers of weapons from a ship operated by the same French-Lebanese businessman's company that in March 2011 saw a ship bound for Sinai, Egypt, via Syria to supply weapons to Hamas in Gaza intercepted by Israeli naval commandos. The containers in Lagos, which included 107mm Katyusha artillery rockets used by [Hezbollah] against Israel in 2006, were shipped on behalf of a Tehran–based Islamic Revolutionary Guard Corps (IRGC) "front company" and were picked up at Bandar Abbas in Iran, where the IRGC has a naval base. According to Nigeria's foreign minister, the weapons were destined for a warehouse in Abuja, but shippers altered documents to send them to Gambia (presumably for anti-Senegalese rebels in Casamance). Nigerian security officials arrested four individuals: a senior Quds Force officer; a Nigerian who formerly studied in Iran and worked at

> Radio Tehran's Hausa language service; and two Nigerian customs officials. A fifth Iranian suspect, Sayyed Akbar Tabatabaei, who was the Quds Force Africa Corps commander, took refuge in the Iranian Embassy, flew back to Tehran with Iran's foreign minister and was reportedly reassigned to Venezuela to run Quds Force operations in Latin America. One month after these arrests, $10 million worth of heroin hidden in auto engine parts suspected of being linked to the weapons shipment in October was seized in Lagos from a ship originating in Iran.

518. On February 27, 2013, *Freedom Newspaper* published an editorial titled "Lebanese Mobsters increase their Stranglehold on Gambian Economy," which described how President Jammeh permitted the Lebanese "mobsters" in the region monopolies over its natural resources. The article cited the U.S. Department of Treasury's press release announcing its identification of LCB as a "primary money laundering concern" under the PATRIOT Act, in which The Gambia-based Prime Bank was specifically identified as being "partially owned by a Lebanese individual known to be a supporter of Hezbollah." The article further noted that no Gambian at that time was allowed to import any petroleum or fuel, as Gam Petroleum, a "company owned by Muhammad Bazzi and his cohorts" had a monopoly over that right. The report further described how NAWEC was obligated to purchase electricity by these Lebanese monopolies at prices determined by them.

519. In 2011, Bazzi and Safieddine worked to resolve a dispute and reestablish relations between Iran and The Gambia.

520. The U.S. Department of Treasury later confirmed that Bazzi was also a "close associate" of Yahya Jammeh, the former president of The Gambia, who was sanctioned by the United States in December 2017 for his record of human rights abuses and money laundering.

521. On May 17, 2018, Bazzi was designated an SDGT by the U.S. Department of Treasury.[59]

522. Five companies Bazzi owned or controlled were also designated by the U.S. Department of Treasury on the same date.

523. Bazzi worked closely with former Gambian president Yahya Jammeh to loot the country and open it up to Hezbollah for narcotics trafficking, money laundering, and arms dealing.

524. Bazzi ran several companies around the world, often with a business associate named Fadi George Mazegi.

525. In The Gambia, Bazzi installed Fadi George Mazegi as a "Non-Executive Director" of Prime Bank, a subsidiary of Lebanese Canadian Bank used by Hezbollah's BAC and the IRGC to launder enormous sums of money. Although official documents reportedly show Bazzi was an owner of the bank, he has told *The Wall Street Journal* that "he had only helped procure a banking license for friends."

526. Prime Bank (Gambia) became a key money laundering hub for Hezbollah and a favored channel for moving Hezbollah's money to LCB in Lebanon. It was a major conduit for Ayman Joumaa's network to launder drug money for the Mexican cartels. It also moved hundreds of millions of dollars for the IRGC at the behest of and in coordination with Bazzi and Abdallah Safieddine, who reported

[59] A month after designating him for supporting Hezbollah's terrorist activities, the U.S. Dep't of Treasury released a report on human rights that criticized the Gambian regime of Yahya Jammeh. The U.S. Dep't of State also described The Gambia as "a source and destination country for women and children subjected to forced labor and sex trafficking." According to the U.S. Dep't of State, "Gambian women are subjected to forced labor and sex trafficking in the Middle East, including Lebanon and Kuwait." Bazzi has been linked to the Gambian human trafficking network, and a published report further linked him to "the process of using the Syrian girls who are collected from refugee camps and trading them for money to help Hezbollah."

directly to the late Maj. Gen. Qassem Soleimani who was the head of the IRGC–QF at the time.

527. Bazzi's son, Wa'el Muhammad Bazzi, owns shares in several of his father's corporate holdings and has assumed control of several of them following his father's SDGT designation (in order to facilitate sanctions evasion).[60]

528. Bazzi owned or controlled the following companies:

- **Global Trading Group NV** (SDGT), a global energy products and services company headquartered in Antwerp, Belgium, that also has locations in Sierra Leone, The Gambia, Ivory Coast, and Benin. On August 9, 2018, the company changed its name to Energy Engineers Procurement and Construction.[61]

- **Euro African Group LTD** (SDGT), a major fuel supplier in The Gambia. According to *Reuters*, Euro African Group LTD held exclusive rights to import fuel to The Gambia between 2008 and 2013 and a fuel supply deal to the state-run utility. Bazzi acknowledged to *Reuters* that the company made three payments to the Jammeh Foundation for Peace totaling $1.3 million in 2013. Documents obtained by *Reuters* reflect five payments into the account in 2013 totaling $2.55 million—each referencing Euro African Group.
- **Africa Middle East Investment Holding SAL** (SDGT).
- **Premier Investment Group SAL Offshore** (SDGT).
- **GAM Petroleum** (Storage Facility).
- **Prime Bank (Gambia)**.

---

[60] Wa'el Bazzi was designated an SDGT by OFAC on April 24, 2019. *See*, Press Release, *Treasury Targets Sanctions Evasion Conduits for Major Hizballah Financiers*, U.S. DEP'T OF TREASURY (Apr. 24, 2019), https://home.treasury.gov/news/press-releases/sm668.

[61] In October 2018, Muhammad Bazzi was still attempting to negotiate oil-related contracts on behalf of Global Trading Group NV "for the benefit of the government of Iran" but noted the need "to take definite precautions, attentions and preparations in our steps and actions…"

- **Ibrahim Bazzy Bazzi and Sons LTD** (Sierra Leone).

529. Muhammad Bazzi is (or was prior to his SDGT designation) a director of the Gambia Milling Corporation along with Fadi George Mazegi. Bazzi's Premier Investment Group (SDGT) appears to have owned 50 percent of the company.

530. During the Relevant Period, Bazzi maintained close ties to other U.S.-designated individuals, including Hezbollah financiers Adham Hussein Tabaja and Ali Youssef Charara. He also had extensive links to Hezbollah's most senior narcotics traffickers, including the U.S.-designated SDNTK, Ayman Joumaa.

531. On April 23, 2019, the U.S. government's "Rewards for Justice" Program announced a reward of up to $10 million "for information leading to the disruption of the financial mechanisms of Lebanese Hezbollah."

532. The announcement described Bazzi as a "key Hezbollah financier, who has provided millions of dollars to Hezbollah generated from his business activities" and noted that the reward offer was highlighting him and two other individuals "as examples of key Hezbollah financiers and facilitators about whom it seeks information and whom the U.S. Department of the Treasury has designated as SDGTs."

533. In February 2023, a three-count indictment was unsealed in United States District Court for the Eastern District of New York charging Bazzi, a Lebanese and Belgian citizen, and Talal Chahine, a Lebanese citizen, with conspiracy to conduct and cause United States persons to conduct unlawful transactions with an SDGT, attempt to conduct and cause United States persons to conduct unlawful transactions with an SDGT, and money laundering conspiracy.

534. Bazzi was also apprehended that same month in Romania and later extradited to the United States where he is currently incarcerated pending trial.

535. Several of Bazzi's commercial operations served as major conduits for Hezbollah's BAC investments and its money laundering and illicit oil and weapons

trafficking operations. SCB was described as the "Principal Banker" for the following corporate entities controlled by Bazzi during the Relevant Period:[62]

- Ibrahim Bazzy and Sons LTD (Sierra Leone).
- Gam Petroleum (Gambia).
- Global Trading Group NV (Belgium) (SDGT).
- Euro African Group LTD (Gambia) (SDGT).

536. Bazzi not only worked with SCB closely in multiple jurisdictions including high-risk jurisdictions like Sierra Leone and The Gambia—known for high levels of government corruption—but he was also a Politically Exposed Person ("PEP") who served as an "honorary consul" and was related by marriage to the President of Gambia during the Relevant Period and was closely associated with government corruption in that country.

537. SCB played a key operational role in providing Bazzi and his network entities with tailored financial services designed to evade counterterrorism financing controls.

538. These services included:

- Maintaining nested correspondent accounts that obscured the true origination points of transactions from U.S. regulators;
- Processing structured transactions just below reporting thresholds;
- Facilitating foreign exchange transactions that enabled currency conversion crucial for international operations; and
- Providing trade finance facilities through documentary letters of credit that created a veneer of legitimacy for otherwise illegal transactions.

---

[62] SCB's Gambian subsidiary was also described as the "Principal Banker" for the Gambian operations of Hezbollah's BAC investment vehicle, Tajco (SDGT) according to a publicly available report.

539. In 2000, Bazzi founded Global Trading Group NV as a commodities trading firm based in Antwerp, Belgium.

540. According to The Gambia's 2019 Jammeh Commission findings,[63] Bazzi's Global Trading Group and Euro African Group operated as alter egos, systematically committing procurement fraud, bribery, and money laundering by exploiting their exclusive petroleum supply contract with the Gambian government.

541. Euro African Group operated as the exclusive importer of Heavy Fuel Oil ("HFO") into The Gambia beginning in 2002 under an exclusive license from then-President Jammeh's corrupt regime.

542. Euro African Group's primary shareholder and managing director was Muhammed Bazzi, the company's "principal banker" was SCB–Gambia, and the company was located in the Standard Chartered Bank Building, 2nd Floor, in Banjul, The Gambia. It was listed as an affiliated company of Gam Petroleum Storage Facility Co. Ltd, whose address is also Standard Chartered House Building, 2nd Floor.

543. As The Gambia's HFO importer, Euro African Group received payments in Gambian dalasi from domestic customers, including the National Water and Electricity Company, but needed to purchase HFO—with Global Trading Group acting as broker—from African and European suppliers, with transactions primarily denominated in U.S. dollars as evidenced in shipping documentation and commercial invoices.

---

[63] The Jammeh Commission of Inquiry, established under The Gambia's Constitution to investigate financial misconduct during former President Yahya Jammeh's 22-year authoritarian regime (1994–2017), concluded its work on March 19, 2019, submitting a nine-volume report to The Gambia's democratically elected President. Tasked with forensically examining systemic mismanagement of public funds—such as diverted revenues, inflated contracts, and central bank exploitation—the Commission analyzed bank records, audit reports, and testimony from over 190 witnesses (including Bazzi).

544. This required the systematic conversion of Gambian dalasi into U.S. dollars through foreign exchange transactions that created numerous opportunities for value manipulation and layering.

545. Because the Central Bank of Gambia lacked the technical mechanisms to handle settlement risk inherent in cross-currency transactions, SCB acted in some respects as Gambia's central bank, particularly relating to the interbank foreign exchange market (indeed SCB–Gambia effectively *was* The Gambia's central bank until 1971).

546. SCB–London maintaining a nested U.S. dollar correspondent account for the Central Bank of Gambia (account number ending in 2950). SCB–Gambia and SCB–Dubai simultaneously maintained separate U.S. dollar accounts for Bazzi's Euro African Group (account numbers ending in 6270 and 9770 respectively).

547. This account structure enabled SCB to layer the transactions through New York in a way that obscured from U.S. regulators the relationship between the origin and destination of funds while facilitating the conversion between local currency and U.S. dollars needed for Bazzi's money laundering operations.

548. SCB–Gambia's credit capacity, backed by the strength of SCB's $690 billion global balance sheet, was operationally crucial because it enabled the bank to provide upfront U.S. dollar liquidity, issue documentary letters of credit, and absorb currency conversion risks for Euro African Group while awaiting the settlement of dalasi-denominated payments through the Central Bank of Gambia's manual deferred net settlement payment system.

549. For Bazzi, SCB–Gambia's access to international correspondent banking networks through SCB–New York, SCB–London, and SCB–Dubai and its ability to pre-fund Eurodollar payments were indispensable for his money laundering operations on behalf of Hezbollah and the IRGC.

550. SCB–Gambia's financial capacity was crucial to Euro African Group's and Global Trading Group's ability to engage in large cross border transactions.

551. Euro African Group LTD (itself an SDGT) was controlled and operated by Bazzi, himself designated an SDGT for being a key Hezbollah financier and facilitator.[64]

552. As a prominent Hezbollah BAC operative, Bazzi provided millions of dollars to Hezbollah and worked closely with other Hezbollah financiers like Adham Tabaja (also an SDGT) on oil ventures in Iraq to generate funds for the terrorist group.[65]

553. Euro African Group held exclusive rights to import fuel to The Gambia between 2002 and 2016 and held a fuel supply deal with the country's state-run utility.

554. This dominant market position enabled the company to generate substantial revenues that could be diverted to support Hezbollah.

555. During the Relevant Period, SCB processed, cleared, and settled trade finance, foreign exchange, and payment transactions worth tens of millions of dollars for Bazzi's Euro African Group.

556. SCB–Gambia used its CHIPS Universal Identifier 080917 to facilitate U.S. dollar transactions for Euro African Group through its correspondent relationship with SCB–New York, which acted as its intermediary and direct CHIPS participant.

557. For Euro African Group's foreign exchange transactions, SCB–Dubai relied on specific SWIFTNet FIN message types to document and execute trades.

558. For Euro African Group's foreign exchange spot transactions, SCB–Gambia would transfer the U.S. dollars from Euro African Group's account to the

---

[64] Press Release, *Treasury Targets Key Hizballah Financing Network and Iranian Conduit*, U.S. DEP'T OF TREASURY (May 17, 2018), https://home.treasury.gov/news/press-releases/sm0388.

[65] *See* Press Release, *Treasury Sanctions Hizballah Front Companies and Facilitators in Lebanon and Iraq*, U.S. DEP'T OF TREASURY (Jun. 10, 2015), https://home.treasury.gov/news/press-releases/jl0069; Press Release, *Treasury Targets Sanctions Evasion Conduits for Major Hizballah Financiers*, U.S. DEP'T OF TREASURY (Apr. 24, 2019), https://home.treasury.gov/news/press-releases/sm668.

counterparty's bank via SCB–New York's CHIPS account, while the counterparty bank would use its Eurosystem TARGET2 account for sending the agreed euros to Euro African Group's account.

559. During the Relevant Period, SCB–Dubai maintained a U.S. dollar account (number ending with 9770, group number 990057340) for Euro African Group.

560. SCB–Dubai processed Euro African Group's foreign exchange transactions through this account, including using the branch's U.S. dollar correspondent account at SCB–New York (number 3582088678001) for settling the U.S. dollar leg of each foreign exchange trade in New York.

561. During the eighteen-month period between January 2009 and June 2010 alone, SCB–Dubai processed and settled at least seventy-three foreign exchange transactions for Euro African Group with an aggregate value of $16,659,286.07 U.S. dollars.

562. During the Relevant Period, SCB–Gambia processed, cleared, and settled U.S. dollar funds transfers between Euro African Group's account at SCB–Gambia and Global Trading Group's account, number ending 1241 at KBC Bank NV (Brussels) worth an aggregate value of at least $72.8 million U.S. dollars.

563. In March 2009, the same month that SCB–New York received a $2.2 billion loan from the Federal Reserve Board, SCB–Dubai executed two foreign exchange spot trades for Euro African Group totaling $1,273,138.57 U.S. dollars which were settled by SCB–New York.

564. Separately, SCB–Gambia maintained at least two accounts for Euro African Group: one in U.S. dollars (number ending 2700) and one for Gambian dalasi.

565. To facilitate cross-border payments, SCB–Gambia used its SWIFTNet account (identified by BIC SGBLGMGM) to send and receive FIN payment orders, confirmations, correspondent account statements, and encrypted free-text messages.

566. During the Relevant Period, SCB–Sierra Leone maintained a U.S. dollar account for Bazzi's Ibrahim Bazzi & Sons LTD, identified in its eBBS core banking system by "Bazzi Group," number 990013209.

567. Separately, SCB–Dubai maintained a U.S. dollar account, number 990013209, for Ibrahim Bazzi & Sons.

568. In December 2009, SCB–Dubai processed a foreign exchange transaction for Ibrahim Bazzi & Sons worth $94,426 U.S. dollars.

569. The U.S. dollar portion of this foreign exchange transaction was settled through SCB–New York and CHIPS.

570. SCB–Dubai also maintained a U.S. dollar account ending in 2579, for Prime Bank LTD of Gambia, in order to provide Prime Bank access to New York's financial system through SCB–New York. Prime Bank, the LCB-owned bank that operated as a key Hezbollah money laundering center and Bazzi's personal laundering operation, is discussed above.

**2. The Tajideen Family Network (SDGT)**

571. There were originally eleven siblings, at least nine of whom are or were active in the Tajideen Network in some fashion:

- Kassim Muhammad Tajideen;
- Mahmoud Muhammad Tajideen;
- Hassan Muhammad Tajideen (deceased);
- Ali Muhammad Tajideen;
- Hussein Muhammad Tajideen;
- Fatimah Muhammad Tajideen;
- Youssef Muhammad Tajideen;
- Ibrahim Muhammad Tajideen;
- Ahmad Muhammad Tajideen;
- Jaffar Muhammad Tajideen; and
- Mariam Muhammad Tajideen.

572. The Tajideen brothers Kassim Tajideen, Ali Tajideen, and Hussein Tajideen are Lebanese businessmen who have all been designated SDGTs for their role as Hezbollah fundraisers, money launderers, and financial contributors. Furthermore, the other Tajideen family members listed above, though not (yet) designated SDGTs, play important supporting roles in the Tajideen Network.

573. The eldest brother, Kassim Tajideen, built a global network of food-trading companies and real-estate holdings after he emigrated from Lebanon to Africa in 1976.

574. Initially, he settled in Sierra Leone before setting up shop in Cote d'Ivoire, Angola, and the Democratic Republic of Congo over the next two decades.

575. Together, the Tajideen family controls a vast network of interlocking companies spanning the globe involved in billions of dollars in money laundering and illicit finance on Hezbollah's behalf.

576. The Tajideen family network is a vast commercial and criminal enterprise funded by Hezbollah's BAC, built on a foundation of sizeable bribes to top officials in cooperative jurisdictions.

577. By bribing officials across Africa for decades, Tajideen companies were able to evade import and export tariffs, undercut local competitors' prices, gain monopolies and government contracts, and secure discreet access to airports, landing strips, and ports across central and western Africa.

578. Although likely known to Western intelligence long before the turn of the century, the Tajideens and their business associates first came to the attention of European law enforcement after the September 11, 2001, attacks when these law enforcement agencies were collecting intelligence on radical Islamists, and the Belgian Federal Police placed one particular individual under surveillance.

579. This individual had taken a low-level administrative job at a trading company in Antwerp known as Soafrimex which conducted extensive trade with Africa.

580. Soafrimex was a company registered in Antwerp in 1989 by Kassim Tajideen (listed as residing in Sierra Leone) and Salim Reda (listed as a resident of the Ivory Coast).

581. Soafrimex would (on paper) purchase commodities from companies all over Africa (*e.g.* food, clothing, wood) that belonged to its own network of companies and would transport the goods using its own transport network, principally in Africa.

582. These commodities would then be re-sold (through affiliated companies) and the proceeds (in local currency) would be used to purchase conflict diamonds for further sale and/or money laundering or deposited in "cooperative" banks in Lebanon and then reinvested.

583. In May 2003, as the result of the Soafrimex investigation, Kassim Tajideen and his wife Huda were arrested in Belgium in connection with fraud, money laundering, and diamond smuggling.

584. Belgian police discovered more than a dozen affiliated diamond companies that operated in Africa and received funds transfers through the same money laundering network.

585. Nevertheless, a Belgian judge determined that the Tajideens were not a flight risk and released them on bail.

586. They immediately fled to Beirut, and Kassim Tajideen restructured Soafrimex, folding it into a newly acquired corporate vehicle called Ovlas Trading SA (SDGT).

587. Other reporting also detailed this money laundering network.

588. For example, Partnership Africa Canada ("PAC"), a coalition of Canadian and African NGOs working together on issues of human rights, published its Annual Review of the Diamond Industry in 2004 focusing on the DRC's listing by the UN Development Program as the 167th country on its Human Development Index of 175 countries.

589. PAC's report noted that despite the DRC being one of the largest producers of diamonds in the world, it draws scarce benefits from its natural resources, and attributed the problem to the African government's inability to tax the illegal export of diamonds from the region.

590. Furthermore, PAC's report detailed how this illegal exportation was often conducted by Lebanese nationals involved in money laundering through their "extensive family networks which operate in several economic sectors."

591. PAC specifically cited the "Antwerp company, Soafrimex[, …] run by the Tajideen family," as having been "accused of money laundering," and described how an investigation of the company following its raid by Belgian police in May 2003 was still ongoing.

592. PAC's review further reported that the "Tajideen are connected to one of the largest importers of basic products from the DRC, Congo-Futur."

593. On February 26, 2007, the *Mideast Mirror* published an article titled "Gloomy Assessments" reporting on a recent intelligence briefing given to Israeli Prime Minister Ehud Olmert and the other members of his cabinet.

594. The briefing included a discussion of a media report by the *London Times*, picked up by *The Jerusalem Post*, describing how Hezbollah was expanding its presence into the border of a UN-patrolled peacekeeping zone "with the apparent aim of creating a Shiite-controlled buffer that would allow the organization to avoid being noticed while they build their forces."

595. Hezbollah's expansion was enabled, according to the reports, by "Shiite businessman Ali Tajiddine, a diamond trader with close ties to Hezbollah, who has begun buying large tracts of land from their Christian and Druze owners to serve as Hezbollah's base of operations."

596. The same day, the *Christian Science Monitor* published an article titled "Hezbollah Builds New Line of Defense," reporting that Ali Tajideen's "connections to Hezbollah are widely known locally in south Lebanon."

597. In addition, the *Christian Science Monitor* article stated that one of Tajideen's "relatives was arrested in Antwerp, Belgium, in May 2003 in a case involving diamonds from West Africa and suspected money laundering on behalf of Hezbollah," and that Tajideen was "snapping up vast tracts of land" on the northern border of the UN's peacekeeping zone.

598. Tajideen was making these purchases in cash in whatever amounts the Christian and Druze property holders requested, using funds reportedly transferred by Iran.

599. The *Christian Science Monitor* article also reported that Ali Tajideen's intention in purchasing the land was presumably "to create a Shiite belt spanning the northern bank of the Litani, allowing Hezbollah freedom to operate while severing Christian and Druze districts from each other," since there was no other reason the land would be valuable to Tajideen.

600. The article also confirmed that Hezbollah did not deny that it was replenishing its arms, reporting that three weeks prior, Lebanese customs police detained "a truck filled with rockets and mortars destined for Hezbollah," which was followed by a speech by then-Hezbollah leader Nasrallah in which he admitted that Hezbollah was transporting its weapons to its front lines.

601. Hezbollah's expansion into the UN-patrolled zone, facilitated by Ali Tajideen's all-cash property purchases, was widely reported by the international media, including by:

- *The Australian* of Syndey in an article titled "Hezbollah Land Grab Heralds War" published on February 27, 2007;
- The *Sunday Independent*, an Irish newspaper, in an article titled "Hezbollah in Land Grab as War with Israel Looms" published on August 12, 2007;
- *The Sunday Telegraph* of London, in an article titled "Hezbollah Snaps up Frontier Land to Launch Second War on Israel—UN Helpless as Teheran-backed Militants Take Over Villages in Southern Lebanon" published on August 12, 2007;

- The *Edmonton Journal* of Alberta, Canada, in an article titled "Hezbollah Buying up Real Estate Near Israeli Border; Iranian Money Helping Rebuild War Footing" published on August 12, 2007; and,
- *United Press International* on August 12, 2007, in a website article titled "Hezbollah Buying Land Near Israel."

602. The *Sunday Independent* and *The Sunday Telegraph* articles specifically described how "Mr Tajeddine keeps a Hezbollah charity box in the waiting room of his Tyre office," and is "believed to be a major player in Hezbollah's massive reconstruction programme."

603. In an article titled "Puiul Vulpii, Majorat in Business la 30 de Ani" (Puiul Vulpii, Grown Up in Business at 30 Years Old), published on November 21, 2007, Romania's *Jurnalul National* profiled different foreign companies registered to do business in Romania and reported that Kassim Tajideen had been investigated for money laundering in African countries through his company Soafrimex, describing how Kassim "Tajideen was involved in the exchange of frozen chicken for illegal diamonds, the so-called blood diamonds."

604. The *Jurnalul National* article further reported that Tajideen was also investigated for his role in the assassination of Former President of the Democratic Republic of the Congo Laurent-Désiré Kabila.

605. On May 27, 2009, Kassim Tajideen was designated an SDGT by the U.S. Department of Treasury, which identified him as follows:

> [A]n important financial contributor to Hezbollah who operates a network of businesses in Lebanon and Africa. He has contributed tens of millions of dollars to Hezbollah and has sent funds to Hezbollah through his brother, a Hezbollah commander in Lebanon. In addition, Kassim Tajideen and his brothers run cover companies for Hezbollah in Africa.

606. Kassim Tajideen was later arrested in Morocco in 2017 and extradited to the United States. In December 2018, he pleaded guilty to various OFAC violations and was sentenced to five years in prison before being released during the COVID–19 epidemic on compassionate medical grounds.

607. Kassim Tajideen owns or controls several companies designated as SDGTs, including the following entities:

- **Tajco Company** (LTD; SARL; LLC). On December 9, 2010, Tajco was designated an SDGT. Tajco is a multinational company involved with real estate, international trade, and merchandising based in The Gambia. It manages a series of grocery stores in The Gambia called "Kairaba Shopping Centre" (SDGT), as well as other organizations throughout Lebanon, Sierra Leone, the Democratic Republic of Congo, Angola, and the British Virgin Islands. In 2013, it was reported that the company's name was changed to "Senesco Banjul." The following individuals were involved with the company:
  - Kassim Tajideen was listed as a co-owner and founder of the company;
  - Ali Tajideen was listed as a co-owner and director general of the company;
  - Hassan Ali Tajideen was listed as executive director of the company; and
  - Hussein Tajideen was listed as a co-owner and managing director of the company.
- **Tradex (Sierra Leone)** On December 9, 2010, Tradex was designated an SDGT.
- **Kairaba Supermarket** (a/k/a Kairaba Shopping Center). Kairaba Supermarket is a subsidiary business of SDGT Tajco LTD. Both companies named Hussein Tajideen as the same point

of contact and manager, and both use the same primary business address.[66]

- **Ovlas Trading SA**. Ovlas Trading SA is the parent company of Ovlas Trading SAL (Offshore) and Béton Liban SARL (a/k/a BL SARL). The company deals with general trading and food manufacturing. Ovlas Trading SA was designated an SDGT by the U.S. Department of Treasury on December 9, 2010. Ovlas Trading SA opened a branch in the British Virgin Islands in 2005, shortly after being founded in Lebanon. The following individuals were involved with the company:

    - Kassim Tajideen was listed as the owner of the company, according to the U.S. Department of the Treasury.
    - Hassan Muhammad Tajideen was listed as managing director, authorized signatory and a shareholder according to the U.S. Department of the Treasury.
    - Najmah Hassan Jabir (Hassan's widow) was listed as a shareholder of the company.
    - Nadin Hassan Tajideen (Hassan's and Najmah's daughter) was listed as a shareholder of the company.

- Ovlas Trading SAL (Offshore).

- Afrimex (Offshore) SAL. Established in 2003, the company was owned and controlled by members of the Tajideen family and served as part of the Tajideen Network in Africa on behalf of Hezbollah. It was closely linked to Ayman Joumaa's narcotics trafficking and money laundering network and provided trade-based money laundering service to the Joumaa Network.

- Congo Futur SPRL was established in the Democratic Republic of Congo in 1997 as a subsidiary of Soaframex BV. Officially, the company is controlled by Ahmad Tajideen, but

---

[66] A 2013 OFAC enforcement action demonstrates the way in which the Tajideen Network conducts its illicit money laundering operations between Africa and Lebanon by means of U.S. dollar-clearing in the United States. *See,* OFFICE OF FOREIGN ASSETS CONTROL, HSBC BANK USA N.A. SETTLES POTENTIAL CIVIL LIABILITY FOR APPARENT VIOLATIONS OF THE GLOBAL TERRORISM SANCTIONS REGULATIONS (Dec. 2013), https://ofac.treasury.gov/media/13721/download?inline.

> Kassim Tajideen controls the company and the entire network of subsidiaries and sister companies related to it.

608. Kassim's brothers, Ali and Hussein Tajideen, were also designated SDGTs by the U.S. Department of Treasury on December 9, 2010. Ali Tajideen and Hussein Tajideen were, at all relevant times, business partners of Kassim Tajideen.

609. Both Ali and Hussein Tajideen were among Hezbollah's top financiers in Africa.

610. Hussein Tajideen was a primary Hezbollah fundraiser and prominent Hezbollah supporter in The Gambia.

611. Since at least March 2006, Hussein Tajideen owned 50 percent of Tajco LTD, in Banjul, The Gambia, and served as the managing director of the company.

612. Ali Muhammad Tajideen controlled Tajco Company SAE/SARL, the Lebanese sister company of Tajco in Africa. It was used for many years as Hezbollah's conduit for purchasing land in Lebanon to expand its areas of control and to acquire strategic parcels for political and strategic purposes.[67]

613. Ali Tajideen, through Tajco, also controlled a network of companies in The Gambia, Sierra Leone, the Democratic Republic of Congo, Angola, and the British Virgin Islands.

614. Ali Tajideen's Tajco real estate empire was of strategic importance to Hezbollah because the Tajideen clan is from southern Lebanon and Ali Tajideen's acquisitions were situated in militarily strategic locations south of the Litani river in Lebanon where UN peacekeeping forces have nominally been responsible for preventing Hezbollah from entrenching along the border with Israel.

---

[67] Kassim Tajideen (SDGT) was listed as the co-founder of the company; Ali Tajideen's wife, Nur al-Ain Muhammad Ali Atwi, was listed as one of the partners (owning 20 percent of the shares) in the company; and Hussein Muhammad Tajideen (SDGT) was listed as one of the partners (owning 20 percent of the shares).

615. As the relatively recent discovery of networks of Hezbollah tunnels burrowed under Israeli territory attest, UN peacekeeping forces have—at best—been ineffectual in their stated purpose.

616. By contrast, Ali Tajideen, Jihad al-Bina (the Lebanon-based construction company which was designated an SDGT by the U.S. Department of the Treasury in February 2007 and which was formed and operated by Hezbollah under the IRGC-QF's direction), the IRGC–QF, and Hezbollah's BAC have been highly effective in rebuilding Hezbollah's terror infrastructure south of the Litani river.

617. During the Relevant Period, SCB Gambia maintained both U.S. dollar and Gambian dalasi-denominated bank accounts in its eBBS core banking system for Tajco LTD (Gambia) ("Tajco–Gambia"), identified by SCB group ID number 990057865.

618. Tajco–Gambia was co-owned by three Tajideen brothers: Hussein, Ali, and Kassim, each of whom were designated SDGTs (discussed above).

619. SCB–Gambia processed, cleared, and settled U.S. dollar funds transfers worth over $38.2 million U.S. dollars through SCB–New York using SWIFT, CHIPS, and the FRBNY.

620. Separately, SCB–Dubai maintained a U.S. dollar account for Tajco, number 112409201 (group ID 990057865) in its eBBS core banking system and processed foreign exchange transactions worth an aggregate of at least $2.31 million U.S. dollars during the Relevant Period.

621. SCB–Dubai processed the U.S. dollar foreign exchange settlement leg of these transactions through its correspondent account at SCB–New York (number ending 8001) and its designated CHIPS sub-account, UID number 312988.

622. This settlement process relied on SCB–New York's mandatory daily pre-funding of its master CHIPS account (number 0256) and its continuous provisioning of intraday credit to facilitate timely transaction clearing and settlement.

623. Furthermore, SCB knew that in May 2009 OFAC had designated Kassim Tajideen as an SDGT for contributing "tens of millions of dollars to Hizballah" from his "network of businesses in Lebanon and Africa."[68]

624. Nonetheless, in August 2010, SCB–Dubai processed a foreign exchange transaction for Tajco through its account, number ending 9201, valued at $290,803.56 U.S. dollars.

625. The U.S. dollar portion of this foreign exchange transaction was settled through SCB–New York and CHIPS.

626. During the Relevant Period, Standard Chartered Bank Sierra Leone LTD ("SCB–Sierra Leone") maintained both U.S. dollar and Sierra Leonean leone accounts for Tajco Company LTD (Sierra Leone) ("Tajco–Sierra Leone"), identified in eBBS by SCB group ID 990066849.

627. In December 2010, OFAC designated Tajco and Tajideen's two brothers, Ali Tajideen and Husayn Tajideen ("two of Hizballah's top financiers in Africa"), as SDGTs for providing "millions of dollars in financial support to Hizballah."[69]

**3. Al Zarooni Exchange / Hassan Mohsen Mansour**

628. As described above, consistent with SCB's long-standing policy of facilitating money laundering and terror financing across the globe, SCB's Dubai branch maintained one or more U.S. dollar accounts for, and provided valuable services to, the Dubai-based Al Zarooni Exchange (controlled by Altaf Khanani and his family) during the Relevant Period – part of what the U.S. Department of Treasury describes as a "transnational criminal organization" which "exploits its relationships with financial institutions to funnel billions of dollars across the globe on behalf of terrorists, drug traffickers, and criminal organizations," including "individuals

---

[68] Press Release, *Treasury Targets Hizballah Network in Africa*, U.S. DEP'T OF TREASURY (May 27, 2009), https://home.treasury.gov/news/press-releases/tg149.

[69] Press Release, *Treasury Targets Hizballah Financial Network*, U.S. DEP'T OF TREASURY (Dec. 9, 2010), https://home.treasury.gov/news/press-releases/tg997.

associated with Hezbollah" such as Hassan Mohsen Mansour, "a Hezbollah associate, known to be involved in multi-faceted criminal activity, not simply money laundering and drug trafficking," who was "working directly with established members of Hezbollah" to arrange transport for narcotics to Australia and arrange to move the cash collected back out of Australia for the drug cartels (with Hezbollah getting its commission).

629. To help move the cash out of Australia, Mansour contacted Altaf Khanani whose Al Zarooni Exchange could process currency in Dubai and generate U.S. dollar deposits that would translate into electronic funds transfers through SCB's Dubai branch.

630. The Khanani network laundered billions of dollars annually for criminals, terrorists, and narco-traffickers (including Hezbollah) in significant part by using SCB's Dubai branch to wash cash it obtained through its currency exchange businesses including Al Zarooni Exchange and Mazaka General Trading, LLC.

631. According to the U.S. Department of Treasury, during the Relevant Period (and afterward), Hezbollah and the IRGC used the UAE-based Altaf Khanani money laundering organization ("MLO") and its currency exchange houses, and front-companies based in Dubai, UAE, and Karachi, Pakistan, for processing illicit transactions worth billions of U.S. dollars.[70]

---

[70] *See*, Press Release, *Treasury Sanctions the Khanani Money Laundering Organization*, U.S. DEP'T OF TREASURY (Nov. 12, 2015), https://home.treasury.gov/news/press-releases/jl0265; Press Release, *Treasury Sanctions Individuals and Entities as Members of the Altaf Khanani Money Laundering Organization*, U.S. DEP'T OF TREASURY (Oct. 11, 2016), https://home.treasury.gov/news/press-releases/jl0574.




### 4. Kaloti Jewellery Group / Salor DMCC / Trading Track Company

632. Similarly, SCB's Dubai branch knowingly assisted its customer Kaloti Jewellery Group ("Kaloti"), Dubai's largest gold refinery and retailer, to launder significant sums of money for Hezbollah and other criminal organizations.

633. Kaloti was founded by Munir Al Kaloti in Dubai in 1988 as a small jewelry wholesaler and began buying gold from local markets in 1989.[71]

634. By 2000 it was trading gold bullion, and in 2005 it entered into a partnership with Swiss refiner Valcambi SA to produce customized kilo bars.

635. Kaloti expanded to Hong Kong, Turkey, and Singapore over the next five years and has become Dubai's largest gold refinery and retailer, and one of the largest gold traders and refiners in the world.

---

[71] The Kaloti family of companies included Kaloti Gold Factory LLC (Dubai), Kaloti Laboratory (Muscat), Kaloti Jewellery International DMCC, Kaloti Metals & Logistics LLC (Miami FL), and Kaloti Investment Group Inc (Miami, FL). Kaloti Gold Factory LLC was originally co-founded with the Mdaka family from Lebanon.

636. In an April 12, 2014, press interview in *Middle East Economic Digest* titled "Kaloti Jewellery Group: the Dubai-based refiner's expansion plans reflect faith in gold's long-term prospects," the chairman of the Kaloti Group, Munir Ragheb Al-Kaloti, stated:

> The group trades and hedges hundreds of tonnes of bullion a year via international and local exchanges and some of the world's largest bullion banks such as the UK's Standard Bank and HSBC, Canada-based Bank of Nova Scotia and Switzerland's Credit Suisse.

637. Indeed, by 2007 at the latest, U.S. correspondent banks began filing Suspicious Activity Reports ("SARs") regarding Kaloti transactions due to the volume of its transactions and the high-risk nature and location of its businesses.

638. During the Relevant Period, Kaloti was a customer of Defendant SCB's Dubai branch, and SCB moved large sums of money from Kaloti's accounts at SCB–Dubai to a variety of other high-risk jurisdictions.[72]

639. During the Relevant Period, SCB knew that UAE was a high-risk jurisdiction; Kaloti was involved in a "high-risk business…in jewelry industry, which is known to be a high-risk industry for money laundering"; and many of Kaloti's transactions "were remitted in round dollar amounts" which SCB understood are "a known vehicle for money laundering."[73]

640. Like other banks, SCB–New York did protect *itself* by retroactively filing several SARs after the Relevant Period, once it became aware of U.S. law enforcement's interest in Kaloti, but the bank's UAE operation were *still* assisting Kaloti in 2014.

---

[72] SCB-Geneva was also utilized as part of the Kaloti's money laundering schemes.

[73] Many of Kaloti's transactions were done in cash.

641. A U.S. government investigation into the company commenced in earnest after the U.S. Treasury designated LCB as a "primary money laundering concern" in February 2011, due to its extensive involvement with and support for Hezbollah.

642. DEA investigators had noticed that money sent to some of the used-car companies implicated in the LCB money laundering scheme for Hezbollah appeared to be passing through Kaloti in the UAE, which soon became one of the targets of a new probe, code-named *Operation Honey Badger*.

643. Investigators were especially interested in two Kaloti clients involved in laundering drug money using gold: Salor DMCC, based in Dubai,[74] and a business in Benin called Trading Track Company.

644. Scouring financial records, investigators noticed large wire transfers, sometimes more than once a day, from Kaloti to Salor DMCC, and in the same day, wire transfers from Salor DMCC to used car dealers linked to Hezbollah's BAC through its notorious narcotics kingpin Ayman Joumaa (SDNTK).[75]

645. In the payment details, Kaloti referenced gold trading and Trading Track.

646. Investigators also observed that Kaloti made cash payments worth millions of dollars to suppliers, a major money laundering red flag.

647. For example, Kaloti paid Salor $414 million U.S. dollars *in cash* for gold in 2012, and in that same year, it paid Trading Track $28 million U.S. dollars in cash for gold.

648. As part of their investigation, DEA agents subpoenaed bank records from numerous U.S. banks.

---

[74] Salor DMCC was operated by a Lebanese businessman, Muhammad El Jouzo, affiliated with Hezbollah's BAC.

[75] Hezbollah's BAC used Salor DMCC to convert cash from sales of used cars in Africa to buy gold sold to Kaloti in Dubai and then use the proceeds of the gold sales to further launder Hezbollah's money, often by purchasing additional used cars.

649. As a result, between 2012 and 2013, U.S. banks filed a flurry of Suspicious Activity Reports regarding Kaloti.

650. For example, Deutsche Bank reported that in 2012, Kaloti transferred large sums from its Deutsche Bank accounts to its Emirates NBD bank account in Dubai.

651. Agents for the company then began withdrawing so much cash from Emirates NBD that the money had to be moved in wheelbarrows.

652. Deutsche Bank reported the withdrawals to U.S. authorities the next year, writing that some traders on the London commodities exchange "seemed to be backing away" from Kaloti and that Deutsche Bank planned to do the same.

653. Around the same time, JPMorgan Chase advised that it had suspended commodities trading with Kaloti because the company had "attracted interest" from law enforcement and appeared to be engaging in "high-risk" transactions.

654. SCB's Dubai branch nevertheless continued to maintain its accounts with Kaloti during this time and continued to provide it with access to the global financial system.

655. After 2011, eight different banks, including SCB–New York, flagged thousands of Kaloti transactions, worth $9.3 billion, that occurred between 2007 and 2015.

656. For example, SCB–New York filed a SAR regarding transactions between Kaloti and Dubai-based Bafleh Jewellery that occurred between January 2008 and August 2012, and another SAR on October 17, 2012, reporting 31 transactions worth a total of $74.72 million U.S. dollars between Chennai-based Surana Corporation and Kaloti from October 2009 through December 2011. (These filings followed law enforcement subpoenas signifying that Kaloti was under investigation.)

657. In July 2012, for example, SCB filed another SAR to report nearly $100 million in "suspicious wire transfers." In the span of five months, Asanska Jewellery

LTD received $10.25 million in 10 transactions into accounts at Intercontinental Bank Ghana and Access Bank Ghana from JLM Trading FZE in Dubai.

658. The SAR reported that almost half of the $100 million was sent by Kaloti to JLM Trading during the same period in 2012. According to the SAR, SCB alerted FinCEN to the transactions involving the companies for various reasons, including high-risk jurisdictions, such as the United Arab Emirates, the "high-risk business … in jewelry industry, which is known to be a high-risk industry for money laundering" and because "a number of transactions were remitted in round dollar amounts" which the bank said are "a known vehicle for money laundering."

659. Of course, Kaloti's areas of operation, line of business and transaction structures did not become high-risk in 2012; they were *always* high-risk—as SCB well understood—and there was nothing routine about the volume or nature of Kaloti's business or the transactions SCB's Dubai branch was facilitating.[76]

660. Investigators and auditors later discovered that over 40 percent of Kaloti's business was conducted in cash and that the total amount of Kaloti's cash transactions was over $5.2 *billion* U.S. dollars and that their quantum, had not been reported to the Dubai or United Arab Emirates authorities.

661. Kaloti had also purchased over 57 tons of gold from suppliers in Sudan (including Sudan's central bank) which was both a designated State Sponsor or Terrorism at the time and engaged in a bitter civil war fueled in part by illicit trade in precious minerals, including gold.

662. It also engaged in more than $450 million in cash transactions for Viren Jewellery Limited whose gold sales appeared to have been derived from mines controlled by armed rebels in the Democratic Republic of Congo and over $200

---

[76] In the *2003 National Money Laundering Strategy* report, the U.S. Departments of Treasury and Justice described how "[t]errorist organizations around the world have also used gold and the trade of precious commodities to launder money or transfer value," and explained the multiple reasons that "gold is popular with money launderers."

million in cash transactions with Persian Gold LLC and Golden Commodities General Trading LLC, both of which sourced their gold from Iran.

663. Kaloti also directed $90 million in Eurodollar wire transfers for offshore drug money launderers working for South American clients.

664. In May 2012, SCB submitted an SAR regarding transactions worth $3.9 million U.S. dollars relating to 11 companies, including Ghana-based Vital Insight Investments LTD.

665. According to SCB, on September 28, 2011, and October 6, 2011, Kaloti sent Vital Insight Investments an electronic funds transfer worth $550,000 U.S. dollars with payment details reflecting "Purpose of Payment: Gold Trading B/O Gold Diam Export Ltd."

666. SCB reported in the SAR that Vital Insight is registered in the tax haven of British Virgin Islands but has an "operations office" in Accra (Ghana), and that it "appears to be a potential shell company with no verifiable business purpose."

667. Even after other Western banks were scared off by the reputational and legal risks posed by Kaloti, SCB continued its relationship with Kaloti.

668. SCB's UAE branches understood (as did SCB as a whole) that its operations in that country were hugely profitable because they facilitated money laundering, terror financing, sanctions evasion, and other financial crimes, yet the exposure of its complicity in various criminal schemes (including those linked to terrorism) did not lead SCB either to depart from the UAE market or significantly overhaul its operations there until after the Relevant Period, and even then – after numerous government investigations, criminal penalties and fines – SCB's corporate culture still emphasized cultivating high risk customers as long as the potential for profits justified the risk of getting caught (again).

### E. SCB KNOWINGLY PROVIDED SUBSTANTIAL ASSISTANCE TO THE IRGC

#### 1. MTN–Irancell and TCI

669. During the Relevant Period, Iran had two major telecommunications companies: MTN–Irancell and TCI (Telecommunications Company of Iran). Both were controlled by, and largely owned by, the IRGC.

670. In 2006, Treasury counterterrorism personnel conducted a roadshow throughout Europe and the Middle East where they warned banks—including SCB—against working with Iranian entities, including a specific "Foundation," that were effectively "fully owned by the IRGC." Specifically, "[Stuart] Levey recalled the IRGC's interference with [] major … deals" including "the IRGC's involvement in … [a] deal … [for] Irancell, [controlled by the Foundation and therefore] … fully owned by the IRGC …."

671. IRGC and Hezbollah operatives were embedded throughout Irancell's corporate structure, including its headquarters in Tehran. Indeed, as early as 2008, the E.U. sanctioned Irancell Board of Directors Chairman Ebrahim Mahmudzadeh in recognition of his vital support to IRGC missile-related operations.

672. Senior IRGC operatives' control at every level of Irancell ensured that transactions that aided Irancell directly enabled IRGC-sponsored attacks. From 2005 through 2022, for example, Mohammad Mokhber served as one of Ayatollah Khamenei's closest confidants, and an Irancell official. As Saeed Ghasseminejad of the Foundation for Defense of Democracies explained in 2024, Mohammad Mokhber "came to national notice when he moved to Tehran to join the Mostazafan Foundation, which handles much of Khamenei's business," for which Mokhber "managed the foundation's" affairs when the Foundation "facilitated the creation of Irancell." Notorious IRGC supporter—and proud champion who helped the IRGC operationalize Khamenei's "Resistance Economy" through Irancell—Alireza Dezfouli, similarly, served as Irancell's CEO from 2005 through 2019.

673. U.S. government statements confirmed that Irancell was an IRGC front. In 2006, for example, Stuart Levey—the Treasury Department's top IRGC-facing counterterrorism official—advised companies considering the Middle Eastern telecoms marketplace, that Irancell was "fully owned by the IRGC." The U.S. government's conclusion that Irancell was "fully owned by the IRGC," was widely reported in the media during the Relevant Period, and continuing thereafter.

674. On November 30, 2009, an article in *Newsweek* titled "Iran's Dirty Hands" stated the following regarding the Ahmadinejad regime's privatization of the Telecommunication Company of Iran:

> Last week a special parliamentary commission blasted the government's privatization efforts, which have been riddled with backdoor dealings. One shady transaction was singled out: the recent $7.8 billion sale of the Telecommunication Co. of Iran, which the commission says was essentially handed over to the Revolutionary Guards (or IRGC), *whose only competitor in the bidding process was fictitious*. And this sale was just one sign of the surging economic power of the Guards. (Emphasis added.)

675. U.S. counterterrorism sanctions prevented these strategic companies from acquiring equipment necessary to improve the IRGC's telecommunications infrastructure.

676. On April 5, 2012, the *Mail & Guardian* published an extensive investigation about the IRGC's embedded unit with its own offices at Irancell's Tehran headquarters, where senior Irancell employees—including longstanding Irancell CEO and notorious IRGC sponsor Dezfouli—enthusiastically helped the IRGC wield Irancell data as a weapon to help IRGC terrorists identify, locate, track, target, torture, and murder IRGC enemies.

677. The piece reported:

a. "Sources close to [Irancell] … described an Orwellian environment in [its] Tehran headquarters, where [Irancell] allegedly gave military intelligence [i.e., IRGC] officials 'open' access. … Fifty-one percent [of Irancell] is held by [a] … consortium [that included] … a

subsidiary owned by … Iran Electronics Industries. [IEI] is subject to US and European Union sanctions …. [IEI] also holds a share in [] Arya Hamrah, which owns and runs [] Irancell's data centre that houses [Irancell]'s servers and hardware."

b. "Sources close to [Irancell] … claimed: … [1] Because [] Irancell and its data centre were part-owned by the Iranian military [IRGC], [Irancell] subscriber data was shared 'on a collegial basis' with the intelligence sector; [2] A shadowy 'second floor' in [Irancell]'s [headquarters] building [in Tehran] was populated by [IRGC] intelligence officials ….; [3] During the 2009 and 2010 … protests [in Iran], [IRGC operatives] from the second floor [of Irancell's Tehran headquarters], accompanied by Irancell chief executive Alireza Dezfouli, allegedly approached [Irancell] data warehouse staff regularly to demand detailed records for individuals."

c. "Military intelligence[:] The sources familiar with [Irancell] … said that, because of [the IRGC's role in Irancell's] ownership structure[], Irancell readily gave information about subscribers to intelligence officials [IRGC-IO operatives]. … One of the sources said: 'MTN's data centre in Iran is effectively run by the military and military intelligence [i.e., IRGC]. None of the intelligence organisations needs to go through normal procedures to access [Irancell] subscriber data and track individuals.' Describing the climate at [Irancell's] headquarters [in Tehran], a senior [Irancell] official said it was dominated by the presence of Iran's military intelligence [i.e., IRGC] officials and the 'morality police' [IRGC Basij]."

d. "[An Irancell official] said: 'The people on the second floor are from military intelligence [*i.e.*, IRGC]….' The [Irancell] staffer described how [IRGC operatives] from the second floor would accompany Dezfouli to collect [Irancell customer and network] data on individuals and political dissidents."

678. On December 28, 2012, for example, *Reuters* corroborated the sum and substance of the *Mail & Guardian*'s investigation.

679. Indeed, reports and statements published by the United States, Iranian regime, Iranian opposition, media, terrorism scholars, and NGOs repeatedly linked Iranian telecom to the IRGC. Other examples include Ali Alfoneh, of the American

Enterprise Institute, in October 2007; *APS Diplomatic News Service* in November 2009; *UPI* in November 2009; and the *Guardian* in November 2009.

680. The IRGC, working with China's ZTE Corporation and Huawei (specifically, its Iranian subsidiary Skycom Technology Company LTD), worked out a robust trade finance/money laundering scheme to evade these sanctions.

681. The United States charged ZTE Corporation and Huawei for sanctions violations.

682. In 2017, DOJ announced that ZTE Corporation pleaded guilty and agreed to pay over $430.4 million "for Violating U.S. Sanctions by Sending U.S.-Origin Items to Iran."

683. In 2021, Huawei's CFO admitted its role in this scheme.

684. According to DOJ, "between 2010 and 2014, Huawei caused Skycom to conduct approximately $100 million worth of U.S.-dollar transactions through Financial Institution 1"—that is, SCB—"that cleared through the United States."

685. As part of this scheme, the IRGC set up a front company called Exit40. According to Reuters, Exit40 "was headquartered in Switzerland, with offices in Dubai, Florida, Switzerland and India."

686. A 2012 *Reuters* report indicated that Exit40 played a role in MTN's illegal procurement scheme of U.S. equipment for Irancell.

687. Indeed, SCB was critical to this scheme. As *Reuters* reported in the same article, "Standard Chartered Bank and China's ZTE Corp, have helped Iran undermine increasingly tougher sanctions."

688. During the relevant period, SCB–Dubai maintained a U.S. dollar account for Exit40 FZE, number ending in 5184, and processed millions of dollars' worth of foreign exchange transactions for Exit40, including Eurodollar settlement payments through SCB–New York.

689. During the Relevant Period, SCB–Dubai maintained a U.S. dollar account for ZTE Corporation, number ending in 2801, and processed foreign

exchange transactions worth over $100 million U.S. dollars for ZTE, including Eurodollar settlement payments through SCB–New York.

690. During the Relevant Period, SCB–Dubai maintained a U.S. dollar account for MTN Dubai LTD (including MTN-Irancell), number ending in 0801, and processed foreign exchange transactions worth over $40 million U.S. dollars for MTN Dubai, including Eurodollar settlement payments through SCB–New York.

691. During the Relevant Period, SCB–Dubai maintained a U.S. dollar account for Huawei's Skycom Technology Company LTD, number ending in 5401, and processed foreign exchange transactions worth millions of U.S. dollars for Skycom, including Eurodollar settlement payments through SCB–New York.

692. During the Relevant Period, SCB knew that Skycom was controlled and owned by Huawei and was part of a money laundering scheme to benefit Iran's telecommunications system.

693. On July 30, 2014—years after these stories were first reported—SCB attempted to cover its tracks by filing a SAR against ZTE Corporation (as reported in the "FinCEN Files" stories).

694. SCB had another role in the scheme. In the scheme to win one of two mobile phone licenses in Iran, MTN paid 173.9 million U.S. dollars to Irancell through Bank Melli in 2005. MTN's purpose for this payment, styled as a loan, was to cover the IRGC's purchase (through U.S.-designated, IRGC-controlled, major Iranian defense industry companies) from Irancell of 49% of Irancell shares. MTN purchased 51% of Irancell shares, making Irancell essentially a joint venture between MTN and the IRGC and making Irancell the IRGC's phone company for its terrorist apparatus.

695. From 2006-2011, Irancell—an IRGC-controlled company—made hundreds of millions of dollars in shareholder payments to MTN at its account at SCB-Dubai. Moreover, in 2011, Irancell made repayment on the "loan" to MTN at MTN's account at SCB-Dubai in Euros.

696. SCB knew it was processing payments from an IRGC-controlled entity, critical to the IRGC's operations. Parts of the IRGC-controlled ownership structure of Irancell were designated by the United States during the relevant period (e.g., Iran Electronics Industries, designated in 2008 by the EU and U.S. and owned by MODAFL). It was publicly reported during the Relevant Period that the IRGC controlled Iran's telecommunications companies (i.e., Irancell and TCI). For example, UPI reported in 2009 that the IRGC controlled all of Iran's cellphone companies.

**2. Reza Zarrab's Network of IRGC Entities**

697. Reza Zarrab is an Iranian–Turkish gold trader who admitted to helping Iran evade economic sanctions through a money-laundering scheme that U.S. federal prosecutors say threatened international security.

698. Zarrab was arrested in Miami on March 19, 2016, on charges that he "conspired for years to violate and evade United States sanctions against Iran and Iranian entities."

699. According to prosecutors, Zarrab bribed Turkish government officials and executives at Turkey's Halkbank to allow the IRGC to use proceeds from oil and gas sales to buy billions of dollars in gold. Zarrab later testified that his employees smuggled the gold in suitcases to Dubai, where it was sold.

700. The proceeds from the gold sales were then used by IRGC-controlled companies like NIOC, Naftiran Intertrade Company SARL, and Mahan Air to initiate or benefit from international funds transfers, including Eurodollar funds transfers through the U.S. financial system.

701. Prosecutors recovered letters from Zarrab to then-Iranian President Mahmoud Ahmadinejad and the head of the CBI responding to Ayatollah Khamenei's call for "economic jihad" to beat the crippling international sanctions imposed against Iran with an offer to use his family's business, which he described as having "half a century of experience in foreign exchange."

702. The letter continued: "The Zarrab family… considers it to be our national and moral duty to declare our willingness to participate in any kind of cooperation in order to implement monetary and foreign exchange anti-sanction policies."

703. Adem Karahan, a Turkish national who helped execute Reza Zarrab's money laundering scheme, testified that this was actually a pledge of continued loyalty, as "Ahmadinejad is a good friend of Zarrab's father [Hossein Zarrab]." Zarrab himself confirmed in court that he was able to pitch his services directly to the head of Iran's central bank because "acquaintances of my father" arranged the meeting.

704. Zarrab's scheme ran from at least 2007 through 2016 and involved gold and oil purchases, falsified export records, transactions in multiple currencies, and shell companies in three countries. Much of the proceeds associated with avoiding Iranian sanctions moved through Western banks, including $1.2 billion U.S. dollars through SCB.

705. SCB–New York eventually filed a SAR in 2012 flagging $142 million in "quite unusual and suspicious" transactions involving Dubai-based Gunes General Trading, part of Zarrab's money laundering scheme, but Gunes General Trading's SCB account was still active in 2013, and continued to engage in transactions that were obviously suspect.[77]

706. Three months *after* Zarrab was arrested in 2016, SCB–New York filed several suspicious activity reports detailing a decade of bank transactions involving Zarrab and other entities. These were by all appearances meant to protect SCB, not evidence of SCB learning its customer was money laundering for Iran.

---

[77] Zarrab later testified that he used accounts at SCB in the UAE belonging to a Dubai-based money transfer business Al Rostamani International Exchange to wire millions of dollars of Iranian money through a Zarrab shell company in 2014 and 2015 as well.

707. That October, SCB–New York filed a series of reports as part of another SAR, listing $133 million worth of Eurodollar transactions made by entities tied to Zarrab's network.[78]

708. SCB said it filed those reports "for continued transactional activity related to a multi-jurisdictional investigation of possible money laundering and other offenses related to Reza Zarrab."

709. SARs filed by SCB–New York on entities and individuals tied to Zarrab reported thousands of transactions totaling more than **$5.8 billion** between January 2007 and September 2016—some of it after his criminal activities became public.[79]

710. U.S. prosecutors later identified 1,575 SCB Eurodollar transactions, totaling more than $338.7 million, with Al Nafees Exchange LLC, a UAE-based money services business owned in part by Reza Zarrab's father, Iranian businessman Hossein Zarrab.

711. Al Nafees, which was named in Zarrab's U.S. indictment, made hundreds of millions of dollars in wire transfers to Asia Exchange Centre, a Dubai currency exchange owned by Emirati businessman Ali Omran Salim Al Owais, whose license was revoked by UAE's central bank in 2013 reportedly for regulatory violations.

---

[78] Indeed, Zarrab's criminal activity had become public years before his 2016 arrest in the U.S.; he was arrested in Turkey in December 2013 as part of a widely publicized probe of corruption, gold smuggling, and money laundering. He was released after the investigation was quashed, but a detailed law enforcement investigative report was leaked to the Turkish media in early 2014, as reported in the March 14, 2014, edition of the Turkish paper *Cumhuriyet Gazetesi*, which set out his work for Iran.

[79] Some of those funds constituting millions of dollars flowed through Bella Investments, a front company established by Zarrab in May 2007 that used its SCB account(s) in Dubai involving four Turkish firms registered to Adem Karahan but controlled by Zarrab. Some of that money appears to have involved money laundering for various Russian clients as well.

712. Between January 2007 and April 2012, Al Nafees processed some $3.58 billion in financial transactions for thousands of companies around the world. Much of that money was of dubious origin.

713. In 2010 and early 2011, for example, nearly $170 million was wired to Al Nafees by Kapital Kiymetli Madenler and Pirlanta Kiymetli Madenler. Those Turkish companies were directed by employees of Reza Zarrab who were identified by Turkish authorities as members of his criminal organization.

714. Kapital Kiymetli Madenler was fronted by Adem Karahan, who testified during Zarrab's criminal trial that the firm had "**no commercial activity**" and was used only to facilitate money transfers that ultimately benefited Iran.

715. According to the U.S. Attorney's Office for the Southern District of New York:

> Al Nafees Exchange conducted international U.S. dollar financial transactions on behalf of and for the benefit of Iranian clients, such as Mellat Exchange, that were executed through correspondent accounts held at banks located in the United States; that Al Nafees Exchange conducted international financial transactions in U.S. dollars and foreign currencies for the benefit of and on behalf of Iranian entities, including entities designated as Specially Designated Nationals ("SDNs") by the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"); that Al Nafees Exchange conducted huge volumes of U.S. dollar international financial transfers and currency exchanges; and that Al Nafees Exchange communicated regularly with Zarrab and with Royal Holdings employees concerning international financial transactions, precious metals transactions, and currency transactions.

716. Prosecutors estimated that Zarrab moved at least $20 billion U.S. dollars for the Iran conspiracy from 2010 to 2015 alone, but SCB's UAE branches continued to process transactions for various Zarrab entities at the same SCB–New York, periodically filing SARs identifying money laundering activities.

717. HMEA sent at least $45 million to obscure Turkish and UAE firms that were controlled by Zarrab associates and linked to Dubai companies in Zarrab's money-laundering scheme: Atlantis Capital General Trading, which transferred more than $1 billion to Iranian banks, and Hanedan General Trading, a Dubai-based company owned and operated by Zarrab's brother Mohammad, which moved $250 million through U.S. bank accounts.

718. Following the same pattern as Khanani and Kaloti, as discussed above, SCB knowingly and substantially assisted IRGC-controlled entities (e.g., NIOC, Naftiran Intertrade Company Sarl, and Mahan Air) launder money through Reza Zarrab's network of front companies.

719. As with its other money laundering endeavors, SCB branches and subsidiaries in high-risk jurisdictions profited from what they knew to be obviously illegal financial activities and actively assisted their consummation while SCB–New York was relegated to engaging in damage control, reporting to U.S. regulators whenever a risk of discovery arose and SCB wanted to plausibly deny its knowledge of the criminal schemes in which it was engaged.

### 3. The IRGC's Smuggling of Oil to Chinese Refineries

720. SCB's branches and subsidiaries in Hong Kong, Singapore, and UAE helped CBI launder "stripped" payment orders and process credit transactions worth billions of dollars to NIOC's oil export broker, Naftiran Intertrade Company SARL ("NICO"), that were cleared and settled through New York.

721. Transactions between the Chinese state-owned oil broker Zhuhai Zhenrong and NICO[80] illustrate how the IRGC clandestinely moved oil sale proceeds through the global financial system with Defendants' assistance.

---

[80] In November 2008, OFAC identified NICO, among others, as an entity "owned or controlled by the Government of Iran." *See* Press Release, *OFAC Identifies Entities Owned or Controlled by the Government of Iran*, OFFICE OF FOREIGN ASSETS CONTROL (Nov. 26, 2008), https://home.treasury.gov/news/press-releases/hp1299.

722. During the Relevant Period, SCB–Dubai maintained a U.S. dollar account for NICO front-company FAL Oil Company LTD ("FAL Oil") (a/k/a "FAL Energy Company LTD" or "FAL Group") and processed MT–910 SWIFT credit messages from SCB's New York branch, worth millions of dollars annually, by crediting FAL Oil's U.S. dollar account with payments for NIOC's crude oil shipments via NITC's tankers.

723. For example, in May 2005, SCB–Dubai credited a payment worth $33 million U.S. dollars into FAL Oil's U.S. dollar account, for further credit to NICO and for the ultimate benefit of the IRGC-controlled NIOC.

724. Between January 2, 2008, and January 5, 2012, SCB–Dubai processed 314 foreign exchange transactions for FAL Oil worth a total value of $3,059,171,977.11 U.S. dollars.

725. In 2012, the U.S. Department of State designated Zhuhai Zhenrong for brokering "the delivery of over $500 million in gasoline to Iran between July 2010 and January 2011," and FAL Oil for brokering "over $70 million in refined petroleum to Iran over multiple shipments in late 2010…."[81]

726. In 2019, the U.S. Department of State further designated Zhuhai Zhenrong for purchasing hundreds of millions of dollars in oil from NIOC, noting that the designation was intended to "deny the [Iranian] regime critical income to fund terror around the world, engage in foreign conflicts, and advance its ballistic missile development."[82]

---

[81] *See* Press Release, *Three Companies Sanctioned Under the Amended Iran Sanctions Act*, U.S. DEP'T OF STATE (Jan. 12, 2012), https://2009-2017.state.gov/e/eb/rls/fs/2012/180645.htm.

[82] Press Release, *The United States to Impose Sanctions on Chinese Firm Zhuhai Zhenrong Company Limited for Purchasing Oil from Iran*, U.S. DEP'T OF STATE (Jul. 22, 2019), https://2017-2021.state.gov/the-united-states-to-impose-sanctions-on-chinese-firm-zhuhai-zhenrong-company-limited-for-purchasing-oil-from-iran/.

727. The IRGC also relied on a web of foreign exchange houses in Iran and the UAE, as well as a vast network of front companies in Hong Kong, Singapore, Turkey, and the UAE, to orchestrate the sale of billions of dollars' worth of petrochemicals from Iran-based companies such as the IRGC-affiliated Mehr Petrochemical Company.

728. In March 2023, OFAC described the IRGC's alleged decades-long use of "shadow banking" networks based on foreign exchange houses as a prime example of its various "multi-jurisdictional illicit finance systems."[83]

729. SCB acted as an indispensable component of these shadow banking networks and trade-based money laundering schemes by allowing various brokers and front companies engaged in the "multi-jurisdictional illicit finance systems" to gain entry to the U.S. and global financial system with all its commercial advantages.

## VII. BANK SADERAT PLC KNOWINGLY PROVIDED SUBSTANTIAL ASSISTANCE TO HEZBOLLAH

730. Since the Iranian revolution, Bank Saderat Iran has served as a central part of Iran's terror financing system.

731. From 2002 forward, Defendant Bank Saderat Plc continued Bank Saderat's existing practice of: (1) illegally routing its USD transactions through the United States; and (2) transferring tens of millions of dollars to Hezbollah and other designated terrorist groups.

732. To do so, both banks developed schemes by which Western banks would omit Bank Saderat's (Iran and London) name from U.S. dollar-denominated payment messages in order to circumvent counterterror-financing controls in the United

---

[83] Press Release, *Treasury Targets Sanctions Evasion Network Moving Billions for Iranian Regime*, U.S. DEP'T OF TREASURY (Mar. 9, 2023), https://home.treasury.gov/news/press-releases/jy1330.

States—conduct that several Western banks eventually admitted to in deferred prosecution agreements.

733. As detailed in a January 9, 2009, Deferred Prosecution Agreement entered into by Lloyds TSB Bank Plc ("Lloyds") with U.S. law enforcement, Defendant Bank Saderat Plc directed illegal funds transfers to the U.S. and worked with Lloyds to strip its USD transactions of any reference to Iran or Bank Saderat.

734. In 2003, Lloyds exited its relationship with Bank Saderat Plc, and Credit Suisse assumed Lloyds' role of illegally transferring USD through the United States while stripping references to Bank Saderat Plc and Iran from the transactions (as Credit Suisse admitted in a Deferred Prosecution Agreement it signed in 2009).

735. On February 13, 2004, Defendant SCB opened accounts for Bank Saderat Plc. It also maintained other accounts for Bank Saderat Iran, including an account at SCB, Dubai.

736. During the Relevant Period, from 2004 to 2011, and as described in more detail below, Bank Saderat Plc, working in concert with Standard Chartered Bank, financed the illegal acquisition of various U.S.-origin export-controlled goods on behalf of Mahan Air and various sub-agencies of MODAFL.

737. From at least 1998 to 2005 (and likely thereafter), Bank Saderat Plc worked with SCB to illegally acquire U.S.-manufactured military equipment for Iran.

738. For example, in 2001-2002, Bank Saderat Plc (then IOIB) knowingly sent concealed and illegal payments via SCB's New York branch and JP Morgan Chase, New York, to SCB in Dubai on behalf of a MODAFL subsidiary, the Iran Helicopter Support and Renewal Company ("IHSRC").

739. The payment facilitated IHSRC's acquisition (via a company named Jetpower) of U.S. manufactured helicopter parts through an elaborate money laundering scheme intended to conceal from U.S. authorities: (1) the unlawful acquisition of U.S.-manufactured equipment for Iran's military; (2) the complex

layering of the transaction involving Bank Melli's branches in London and Hong Kong; and (3) Bank Refah and Bank Saderat's involvement with SCB.

740. On September 8, 2006, the U.S. Office of Foreign Assets Control amended § 560.516 of the Iranian Transactions Regulations ("ITRs") and excluded Bank Saderat from the Iranian U-Turn exemption in the Eurodollar payment system.[84]

741. OFAC stated the following regarding Bank Saderat Iran's exclusion:

> OFAC has amended the Iranian Transactions Regulations (ITR) to cut off Bank Saderat, one of Iran's largest government-owned banks, from the U.S. financial system. Bank Saderat has been a significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah….

742. As noted above, according to then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey: "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hezbollah and other terrorist organizations each year. We will no longer allow a bank like Saderat to do business in the American financial system, even indirectly."

743. The Department of Treasury press release announcing the changes to the ITR stated that "a Hezbollah-controlled organization [] has received $50 million directly from Iran through Bank Saderat since 2001."

744. Western banks continued working with Bank Saderat Plc.

---

[84] Alongside its economic sanctions against Iran, the United States government had designed an exception process to permit Iran's circumscribed access to U.S. dollars through a narrowly-tailored exemption to the Iranian Trade Regulations, known as the "U-Turn exemption." The purpose of the U-Turn exemption was to permit Iranian parties indirect access to USD funds, provided that these transactions were fully disclosed to U.S. correspondent banks; were strictly for Iran's legitimate agencies, operations and programs; and were not earmarked for terrorist, WMD proliferation or other proscribed purposes.

745. For example, *The Wall Street Journal* reported on January 10, 2007, that "[i]ntelligence officials say Bank Saderat, a large, state-controlled Iranian bank placed on a U.S. Treasury blacklist in October for allegedly funding terrorism, has been able to process dollar transactions through Commerzbank's New York branch in recent months …."

746. And in an October 9, 2006, email, HSBC–Middle East's Regional Head of Legal and Compliance noted the U.S. government's "direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah" but nonetheless maintained the account(s) thereafter and continued to facilitate transactions for Bank Saderat PLC.

747. Then-Assistant Treasury Secretary for Terrorist Financing Daniel Glaser testified on March 21, 2007, before a Senate Committee that during the prior nine months, senior Treasury officials had "engaged in unprecedented outreach to the international private sector, meeting with more than 40 banks around the world to share information and discuss the risks of doing business with Iran," and emphasized that "Hezbollah uses Saderat to send money to other terrorist organizations as well."

748. In October 2007, Bank Saderat Iran (including Defendant Bank Saderat PLC), was designated an SDGT.

749. The U.S. Department of Treasury's press release regarding Bank Saderat's designation stated the following regarding the bank's material support of Hezbollah:

> Bank Saderat, its branches, and subsidiaries: Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP–GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence.

## VIII. THE IRGC–QF AND HEZBOLLAH COMMITTED ACTS OF INTERNATIONAL TERRORISM AT THE IRGC'S DIRECTION IN WHICH PLAINTIFFS WERE FORESEEABLY INJURED

750. As previously noted, the IRGC helped establish, fund, arm and direct the Lebanese-based Foreign Terrorist Organization Hezbollah.

## IX. THE PLAINTIFFS

### 1. THE MAY 29, 2007 ATTACK – SADR CITY

**The Hancock Family**

751. Jerral Hancock is a citizen of the United States and domiciled in the State of California.

752. On May 29, 2007, Jerral Hancock, then 31, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated under his vehicle.

753. The weapon used to injure Mr. Hancock was an IRGC-manufactured EFP provided to IRGC and Hezbollah-funded and trained terror operatives in Iraq.

754. As a result of the attack, his spinal cord was severed, his left arm was torn off above the shoulder, and he sustained burns on 30% of his body.

755. As a result of the attack, Mr. Hancock suffers from paralysis below his chest and the lasting effects from shrapnel lodged in his spine, and he underwent amputation of his left arm. Due to his injuries, he received a 100% disability rating from the VA.

756. Plaintiff Samantha Hancock is a citizen of the United States and domiciled in the State of California. She is the sister of Jerral Hancock.

757. As a result of the attack, and the injuries Jerral Hancock suffered, Plaintiff Samantha Hancock has experienced severe mental anguish and extreme emotional pain and suffering.

### 2. THE DECEMBER 9, 2007 ATTACK – AZ ZUBAYDIYAH

**The Shaw Family**

758. Micah Shaw was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

759. On December 9, 2007, Micah Shaw, aged 32, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

760. Micah Shaw was killed in the attack.

761. The weapon used to kill Micah Shaw was an IRGC-manufactured EFP provided to IRGC and Hezbollah-funded and trained terror operatives in Iraq.

762. Elena Shaw is a citizen of the United States and domiciled in the State of Washington. She is the widow of Micah Shaw.

763. Elena Shaw brings this action on behalf of the Estate of Micah Shaw, as its legal representative.

764. As a result of the December 9, 2007, attack, Micah Shaw experienced conscious pain and suffering before his death. The Plaintiff Estate of Micah Shaw is entitled to recover economic and non-economic damages from Defendants.

### 3. THE APRIL 21, 2008 ATTACK – SADR CITY

#### The Rosa-Valentin Family

765. Luis Rosa-Valentin is a citizen of the United States and domiciled in the State of Maryland.

766. On April 21, 2008, Luis Rosa-Valentin, then 24, was serving in the U.S. military in Iraq.

767. Mr. Rosa-Valentin was on foot patrol in the Al Amin neighborhood of Baghdad when he was struck by an EFP emplaced by Special Groups.

768. The weapon used to injure Mr. Rosa-Valentin was an IRGC-manufactured EFP provided to IRGC and Hezbollah-funded and trained terror operatives in Iraq.

769. As a result of the attack, Mr. Rosa-Valentin lost both of his legs and his left arm. He also suffered blindness in one eye, lost his hearing, and broke every bone

in his face.

770. He has also been diagnosed with a TBI and PTSD.

771. Plaintiff Luis Rosa-Alberty is a citizen of the United States and domiciled in Puerto Rico. He is the father of Luis Rosa-Valentin.

772. Plaintiff Alex Rosa-Valentin is a citizen of the United States and domiciled in the State of Florida. He is the brother of Luis Rosa-Valentin.

773. As a result of the attack, and the injuries suffered by Luis Rosa-Valentin, Plaintiffs Luis Rosa-Alberty and Alex Rosa-Valentin have experienced severe mental anguish and extreme emotional pain and suffering.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## CIVIL LIABILITY FOR AIDING AND ABETTING IN VIOLATION OF 18 U.S.C. § 2333(d)(2) (JASTA) AGAINST STANDARD CHARTERED BANK FOR KNOWINGLY PROVIDING SUBSTANTIAL ASSISTANCE TO HEZBOLLAH

774. Plaintiffs repeat and re-allege each and every allegation of the paragraphs in Sections III, IV, V(A)-(F), VI(A)-(D), and VIII as if fully set forth herein.

775. Each attack alleged herein was an act of international terrorism as defined by 18 U.S.C. § 2331(1).

776. Hezbollah was designated as a Foreign Terrorist Organization on October 8, 1997, and was so designated as of the date each attack alleged herein was committed.

777. The IRGC and Hezbollah together with their Iraqi agents and proxies, including the Special Groups, committed, planned and authorized each attack alleged herein.

778. The IRGC and Hezbollah provided the Hezbollah-designed EFPs, IRAMs, and other explosive devices used in the attacks against Coalition Forces that injured Plaintiffs and killed their decedents.

779. The IRGC and Hezbollah funded, trained, equipped, guided, directed and controlled the cells and individuals who emplaced and activated the EFPs, IRAMs and other explosive devices and/or, shot, kidnapped and/or tortured Plaintiffs and/or their decedents.

780. SCB aided and abetted Hezbollah in the commission of its acts of terrorism by knowingly and systemically providing it (and its agents acting in concert with it and at its direction) with tens of millions of dollars and access to the global financial system, including during the Relevant Period.

781. Indeed, SCB did so pervasively and systemically over the course of many years.

782. SCB was generally aware of its role in the overall illegal activity of providing tens of millions of dollars to Hezbollah.

783. SCB was generally aware of its role in funding Hezbollah.

784. SCB was generally aware that the IRGC and Hezbollah were committing terrorist attacks against Americans in Iraq.

785. SCB knew that Hezbollah was not only an FTO, but among the most dangerous terrorist groups in the world, and that providing illegal access to the U.S. financial system would foreseeably aid Hezbollah in committing acts of international terrorism, including terrorism in Iraq.

786. SCB aided and abetted Hezbollah in its commission of the acts of international terrorism that injured Plaintiffs, by culpably and consciously providing substantial and vital assistance to Hezbollah and its IJO during the Relevant Period and transferring significant sums of money through the U.S. financial system for its benefit.

787. Hezbollah and its IJO depended on SCB to move vast amounts of money from its worldwide operations, including money laundering involving narcotics, gold and conflict diamonds.

788. SCB understood its role in helping fuel Hezbollah's illicit activities, was generally aware that by providing substantial assistance to Hezbollah it was aiding and abetting Hezbollah's terrorist and criminal activities, including terrorist attacks, and nonetheless continually assisted Hezbollah in its efforts.

789. SCB provided assistance to customers that belonged to Hezbollah's BAC that were closely intertwined with Hezbollah's violent activities, including the exchange houses and gold traders Hezbollah used to collect cash it generated from its worldwide criminal operations (including narcotics and weapons trafficking), and other components of its global money laundering scheme.

790. SCB provided substantial assistance to Hezbollah for at least several years.

791. SCB's assistance was therefore deliberate and long-term, not a passing fancy or impetuous act.

792. The specific attacks alleged herein were all committed by Hezbollah and the IRGC through their Iraqi proxy groups.

793. The acts committed jointly by the IRGC and Hezbollah that injured Plaintiffs were acts of international terrorism within the meaning of 18 U.S.C. § 2331, involving violent acts intended to influence the United States by coercion (by coercing the withdrawal of Coalition Forces from Iraq) and to intimidate and coerce the Iraqi population, and were also acts constituting terrorist activities within the meaning of 8 U.S.C. § 1182(a)(3)(B)(iii)–(iv), and/or engaging in terrorism within the meaning of 22 U.S.C. § 2656f.

794. The acts of international terrorism at issue were foreseeable consequences of providing Hezbollah with tens of millions of dollars.

795. Plaintiffs' injuries were proximately caused by Hezbollah's acts of international terrorism.

## SECOND CLAIM FOR RELIEF

## CIVIL LIABILITY FOR AIDING AND ABETTING IN VIOLATION OF 18 U.S.C. § 2333(d)(2) (JASTA) AGAINST STANDARD CHARTERED BANK FOR KNOWINGLY PROVIDING SUBSTANTIAL ASSISTANCE TO THE IRGC

796. Plaintiffs repeat and re-allege each and every allegation of the paragraphs in Sections III, IV, V(A)-(B) and (D)-(F), VI(A)-(C) and (E), and VIII as if fully set forth herein.

797. Each attack alleged herein was an act of international terrorism as defined by 18 U.S.C. § 2331(1).

798. Hezbollah was designated as a Foreign Terrorist Organization on October 8, 1997, and was so designated as of the date each attack alleged herein was committed.

799. The IRGC was designated as a Foreign Terrorist Organization on April 15, 2019, in part for "engag[ing] in terrorist activity since its inception 40 years ago," its "support for terrorism [that] is foundational and institutional," and its killing of U.S. citizens, including many in the attacks at issue.

800. The IRGC and Hezbollah together with their Iraqi agents and proxies, including the Special Groups, committed, planned and authorized each attack alleged herein.

801. The IRGC and Hezbollah provided the Hezbollah-designed EFPs, IRAMs, and other explosive devices used in the attacks against Coalition Forces that injured Plaintiffs and/or killed their decedents.

802. The IRGC and Hezbollah funded, trained, equipped, guided, directed and controlled the cells and individuals who emplaced and activated the EFPs, IRAMs and other explosive devices and/or, shot, kidnapped and/or tortured Plaintiffs and their

decedents.

803. SCB aided and abetted the IRGC in the commission of its acts of terrorism by knowingly and systemically providing tens of millions of dollars to it (and its agents and proxies acting in concert with it and at its direction), including during the Relevant Period.

804. Indeed, SCB did so pervasively and systemically over the course of many years.

805. SCB was generally aware of its role in the overall illegal activity of providing tens of millions of dollars to the IRGC and laundering at least tens of millions of dollars at the IRGC's direction.

806. SCB was generally aware of its role in funding the IRGC.

807. SCB was generally aware that the IRGC and Hezbollah were committing terrorist attacks against Americans in Iraq.

808. SCB provided substantial assistance to the IRGC for at least several years.

809. SCB's assistance was therefore deliberate and long-term, not a passing fancy or impetuous act.

810. The specific attacks alleged herein were all committed by Hezbollah and the IRGC through their Iraqi proxy groups.

811. The acts committed jointly by the IRGC and Hezbollah that injured Plaintiffs were acts of international terrorism within the meaning of 18 U.S.C. § 2331, involving violent acts intended to influence the United States by coercion (by coercing the withdrawal of Coalition Forces from Iraq) and to intimidate and coerce the Iraqi population, and were also acts constituting terrorist activities within the meaning of 8 U.S.C. § 1182(a)(3)(B)(iii)–(iv), and/or engaging in terrorism within the meaning of 22 U.S.C. § 2656f.

812. The acts of international terrorism at issue were foreseeable consequences of providing the IRGC with tens of millions of dollars.

813. Plaintiffs' injuries were proximately caused by the IRGC's and Hezbollah's acts of international terrorism.

## THIRD CLAIM FOR RELIEF

## CIVIL LIABILITY FOR AIDING AND ABETTING IN VIOLATION OF 18 U.S.C. § 2333(d)(2) (JASTA) AGAINST BANK SADERAT PLC FOR KNOWINGLY PROVIDING SUBSTANTIAL ASSISTANCE TO HEZBOLLAH AND THE IRGC

814. Plaintiffs repeat and re-allege each and every allegation of the paragraphs in Sections III, IV, V, VII and VIII as if fully set forth herein.

815. Each attack alleged herein was an act of international terrorism as defined by 18 U.S.C. § 2331(1).

816. Hezbollah was designated as a Foreign Terrorist Organization on October 8, 1997, and was so designated as of the date each attack alleged herein was committed.

817. The IRGC and Hezbollah together with their Iraqi agents and proxies, including the Special Groups, committed, planned and authorized each attack alleged herein.

818. The IRGC and Hezbollah provided the Hezbollah-designed EFPs, IRAMs, and other explosive devices used in the attacks against Coalition Forces that injured Plaintiffs and killed their decedents.

819. The IRGC and Hezbollah funded, trained, equipped, guided, directed and controlled the cells and individuals who emplaced and activated the EFPs, IRAMs and other explosive devices and/or, shot, kidnapped and/or tortured Plaintiffs and/or their decedents.

820. Bank Saderat Plc aided and abetted Hezbollah in the commission of its acts of terrorism by knowingly and systemically providing tens of millions of dollars to Hezbollah through its agents, including during the Relevant Period.

821. Indeed, Bank Saderat Plc did so pervasively and systemically over the course of many years.

822. Bank Saderat Plc was generally aware of its role in the overall illegal activity of providing tens of millions of dollars to Hezbollah.

823. Bank Saderat Plc was generally aware of its role in funding Hezbollah.

824. Bank Saderat Plc was generally aware that the IRGC and Hezbollah were committing terrorist attacks against Americans in Iraq.

825. Bank Saderat Plc knew that Hezbollah was not only an FTO, but among the most dangerous terrorist groups in the world, and that providing illegal access to the U.S. financial system would foreseeably aid Hezbollah in committing acts of international terrorism, including terrorism in Iraq.

826. Bank Saderat Plc aided and abetted Hezbollah in its commission of the acts of international terrorism that injured Plaintiffs, by culpably and consciously providing substantial and vital assistance to Hezbollah and its IJO during the Relevant Period and transferring significant sums of money through the U.S. financial system for its benefit.

827. Hezbollah and its IJO depended on Defendants to move vast amounts of money from its worldwide operations, including money laundering involving narcotics, gold and conflict diamonds.

828. Bank Saderat Plc understood its role in helping fuel Hezbollah's illicit activities, was generally aware that by providing substantial assistance to Hezbollah it was aiding and abetting Hezbollah's terrorist and criminal activities, including terrorist attacks, and nonetheless continually assisted Hezbollah in its efforts.

829. Bank Saderat Plc provided substantial assistance to Hezbollah for at least several years.

830. Bank Saderat Plc's assistance was therefore deliberate and long-term, not a passing fancy or impetuous act.

831. The specific attacks alleged herein were all committed by Hezbollah and the IRGC through their Iraqi proxy groups.

832. The acts committed jointly by the IRGC and Hezbollah that injured Plaintiffs were acts of international terrorism within the meaning of 18 U.S.C. § 2331, involving violent acts intended to influence the United States by coercion (by coercing the withdrawal of Coalition Forces from Iraq) and to intimidate and coerce the Iraqi population, and were also acts constituting terrorist activities within the meaning of 8 U.S.C. § 1182(a)(3)(B)(iii)–(iv), and/or engaging in terrorism within the meaning of 22 U.S.C. § 2656f.

833. The acts of international terrorism at issue were foreseeable consequences of providing Hezbollah and the IRGC with tens of millions of dollars.

834. Plaintiffs' injuries were proximately caused by the IRGC's and Hezbollah's acts of international terrorism.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a) Accept jurisdiction over this action;

(b) Enter judgment against Defendants and in favor of Plaintiffs for compensatory damages in amounts to be determined at trial;

(c) Enter judgment against Defendants and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333(a);

(d) Enter judgment against Defendants and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

(e) Enter an Order declaring that Defendants have violated the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.*; and

(f) Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: September 28, 2026

By /s/ Emilio A. Cazares

**TURNER & ASSOCIATES, P.A.**
1001 B Ave. Suite 308
Coronado, CA 92118
Office: (619) 537-0007

Emilio A. Cazares; SBN 324810
Cassie N. Holloway; SBN 328284
C. Tab Turner (motion for admission pro hac vice forthcoming)
Email: emilio@tturner.com
Email: Cassie@tturner.com
Email: tab@tturner.com

**OSEN LLC**
Michael J. Radine (motion for admission pro hac vice forthcoming)
Dina Gielchinsky (motion for admission pro hac vice forthcoming)
190 Moore Street, Suite 272
Hackensack, NJ 07601
(201) 265-6400

44 South Broadway
White Plains, New York 10601
Telephone: (212) 354-0111

**MOTLEY RICE LLC**
John Eubanks (motion for admission pro hac vice forthcoming)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9218

Attorneys for Plaintiffs